IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| MILLER AUTO PARTS & SUPPLY | ) | PROPOSED |
| COMPANY, INC., et al., | ) | Jointly Administered Under |
| | ) | CASE NO. 14-68113-mgd |
| Debtors. | ) | |

**DEBTORS' MOTION FOR AN INTERIM ORDER (I) AUTHORIZING
(A) SECURED POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105,
361, 362, AND 364(c) AND (d); (B) GRANTING SECURITY INTERESTS,
SUPERPRIORITY CLAIMS, AND ADEQUATE PROTECTION AND
(C) USE OF CASH COLLATERAL AND (II) SCHEDULING A FINAL
HEARING; AND MEMORANDUM OF POINTS AND AUTHORITIES**

Miller Auto Parts & Supply Company, Inc. ("Miller Auto"), Johnson Industries, Inc. ("Johnson Industries"), Miller Auto Parts & Paint Company, Inc. ("Miller Paint"), and AutoPartsTomorrow.com, LLC ("APT"),[1] debtors and debtors-in-possession herein (collectively, the "Debtors") hereby move this Court, pursuant to Sections 105, 361, 362, 363 and 364 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* as amended (the "Bankruptcy Code"), and Rules 2002, 4001(b), (c), and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of interim and final orders (A) authorizing the Debtors to obtain post-petition financing (the "Post-Petition Financing") from its pre-petition senior secured lender FCC, LLC d/b/a First Capital ("First Capital", and in First Capital's capacity as the Post-Petition Financing lender, sometimes referred to as the "DIP

---

[1] The Debtors have requested joint administration of their cases. In contemplation of joint administration, the Debtors are filing all first day motions (other than the joint administration motion) solely in the main case styled above.

Lender"), (B) authorizing the Debtors to use Cash Collateral,[2] (C) granting adequate protection to the Adequate Protection Parties, (D) modifying the automatic stay, and (E) scheduling a final hearing pursuant to Rules 4001(b) and 4001(c) of the Bankruptcy Rules. In support of this Motion (the "DIP Motion"), the Debtors respectfully represent as follows:

### I. BANKRUPTCY RULE 4001 STATEMENT OF RELIEF REQUESTED

A. **Summary of Material Terms of DIP Facility**

1. **General Overview**

As of the Petition Date, the Debtors were indebted to First Capital in the approximate amount of $12,995,703, inclusive of $2,500,000 in reimbursement obligations for undrawn letters of credit, and contract interest, default interest and charges, and certain fees and charges, under one or more of the following (collectively, the "Pre-Petition First Capital Loan Documents"): (a) Loan and Security Agreement dated as of 8/13/13 (the "Loan and Security Agreement"); (b) Intellectual Property Security Agreement dated as of 8/13/13 (the "Intellectual Property Security Agreement"); (c) Equity Interest Pledge dated as of 8/13/13 (the "Equity Pledge"); (d) Negative Pledge Agreement dated as of 8/13/13; (e) Deposit Account Control Agreement (Hard Account Agreement) dated as of 8/13/13; (f) Deposit Account Control Agreement (Springing Agreement) dated as of 8/13/13; and (g) Irrevocable Proxies dated as of 8/13/13. Copies of the Pre-Petition First Capital Loan Documents are attached, respectively, as **Exhibits B - H** to the DIP Motion. The terms of the Pre-Petition First Capital Loan Documents, together with the Interim Order and any Final Order entered by the Court with respect to the DIP Motion, will govern the proposed post-petition financing arrangement (the "DIP Facility").

2. **Material Terms**

a. **Summary of Rates, Fees and Charges for DIP Facility:** Interest rates, fees, and charges will be the same as under the relevant Pre-Petition First Capital Loan Documents. The Debtor will pay interest on the Indebtedness at a rate equal to the sum of LIBOR (as published in WSJ) plus 4%, calculated on a 360 day per year basis, payable monthly in arrears. (Loan and Security Agreement, Sect. 3(a); Interim Order, Par. 5). Upon an event of default under the DIP Loan Documents, the Debtor will pay interest on the Indebtedness at a rate equal to the sum of LIBOR (as published in WSJ) plus 7%, calculated on a 360 day per year basis, payable monthly in arrears. (Loan and Security Agreement, Sect. 3(c); Interim Order, Par. 5). The only additional fee is a one-time DIP facility loan origination fee of $45,000, which shall be fully earned upon entry of the Final Order. (Interim Order, Par.5). The Debtors shall also pay all of First Capital's

---

[2] Except as otherwise defined herein, capitalized terms used in this Motion shall have the meanings ascribed to them in the Interim Order, a copy of which is attached hereto as **Exhibit A**.

2

and DIP Lender's fees and expenses relating to the Pre-Petition First Capital Loan Documents and the DIP Loan Documents, including without limitation, those incurred in connection with he Bankruptcy Cases. (Loan and Security Agreement, Sects. 10(b), 13(b)(ix), 15(i), Interim Order, Para. 5).  Other fees and charges under the Pre-Petition First Capital Loan Documents are set forth in Item 10 of the Schedule to the Loan and Security Agreement, which is attached hereto as **Exhibit I**.

b. **Maturity Date**:  The DIP Facility shall mature on the occurrence of a Termination Event, as set forth in Paragraph 6 of the Interim Order.

c. **Events of Default**:  Any Breach by Debtors of Interim Order or the Final Order; Any breach of covenants under the Pre-Petition First Capital Loan Documents (other than ipso facto provisions) (Interim Order, Pars. 6 and 19).

d. **Liens**:  All currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, (excluding, pending the Final Order, Avoidance Actions) (the "DIP Facility Collateral"), subject only to, in the event of the termination of the DIP Facility, the payment of the Carve Out. (Interim Order, Par. 7).

e. **Borrowing Limits**:  Based on the limits in the Loan and Security Agreement, including the definition of borrowing base in the Loan and Security Agreement and as modified by Schedule 4 to the Interim Order, and the limits set forth in the Approved Budget attached to the Interim Order.  The maximum loan limit under the DIP Facility is $18,000,000.  (Interim Order, Pars. 2 and 3; Loan and Security Agreement, Pars. 1 and 2 and Schedule).

f. **Borrowing Conditions**:  Entry of Interim Order and Final Order acceptable to DIP Lender, and compliance with orders and DIP Loan Documents by Debtors.  Debtor must have availability under borrowing base, as that term is defined in the Loan and Security Agreement, as modified by Schedule 4 to the Interim Order (Interim Order, Pars. 2, 3,6, and 17;  Loan and Security Agreement, Par. 2 and Schedule).

3**. Summary and Identification of Additional Required Provisions**

a. **Liens under § 364(c) or (d)**:  As security for the DIP Indebtedness, the DIP Lender is granted the following security and liens in the DIP Facility Collateral, subject only to the liens of GM in the Post-Trigger GM Inventory and, in the event of the termination of the DIP Facility, the payment of the Carve Out:

(1) Pursuant to Section 364(c) (2) of the Bankruptcy Code, a perfected first priority senior security interest in and lien upon all pre-and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, as of the Petition Date, is not subject to valid, perfected and non-avoidable liens;

(2) Pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected security interest in and lien upon all pre-and post-petition property of the Debtors, whether now existing or hereinafter acquired, that is subject to valid, perfected and unavoidable liens in existence as of the Petition

3

Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, immediately junior in priority to such valid, perfected and unavoidable liens;

(3)    Pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien on all of the DIP Facility Collateral, including the Pre-Petition Collateral, which shall be senior to all other security interests and liens in the Debtors' property; and

(4)    In addition, other than with respect to the liens of GM in the Post-Trigger GM Inventory or except to the extent otherwise expressly set forth in the Interim Order or in a written instrument, agreement or other document executed by the DIP Lender, neither the Pre-Petition Liens nor the DIP Facility Liens shall be subject to subordination to any other liens, security interests or claims under Section 510 of the Bankruptcy Code or otherwise. (Interim Order, Par.7).

b.    **Adequate Protection for Pre-Petition Claims**:    (1) As adequate protection of First Capital's interests in the Pre-Petition Collateral, including use of the Cash Collateral, pursuant to §§ 361, 363 and 552(b) of the Bankruptcy Code, First Capital is hereby granted valid, binding, enforceable and perfected additional and replacement liens (the "First Capital Senior Adequate Protection Liens") in all property of the Debtors' estates (excluding, pending the Final Order, the Avoidance Actions). The First Capital Senior Adequate Protection Liens shall enjoy the same validity and extent as the liens First Capital held on the Petition Date. The First Capital Senior Adequate Protection Liens are (a) subject only to (i) GM's liens in the Post-Trigger GM Inventory; (ii) the Carve-Out; and (iii) the DIP Facility Liens.  (Interim Order , Par.8 (a)).

(2)    As adequate protection of the secured interests asserted by GM, Ford, the Pre-Petition Non-Seller Subordinated Note Holders, and the Pre-Petition Seller Subordinated Secured Debt Holders (collectively, the "Subordinated Secured Debt Holders"), including use of the Cash Collateral of the Subordinated Secured Debt Holders, the Subordinated Secured Debt Holders are hereby granted valid, binding, enforceable and perfected additional and replacement liens (the "Subordinated Adequate Protection Liens"; collectively, with the First Capital Senior Adequate Protection Liens, the "Adequate Protection Liens") in all property of the Debtors' estates (excluding Avoidance Actions). With respect to such collateral, the Subordinated Adequate Protection Liens shall enjoy the same validity and extent as the liens the Subordinated Secured Debt Holders held against such collateral on the Petition Date. The Subordinated Adequate Protection Liens are subject and subordinate only to (i) the DIP Facility Liens of DIP Lender; (ii) the Pre-Petition Liens of First Capital; (iii) the Senior Adequate Protection Liens of First Capital; (iv) the Carve-Out; and (v) the liens of GM in the Post-Trigger GM Inventory. (Interim Order, Par.8(b)).

(3)    If, notwithstanding the provision of the First Capital Senior Adequate Protection Liens, such First Capital Senior Adequate Protection Liens do not provide adequate protection of First Capital's valid, enforceable and unavoidable interests in the Pre-Petition Collateral, First Capital shall (i) have a claim allowed under § 507(a)(2) of the Bankruptcy Code (the "507(b) Claim"), and, except with respect to being subordinated to the Carve Out, such 507(b) Claim shall be entitled to priority over every other claim allowable under such § 507(a)(2); and (ii)

4

notwithstanding anything herein to the contrary, be entitled to seek further adequate protection of their interests and such further relief as is consistent therewith.  (Interim Order , Par.9).

c. **Validity of Pre-Petition Claims and Liens**:  In Paragraph J of the Interim Order, the Debtors permanently, immediately, and irrevocably acknowledge, represent, stipulate, and agree as to the amount and validity of their indebtedness in favor of DIP Lender, as well as the validity and first priority status of liens in substantially all assets of the Debtors securing said indebtedness.  Said acknowledgements become findings of the Court, subject to the challenge rights granted in favor of the Committee (or if no Committee is appointed, any creditor or party in interest) under Paragraph 24 of the Interim Order. (Interim Order, Para. J).

d. **Superpriority Claims**:  Subject to the Carve-Out described in paragraph 15 of the Interim Order, all of the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, (Interim Order, Para. 10).

e. **Application of Proceeds**:   (1)   Proceeds or payments received by First Capital and/or DIP Lender with respect to the Pre-Petition Collateral and DIP Facility Collateral (defined below) shall be applied as follows: (x) first, to Pre-Petition Indebtedness consisting of accrued and accruing interest, fees, costs and expenses; (y) next, to Pre-Petition Indebtedness consisting of principal; and (z) last, to the outstanding balance of the DIP Facility, first to all accrued and accruing interest, fees, costs and expenses, and then to principal. (Interim Order, Para. 4(a)).

f. **Waiver of Automatic Stay**:  (1) Except as otherwise provided in the Interim Order, the automatic stay pursuant to § 362 of the Bankruptcy Code is vacated as to First Capital and DIP Lender to permit them to perform in accordance with, and exercise, enjoy and enforce their rights, benefits, privileges and remedies pursuant to the DIP Loan Documents without further application or motion to, or order from, the Court, and regardless of any change in circumstances.  (Interim Order, Par.14 (a)). The automatic stay under § 362(a) of the Bankruptcy Code is to be modified to the extent necessary to permit DIP Lender to retrieve, collect and apply payments and proceeds in respect of the Pre-Petition Collateral and the DIP Facility Collateral in accordance with the terms and provisions of the Interim Order, the DIP Loan Documents and the other Post-Petition Financing Documents.  (Interim Order, Par. 14(b))

(2)   Upon the occurrence of a Termination Event and five (5) Business Days after First Capital  or DIP Lender has filed with the Bankruptcy Court, and served by hand delivery, facsimile or overnight mail on counsel to the Debtors, the Committee (if any) and the Office of the United States Trustee, an affidavit identifying any act which gave rise to the occurrence of a Termination Event, the automatic stay under § 362 of the Bankruptcy Code shall be deemed vacated and modified with respect to First Capital and the DIP Lender for the purpose of exercising all of their rights and remedies; provided that the Debtors, the Committee (if any), and/or the United States Trustee have not obtained an order of the Bankruptcy Court reimposing the automatic stay within such five day notice period. (Interim Order, Par.14 (b)).

g. **Waivers of Plan and Cash Collateral Rights**:  The Debtors waive their right to seek further financing, seek authority to use cash collateral or file a plan without payment in full of

5

their indebtedness to the DIP Lender unless DIP Lender otherwise consents. (Interim Order, Par. 12).

h. **Waiver of State Law Perfection Requirements**: The DIP Facility Liens and the Senior and Subordinated Adequate Protection Liens are deemed duly perfected and recorded under all applicable federal or state or other laws as of the date of the Interim Order. (Interim Order Par. 11).

i. **Waiver of Claims Against DIP Lender**: Under Paragraphs J and 22 of the Interim Order, the Debtors waive and release any and all claims and causes of action against DIP Lender, subject to the Committee's challenge rights under Paragraph 24 of the Interim Order (or if no Committee is appointed, any creditor or party in interest). (Interim Order, Pars. J and 22).

j. **Waiver of Certain Rights**: The Debtors waive, among other things, the right to: (i) grant liens on or security interests in any DIP Facility Collateral, which are pari passu with or senior to the DIP Facility Liens or the First Capital Senior Adequate Protection Liens; (ii) seek non-consensual use of Cash Collateral under § 363 of the Bankruptcy Code; (iii) propose a plan of reorganization or liquidation, or seek an extension of the exclusive right to file a plan or solicit acceptances with respect to any plan of reorganization or liquidation without First Capital's or DIP Lender's written consent; or (iv) propose a sale of their assets unless certain conditions are met . (Interim Order, Paras. 12, 13).

k. **Indemnification**: Under Paragraph 14 of the Loan and Security Agreement, DIP Lender and its directors, officers, employees, affiliates, representatives, attorneys and agents, are indemnified by the Debtors for all liabilities relating to the Pre-Petition First Capital Loan Documents or the extension of credit, other than resulting from the gross negligence or willful misconduct of the indemnified party. (Loan and Security Agreement, Para. 14).

l. **Waiver of Surcharge Right**: Under Paragraph 12 of the Interim Order, the Debtors waive their right to seek a surcharge against the Pre-Petition Collateral or the DIP Facility Collateral under § 506(c). (Interim Order, Para. 12).

m. **Provisions Remaining Effective if Interim Relief Granted but Final Relief Denied**: The provisions of the Interim Order are binding upon and inure to the benefit of First Capital, DIP Lender and the Debtors, and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtors' estate or of any estate in any successor cases). (Interim Order, Par. 21). If any of the provisions of the Interim Order are subsequently modified, vacated or stayed by subsequent order, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of the Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations. (Interim Order, Par. 25).

## II.  STATEMENT OF FACTS AND BACKGROUND

### A.  Bankruptcy Filings

The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code on September 12, 2014 (the "Petition Date").  The Debtors continue to manage their financial affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  No trustee or examiner has been appointed in these cases, and no official creditors' committee has been formed as of the date hereof.

### B.  The Debtors' Business Structure and Background

The Debtors are distributors of automotive parts and service equipment, offering a unique product mix of both original equipment and aftermarket products.  Johnson Industries, Miller Paint and APT each are a wholly owned subsidiary of Miller Auto.  The Debtors operate from the Johnson Industries headquarters in Atlanta, Georgia and have distribution operations in the southeast, northeast and on-line.  The Debtors' Southeastern distribution center is located in Norcross, Georgia and supports nine satellite centers across the state and supplies parts to key fleet customers across the country.  From the Satellite locations, the Debtors distribute automotive parts and supplies to a network of dealers, repair shops and fleet customers.  The Debtors have two Northeast distribution hubs, located in Bethel Park, Pennsylvania and Huntingdon, Pennsylvania, which support eleven satellite centers in the Northeast region.  From these locations, the Debtors distribute automotive parts and supplies to a network of dealers, and repair and service shops.  Additionally, the Debtors maintain an on-line presence for retail and distribution focused on B-to-B and B-to-C e-commerce site serving customers nationally under the APT logo. Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of Randy Kulamer in Support of First Day

Applications and Motions (the "<u>Kulamer Declaration</u>") which is incorporated herein by reference.

### C. The Financings with DIP Lender and the Requested Relief

As of the Petition Date, the Debtors were indebted to DIP Lender in the approximate amount of $11,195,514, inclusive of $2,500,000 in reimbursement obligations for undrawn letters of credit, contract interest, default interest, default charges, and fees, costs and expenses. First Capital has been a lender to the Debtors since approximately August 13, 2013. The pre-Petition Date obligations of the Debtors to First Capital are secured by substantially all assets of the Debtors.

By this Motion, the Debtors seek the authority to obtain the DIP Loan and use of cash collateral under the terms set forth in a proposed Interim Order granting this Motion. The terms of the Interim Order shall control in the event of any inconsistency between the terms of the Interim Order and this Motion. The key provisions of the Interim Order are summarized in Section I above.

The Debtors submit that the protections requested by the DIP Lender and First Capital are reasonable in light of the substantial risk that the DIP Lender and First Capital are taking by agreeing to lend the Debtors significant additional sums post-petition. Indeed, since First Capital is already secured by a first priority lien against substantially all of the Debtors' assets, in light of the Debtors' financial condition, First Capital is the only realistic source of post-petition financing and liquidity.

The Debtors have also been unable to procure financing in the form of unsecured credit allowable under section 503(b) (1) of the Bankruptcy Code as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative

8

expense priority pursuant to section 364(c)(1) of the Bankruptcy Code without the granting of liens on their assets.  The Debtors have been unable to procure the necessary financing on terms more favorable than the Interim Order.  No other lender was prepared to provide the immediate financing needed by the Debtors on more favorable terms.

The Debtors require an immediate order of this Court authorizing them to obtain post-petition financing and to use cash collateral to pay their normal and ordinary operating expenses (such as payroll, rent, utilities and payments to suppliers) as they come due in the ordinary course of the Debtors' business and to make those purchases necessary to preserve the going concern value of their businesses, assets pending any sale or reorganization efforts.  An immediate court order is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

The Debtors therefore seek authority to obtain the post-petition financing and to use cash collateral on an interim basis pending a final hearing in accordance with the terms and conditions set forth in the Interim Order.  Given the devastating impact that a closure of the Debtors' business would have on their going concern value, their creditors and their employees, the Debtors submit that the relief requested herein is clearly warranted and appropriate.

### III.  DISCUSSION

**A.     The Debtors Should Be Authorized To Obtain Debtor In Possession Financing To Operate, Maintain and Preserve their Businesses.**

Pursuant to Bankruptcy Code §§ 364(c) and (d), the Debtors request authority to incur the Post-Petition Financing allowable as an administrative expense, having priority over other administrative expenses and secured by a senior lien on substantially all of the property of the Debtors' estates.  The Debtors need cash to meet ongoing obligations necessary to operate their businesses, administer their Chapter 11 estates and maintain the going concern value of their

9

businesses as they conclude asset sales or reorganize so as to achieve the highest values possible for their creditors. The Debtors need to use their cash receipts and the proceeds of the Post-Petition Financing to pay insurance, payroll, payroll expenses, rent, utility charges, professionals and general overhead, to purchase necessary materials, and otherwise continue their businesses and operations. The Debtors believe that the Post-Petition Financing will provide funds sufficient to permit them to operate their businesses pending the sales and reorganization efforts.

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if it has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (Bankr. D. Colo. l985) (authorizing interim financing where debtor's business judgment was that financing was necessary and of benefit to the estate); In re Ames Department Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); see also 2 Collier on Bankruptcy ¶ 364.04, at 364-9-1 ( 2007).

Section 364(d) (l) of the Bankruptcy Code governs the incurring of senior secured debt or "priming" loans. Pursuant to section 364(d) (1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if

(1) the trustee is unable to obtain such credit otherwise; and

(2) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d) (1).

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period. In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988). If a

10

trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully permitted conditions. In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr. N.D. Ill.1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C § 364(d). In re Photo Promotion Associates, Inc., 87 B.R. at 839.

     Section 364(c) of the Bankruptcy Code also contains incentives that a court may grant to post-petition lenders. These inducements are not exhaustive. Courts frequently have authorized the use of other protections not specified in the statute. See, e.g., In re Ellinssen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) aff'd 145 B.R. 312, 316 (BAP 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); In re Antico Mfg. Co., 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on pre-petition collateral to secure post-petition indebtedness). The Debtors have agreed to grant the DIP Lender and First Capital such enhancements in the form of senior liens against their pre-petition and post-petition assets. The Debtors believe that such enhancements are plainly reasonable requests by DIP Lender and First Capital, in return for the Post-Petition Financing.

     Two factors courts consider in determining whether to authorize post-petition financing which grants a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit as an administrative claim under § 364(b)(1)(A) and whether the terms of

11

the transaction are fair, reasonable and adequate, given the circumstances of the debtor and lender.  In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).The Debtor submits that all, of these standards have clearly been satisfied in this case.[3]

> **1.      The Debtor Was Unable to Obtain Unsecured Credit.**

In satisfying the standards of section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under §§ 364(a) and (b).  See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated good faith effort that credit was not available without senior lien by contacting other financial institutions in immediate geographic area; the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable); In re Ames Department Stores, supra, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

As mentioned above and as will be demonstrated at the hearing, the Debtors have been unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c) (1) of the Bankruptcy Code without the grant of liens on assets.  The Debtors have been unable to procure the necessary financing on terms more favorable than the Interim Order.  No other lender was prepared to provide the financing needed by the Debtors.

---

[3] As to all of the facts relevant to the requests for relief set forth in the Interim Order, the Debtors intend to proffer testimony at the hearing held with respect to the DIP Motion.

**2.    The Terms Of The Proposed Post-Petition Financing Are Fair, Reasonable and Adequate.**

The terms of the proposed Post-Petition Financing from the DIP Lender and DIP Lender are fair, reasonable and adequate. First Capital and the DIP Lender are taking a substantial economic risk by lending the Debtors significant additional sums.  Notwithstanding the substantial economic risk that First Capital and the DIP Lender are taking, First Capital and the DIP Lender have agreed to provide such post-petition financing in order to enable the Debtors to preserve the going concern value of their businesses.  The terms of the Interim Order were negotiated by and between the Debtors, the DIP Lender, First Capital, and their respective counsel prior to the bankruptcy filing.

**3.    The Liens Being "Subordinated" Are Already Junior To The Liens Which Currently Exist In Favor Of First Capital.**

Although the liens granted to First Capital and the DIP Lender to secure repayment of the Post-Petition Financing and as adequate protection for the use of the Pre-Petition Collateral technically prime the junior liens in favor of GM (except with respect to GM's liens in the Post-Trigger GM Inventory), Ford, the Pre-Petition Non-Seller Subordinated Note Holders (as defined in the Interim Order), the Pre-petition Seller Subordinated Secured Debt Holders (as defined in the Interim Order) (collectively, the "Subordinated Secured Debt Holders"), First Capital currently is secured by a first priority lien against substantially all of the Debtors' assets and has the ability under its current loan documents to lend more money to the Debtors secured by a senior lien against all of their assets.  Thus, the liens being "subordinated" are already junior to the liens which currently exist in favor of First Capital.

Further, the Subordinated Secured Debt Holders have no right to object to the Debtors' granting the security interests and liens to the DIP Lender and First Capital on the terms set forth in the Interim Order, pursuant to the terms of the Non-Seller Intercreditor and Subordination Agreements (as defined in the Interim Order), the Ford Intercreditor and Subordination Agreement (as defined in the Interim Order), and the GM Intercreditor and Subordination Agreement (as defined in the Interim Order) (collectively, the "Subordination Agreements") which they entered into with First Capital and the Debtors. The Subordination Agreements constitute enforceable agreements in this case pursuant to Bankruptcy Code § 510(a). Under the Subordination Agreements, the Subordinated Secured Debt Holders agreed that they would at all times and in all respects be subordinate and junior in right of payment to any and all indebtedness to First Capital and that their respective security interests in the Debtors' collateral would be subordinate to any existing and future security interests by DIP Lender.

**4.      The Debtors, In The Exercise Of Their Business Judgment, Believe That The Financing From The DIP Lender And First Capital Is Necessary And Proper.**

In determining whether to approve a financing transaction, Court should use its informed discretion, but give deference to the business decision of a Chapter 11 debtor. Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). The best and only available financing commitment for the Debtors comes from First Capital and the DIP Lender.

**5.      The Debtors Have Satisfied The Procedural Requirements Regarding Authority To Obtain Credit.**

Bankruptcy Rule 4001(c) sets forth the procedural requirements for obtaining credit. Bankruptcy Rule 4001(c)(1) requires in relevant part that: "A motion for authority to obtain credit shall be made in accordance with Rule 9014 and shall be served on . . . the creditors

14

included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct. The motion shall be accompanied by the copy of the agreement."  Concurrently with the filing of this Motion with the Court, the Debtors are providing notice of the Motion to the Office of the United States Trustee, the Internal Revenue Service, the Debtors' secured creditors, and the Debtors' 30 largest unsecured creditors on a consolidated basis.  Accordingly, the Motion complies with the requirements of Bankruptcy Rule 4001(c)(1) and the Debtors request that the Court authorize them to enter into the Post-Petition Financing.

      **B.**      <u>**The Debtors Should Be Authorized To Use Cash Collateral To Operate, Maintain and Preserve their Businesses.**</u>

The Debtors' use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c) (1) provides in pertinent part:

"If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral to maintain and operate its property.  11 U.S.C. § 363(2)(B); <u>In re Oak Glen R-Vee</u>, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); <u>In re Tucson Industrial Partners</u>, 129 B.R. 614 (9th Cir. BAP 1991).  The purpose of Chapter 11 is to rehabilitate debtors and access to cash collateral is essential to operate a business.  <u>In re Dynaco Corporation</u>, 162 B.R. 389 (Bankr. D. N.H. 1993), quoting <u>In re Stein</u>, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).  For the Debtors' businesses to remain viable and to preserve going concern values continued use of cash collateral is needed.

Moreover, First Capital will consent to the use of cash collateral so long as the use is subject to the terms of the Interim Order.

### IV.  **CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court:

(i) enter the Interim Order;

(ii) grant interim approval of the Post-Petition Financing pending a final hearing pursuant to the terms and conditions set forth in the DIP Motion;

(iii) authorize the Debtors to use their cash collateral to pay expenses on an interim basis pending a final hearing pursuant to the terms and conditions set forth in the DIP Motion;

(iv) set a final hearing to consider approval of the DIP Motion; and

(v) grant such other and further relief as the Court deems just and proper.

This 15th  day of September, 2014.

SCROGGINS & WILLIAMSON, P.C.

  /s/ J. Robert Williamson
J. Robert Williamson
Georgia Bar No. 765214
Ashley Reynolds Ray
Georgia Bar No. 601559
1500 Candler Building
127 Peachtree Street, NE
Atlanta, Georgia 30303
Telephone: (404) 893-3880
Telecopier: (404) 893-3886
rwilliamson@swlawfirm.com
aray@swlawfirm.com

Counsel for the Debtors

16