# EXHIBIT "A"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **MILLER AUTO PARTS &** | ) | |
| **SUPPLY COMPANY, INC., et. al,** | ) | **Case No. 14-68113-mgd** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |

### INTERIM ORDER (I) AUTHORIZING (A) SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § § 105, 361, 362, AND 364(c) AND (d); (B) GRANTING SECURITY INTERESTS, SUPERPRIORITY CLAIMS, AND ADEQUATE PROTECTION AND (C) USE OF CASH COLLATERAL AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)

Upon the motion (the "Motion")[1] dated September 15, 2014 of debtors and debtors in possession Miller Auto Parts & Supply Company, Inc. ("Miller Auto"), and its co-debtor subsidiaries, Johnson Industries, Inc., ("Industries"), Miller Auto Parts & Paint Company, Inc., ("APPC"), and Autopartstommorrow.com, LLC ("APT"; collectively with Miller Auto, Industries, and APPC, the "Debtors"), (a) requesting entry of an order authorizing the Debtors pursuant to Sections 363(c), 364(c) and 364(d) of title 11 of the United States Code, 11 U.S.C.

---

[1]     Unless otherwise indicated herein, all capitalized undefined terms used herein shall have the meanings given in the Pre-Petition First Capital Loan Documents (as defined below).

§§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c) and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to, inter alia, (i) obtain post-petition financing (the "Post-Petition Financing") pursuant to the terms of the DIP Loan Documents (as defined below) from its pre-petition senior secured lender FCC, LLC d/b/a First Capital ("First Capital", and in First Capital's capacity as the Post-Petition Financing lender, sometimes referred to as the "DIP Lender"), (ii) grant DIP Lender, pursuant to Bankruptcy Code §§ 364(c) and 364(d), first priority (except in the Post-Trigger GM Inventory, as defined below) and junior security interests in all of the Debtors' currently owned and after-acquired property to secure the Debtors' obligations under the Post-Petition Financing; and (iii) grant DIP Lender and First Capital priority in payment with respect to the obligations incurred in connection with the Post-Petition Financing over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below; (b) seeking this Court's authorization to use any Cash Collateral (defined below) in which the Adequate Protection Parties (defined below) may have an interest, pursuant to Bankruptcy Code § 363(c) and to provide adequate protection, pursuant to Bankruptcy Code §§ 361, 363(c) and 364(d) to the Adequate Protection Parties; (c) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001 (the "Interim Order") authorizing the Debtors to borrow under the Post-Petition Financing the amounts set forth in the Approved Budget (as defined below), upon the terms and conditions set forth in this Interim Order pending the Final Hearing referred to below; and (d) requesting that a final hearing (the "Final Hearing") be scheduled by this Court to consider entry of a final order (the "Final Order") authorizing on a final basis, inter alia, the Post-Petition Financing and use of the Cash Collateral; and due and sufficient notice of the Motion under the circumstances having been given; and the

Preliminary Hearing on the Motion having been held before this Court; and upon the entire record made at the Preliminary Hearing; and this Court having found good and sufficient cause appearing therefor;

**BASED ON THE RECORD ESTABLISHED AT THE PRELIMINARY HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

A.    <u>Filing Date</u>. On September 12, 2014 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>"). The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction; Venue</u>. This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2), upon which this Court has constitutional authority to enter a final judgment.

C.    <u>Committee Formation</u>.    No official committee of unsecured creditors (the "<u>Committee</u>") or any statutory committee pursuant to section 1102 of the Bankruptcy Code has yet been appointed in any of these Chapter 11 Cases.

D.    <u>Pre-Petition First Priority Secured Debt with First Capital</u>. The Debtors acknowledge and represent to the Court that First Capital and the Debtors are parties to one or more of the following documents (collectively the "<u>Pre-Petition First Capital Loan Documents</u>"): (1) that certain Loan and Security Agreement dated as of 8/13/13 (the "<u>Loan and Security Agreement</u>"); (2) that certain Intellectual Property Security Agreement dated as of 8/13/13 (the

---

[2]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

"Intellectual Property Security Agreement"); (3) that certain Equity Interest Pledge dated as of 8/13/13 (the "Equity Pledge"); (4) that certain Negative Pledge Agreement dated as of 8/13/13; (5) that certain Deposit Account Control Agreement (Hard Account Agreement) dated as of 8/13/13; (6) that certain Deposit Account Control Agreement (Springing Agreement) dated as of 8/13/13; and (7) those certain Irrevocable Proxies dated as of 8/13/13.

E.     Pre-Petition Non-Seller Subordinated Debt. One or more of the Debtors are parties to the Non-Seller Subordinated Notes set forth on Schedule 1 attached hereto (collectively the "Pre-Petition Non-Seller Subordinated Notes"; the holders of the Pre-Petition Non-Seller Subordinated Notes, collectively, the "Pre-Petition Non-Seller Subordinated Note Holders"), which the Pre-Petition Non-Seller Subordinated Note Holders assert are secured by assets of the Debtors, junior in priority to the Pre-Petition Liens (defined below) of First Capital.

F.     Pre-Petition Seller Subordinated Secured Debt. One or more of the Debtors are parties to the Pre-Petition Seller Subordinated Secured Debt Documents set forth on Schedule 2 attached hereto (collectively the "Pre-Petition Seller Subordinated Secured Debt Documents"; the holders of the Pre-Petition Seller Subordinated Secured Documents, collectively, the "Pre-Petition Seller Subordinated Secured Debt Holders"), which the Pre-petition Seller Subordinated Secured Debt Holders assert are secured by assets of the Debtors, junior in priority to the Pre-Petition Liens (defined below) of First Capital.

G.     Pre-Petition Seller Subordinated Unsecured Debt. One or more of the Debtors are parties to the Pre-Petition Seller Subordinated Unsecured Debt Documents set forth on Schedule 3 attached hereto (collectively the "Pre-Petition Seller Subordinated Unsecured Debt Documents"; the holders of the Pre-Petition Seller Unsecured Debt Documents, collectively, the "Pre-Petition Seller Subordinated Unsecured Debt Holders"), which the Debtors assert are not

secured by assets of the Debtors.

     H.       Pre-Petition Ford Debt. One or more of the Debtors are parties to the following documents with Ford Motor Company ("Ford"): (1) those certain Motorcraft Warehouse Distributor Sales Agreements and related invoices and documents; (2) those certain Security Agreements dated as of 5/6/10 (the "Ford Security Agreements"); and (3) that certain Letter of Credit Agreement dated as of 8/15/13 (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time; collectively with the Motorcraft Warehouse Distributor Sales Agreements and related invoices and documents, and the Ford Security Agreements, the "Pre-Petition Ford Debt Documents" ).

     I.       Pre-Petition GM Debt. One or more of the Debtors are parties to the following documents with General Motors LLC ("GM"): (1) that certain ACDelco Dedicated Distributor Agreement with Miller Auto dated as of 1/1/11; (2) that certain ACDelco Dedicated Distributor Agreement with Industries dated as of 1/1/11 (collectively, the ACDelco Dedicated Distributor Agreements, the "GM ACDelco Agreements"); (3) that certain Purchase Money and Blanket Security Agreement dated as of 3/28/14 between GM and Miller Auto; (4) that certain Purchase Money and Blanket Security Agreement dated as of 3/28/14 between GM and Industries dated as March 28, 2014 (collectively, the Purchase Money and Blanket Security Agreements, the "GM Purchase Money Security Agreements"); (5) those certain Security Agreements dated as of 3/28/14 executed by APPC and APT in favor GM (collectively, the "GM Guaranty Security Agreements"); (6) those certain Letter of Credit Agreements dated as of 8/15/13 (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time; collectively, the "GM Letters of Credit"; with the GM ACDelco Agreements, the GM Purchase Money Security Agreements, and the GM Guaranty Security Agreements, the "Pre-Petition GM

Debt Documents" ).

J.    Stipulations.    In requesting the Post-Petition Financing under the DIP Loan

Documents (defined below), the Debtors, subject to paragraph 24 hereof, permanently,

immediately, and irrevocably acknowledge, represent, stipulate, and agree, that:

(a)    Pursuant to the Pre-Petition First Capital Loan Documents, including

without limitation, the Loan and Security Agreement and the Intellectual Property

Security Agreement, all Obligations of the Debtors to First Capital of any kind or nature

under the Pre-Petition First Capital Loan Documents (the "Outstanding Obligations") are

secured by a first priority, properly perfected blanket security interest (the "Pre-Petition

Liens") in substantially all of the Debtors' assets as of the Petition Date, as described in

detail in the Loan and Security Agreement, the Intellectual Property Security Agreement,

and the Equity Pledge, including without limitation, all accounts, inventory, equipment,

goods, general intangibles, negotiable collateral, investment property, securities,

securities accounts and financial assets, as well as all bank and depository accounts and all

funds on deposit therein, all chattel paper (whether tangible or electronic) and contract

rights, all guaranties, collateral, liens on real or personal property, leases, letters of credit,

letter-of-credit rights, supporting obligations, and all other rights, agreements, and

property securing or relating to payment of accounts or any other collateral, all

documents, books and records relating to any collateral or to the Debtors' business, the

Debtors' equity interests, the Buckley Note (as defined in the Loan and Security

Agreement), the HC/Hendrick Note (as defined in the Loan and Security Agreement),

which HC/Hendrick Note was paid in full prior to the Petition Date, all motor vehicles

and other rolling stock of any kind, all other property of Debtors now or hereafter in the

possession or control of First Capital or any of First Capital's affiliates (including cash, money, credits and balances of each Debtor held by or on deposit with First Capital or any affiliate of First Capital), all other assets of any Debtor in which First Capital receives a security interest to secure all or part of the obligations or which hereafter come into the possession, custody or control of First Capital or any affiliate of First Capital, all of each of Debtors' commercial tort claims listed in the Loan and Security Agreement, all proceeds and products of all of the foregoing in any form, including amounts payable under any policies of insurance insuring all or any of the foregoing against loss or damage, all parts, accessories, attachments, special tools, additions, replacements, substitutions and accessions to or for all or any of the foregoing, all condemnation or requisition payments with respect to all or any of the foregoing and all increases and profits received from all or any of the foregoing, and Debtors' right, title and interest in and to its intellectual property, including without limitation, the following: (i) copyrights, trademarks and patents; (ii) any and all trade secrets, and any and all intellectual property rights in software and software products now or hereafter existing, created, acquired or held; (iii) any and all design rights which may be available to such Debtor now or hereafter existing, created, acquired or held; (iv) any and all mask works or similar rights now or hereafter existing, created, acquired or held; (v) any and all claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above; (vi) all licenses or other rights to use any of the copyrights, patents or trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights; (vii) all

amendments, renewals, re-issues, divisions, continuations and extensions of any of the copyrights, trademarks or patents; and (viii) all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing (the "Pre-Petition Collateral");

(b)    The Debtors are truly and justly indebted to First Capital under the Pre-Petition First Capital Loan Documents, without defense, counterclaim, recoupment or offset of any kind, and that as of the Petition Date, such liability to First Capital was at least $12,995,703, inclusive of $2,500,000 in reimbursement obligations for undrawn letters of credit, and contract interest, default interest and charges, and certain fees and charges, (the "Pre-Petition Indebtedness");

(c)    As of the Petition Date, in consideration of the Post-Petition Financing to be made available under the terms of the Interim Order and the Final Order, the Debtors waive and release any and all causes of action and claims against First Capital and  its respective affiliates, agents, representatives, assigns and successors;

(d)    By reason of the Pre-Petition First Capital Loan Documents, (i) the Pre-Petition Indebtedness is secured by valid, properly perfected and enforceable liens and security interests granted by the Debtors to First Capital upon and in the Pre-Petition Collateral; (ii) the liens held by First Capital securing the Pre-Petition Indebtedness are senior to all other security interests in the Pre-Petition Collateral; and (iii) the claims, liens and security interests held by First Capital may not be avoided or set aside;

(e)    As of the date hereof, there exist no claims or causes of action against First Capital with respect to, in connection with, related to, or arising from the Pre-Petition First Capital Loan Documents that may be asserted by the Debtors.

K.    <u>Intercreditor and Subordination Agreements</u>.  As of the Petition Date:

(a)    The Debtors, First Capital and the Pre-Petition Non-Seller Subordinated Note Holders are parties to certain Intercreditor and Subordination Agreements, specifically (1) that certain Intercreditor and Subordination (with Bahman and Yasmin Mossavar-Rahmani) dated as of 8/13/13; (2) that certain Intercreditor and Subordination Agreement (with Fribourg, Ltd.) dated as of 8/13/13; (3) that certain Intercreditor and Subordination Agreement (with The Ghassem Ladjevardi Trust) dated as of 8/13/13; (4) that certain Intercreditor and Subordination Agreement (with C.H. Miller Hardware Company, Inc.) dated as of 8/13/13; (5) that certain Intercreditor and Subordination Agreement (with Dariush Owlia) dated as of 8/13/13; (6) that certain Intercreditor and Subordination Agreement (with Robert W. Kahan) dated as of 8/13/13; (7) that certain Intercreditor and Subordination Agreement (with United American Securities, Inc.) dated as of 8/13/13; (8) that certain Intercreditor and Subordination Agreement (with Thomas Miller) dated as of 8/13/13/; (9) that certain Intercreditor Subordination Agreement (with EFG Bank) dated as of 8/13/13; (10) that certain Intercreditor and Subordination Agreement (with  Charles and Nancy Moore) dated as of 8/13/13; (11) that certain Intercreditor and Subordination Agreement (with George Sample) dated as of 8/13/13; (12) that certain Intercreditor and Subordination Agreement (with Seyed H. Aleali) dated as of 8/13/13; and (13) those certain three (3) Intercreditor and Subordination Agreements (with the Estate of David Goodman, Jr.) dated as of 6/21/13 (collectively, the "<u>Non-Seller Intercreditor and Subordination Agreements</u>"), pursuant to which the Non-Seller Subordinated Noted Holders agreed, <u>inter alia</u>,  (i) to subordinate all rights to payment of any obligations of Debtors to the Non-Seller Subordinated Note Holders to

payments of all indebtedness of Debtors to First Capital; (ii) to subordinate all security interests granted by Debtors to the Non-Seller Subordinated Note Holders to those granted to First Capital; (iii) that the terms of the Non-Seller Intercreditor and Subordination Agreements shall remain in full force and effect throughout any bankruptcy proceeding; (iv) that First Capital may provide post-petition financing to the Debtors on such terms and conditions as it deems in its sole discretion; (v) to not oppose any use of cash collateral if First Capital consents to such use; (vi) to not contest or challenge the validity, perfection, priority, or enforceability of any liens of First Capital; and (vii) to consent to the sale of the Debtor's assets in a bankruptcy proceeding if First Capital consents to such a sale;

(b)    The Debtors, First Capital and the Pre-Petition Seller Subordinated Secured Debt Holders are parties to those certain Intercreditor and Subordination Agreements, specifically (1) that certain Intercreditor and Subordination Agreement (with Robert Anthony Delmonico) dated as of 8/13/13; (2) that certain Intercreditor and Subordination Agreement (with Robert Alfred Delmonico) dated as of 8/13/13; (3) that certain Intercreditor and Subordination Agreement (with Danielle Delmonico) dated as of 8/13/13; (4) that certain Intercreditor and Subordination Agreement (with Ralph S. Carratura) dated as of 8/13/13; (5) that certain Intercreditor and Subordination Agreement (with Nicole M. Carratura) dated as of 8/13/13; (6) that certain Subordination Agreement among Joseph Horvath, Shirley Horvath (collectively with Joseph Horvath, the "Horvaths")[3], Miller Auto, and First Capital dated as of 8/13/13 (the "Horvath Subordination Agreement") and (7) that certain Intercreditor and Subordination

---

[3]    The Debtors do not believe the Horvaths have a properly perfected security interest in any assets of the Debtors.

Agreement (with Cook Brothers Automotive, Inc., Gary W. Cook, Richard T. Cook (collectively, the "Cook Brothers"))[4] dated as of 8/13/13 (collectively, the "Secured Seller Intercreditor and Subordination Agreements"), pursuant to which the Pre-Petition Seller Subordinated Secured Debt Holders, other than the Horvaths, agreed,[5] inter alia, (i) to subordinate all rights to payment of any obligations of Debtors to the Pre-Petition Seller Subordinated Secured Debt Holders to payments of all indebtedness of Debtors to First Capital; (ii) to subordinate all security interests granted by Debtors to the Pre-Petition Seller Subordinated Secured Debt Holders to those granted to First Capital; (iii) that the terms of the Secured Seller Intercreditor and Subordination Agreements shall remain in full force and effect throughout any bankruptcy proceeding; (iv) that First Capital may provide post-petition financing to the Debtors on such terms and conditions as it deems in its sole discretion; (v) to not oppose any use of cash collateral if First Capital consents to such use; (vi) to not contest or challenge the validity, perfection, priority, or enforceability of any liens of First Capital; and (vii) to consent to the sale of the Debtor's assets in a bankruptcy proceeding if First Capital consents to such a sale;

(c)    The Debtors, First Capital and the Pre-Petition Seller Subordinated Unsecured Debt Holders are parties to those certain Intercreditor and Subordination Agreements, specifically (1) that certain Intercreditor and Subordination Agreement (with C & N Auto Parts, Inc.) dated as of 8/13/13; (2) that certain Intercreditor and Subordination Agreement (with Perimeter Auto Parts, LLC) dated as of 8/13/13; (3) that

---

[4]    The Debtors do not believe the Cook Brothers have a properly perfected security interest in any assets of the Debtors.

[5]    Pursuant to the Horvath Subordination Agreement, the Horvaths agreed to (i) subordinate their right to payment on the obligations of the Debtors to them to payments of all indebtedness of the Debtors to First Capital, and to (ii) subordinate all security interests granted by the Debtors to them to those granted to First Capital.

certain Intercreditor and Subordination Agreement (with Ken Smith Auto Parts, Inc.) dated as of 8/1/13; (4) that certain Intercreditor and Subordination Agreement (with Automotive Color Technology L.L.C.) dated as of 8/13/13; (5) that certain Intercreditor and Subordination Agreement (with Kelly Auto Parts, Inc.) dated as of 8/13/13; (6) that certain Intercreditor and Subordination Agreement (with Dorothy Stong) dated as of 8/13/13; (7) that certain Intercreditor and Subordination Agreement (with Benjamin G. Johnston) dated as of 8/13/13; and (8) that certain Intercreditor and Subordination Agreement (with Bowsman Enterprises, LLC) dated as of 8/13/13 (collectively, the "Unsecured Seller Intercreditor and Subordination Agreements"), pursuant to which the Pre-Petition Seller Subordinated Unsecured Debt Holders agreed, inter alia, (i) to subordinate all rights to payment of any obligations of Debtors to the Pre-Petition Seller Subordinated Unsecured Debt Holders to payments of all indebtedness of Debtors to First Capital; (ii) to subordinate all security interests granted by Debtors to the Pre-Petition Seller Subordinated Unsecured Debt Holders to those granted to First Capital; (iii) that the terms of the Unsecured Seller Intercreditor and Subordination Agreements shall remain in full force and effect throughout any bankruptcy proceeding; (iv) that First Capital may provide post-petition financing to the Debtors on such terms and conditions as it deems in its sole discretion; (v) to not oppose any use of cash collateral if First Capital consents to such use; (vi) to not contest or challenge the validity, perfection, priority, or enforceability of any liens of First Capital; and (vii) to consent to the sale of the Debtor's assets in a bankruptcy proceeding if First Capital consents to such a sale;

      (d)     The Debtors, First Capital, and Ford are parties to that certain Intercreditor and Subordination Agreement dated as of 8/13/13 (the "Ford Intercreditor and

Subordination Agreement"), pursuant to which Ford agreed, inter alia, (i) to subordinate all security interests granted by Debtors to Ford to those granted to First Capital; (ii) that the terms of the Ford Intercreditor and Subordination Agreement shall remain in full force and effect throughout any bankruptcy proceeding; (iii) that First Capital may provide post-petition financing to the Debtors on such terms and conditions as it deems in its sole discretion; (iv) to not oppose any use of cash collateral if First Capital consents to such use; (v) to not contest or challenge the validity, perfection, priority, or enforceability of any liens of First Capital; and (vi) to consent to the sale of the Debtor's assets in a bankruptcy proceeding if First Capital consents to such a sale;

(e)     The Debtors, First Capital, and GM are parties to that certain Intercreditor and Subordination Agreement dated as of 3/28/14 (the "GM Intercreditor and Subordination Agreement"), pursuant to which GM agreed, inter alia, (i) to subordinate all security interests granted by GM (except with respect to the Post-Trigger GM Inventory (defined below)) to those granted to First Capital; (ii) that the terms of the GM Intercreditor and Subordination Agreement shall remain in full force and effect throughout any bankruptcy proceeding; (iii) that First Capital may provide post-petition financing to the Debtors on such terms and conditions as it deems in its sole discretion; (iv) to not oppose any use of cash collateral if First Capital consents to such use; (v) to not contest or challenge the validity, perfection, priority, or enforceability of any liens of First Capital; and (vi) to consent to the sale of the Debtor's assets in a bankruptcy proceeding if First Capital consents to such a sale;

L.     Post-Trigger GM Inventory.  First Capital and the DIP Lender do not have a first priority security interest in the Post-Trigger GM Inventory, as that term is defined in the GM

Intercreditor and Subordination Agreement (the "Post-Trigger GM Inventory").

M.     Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral"

shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in

which First Capital, and, to the extent applicable, GM, Ford, the Pre-Petition Non-Seller

Subordinated Note Holders, and the Pre-Petition Seller Subordinated Secured Debt  Holders (the

"Adequate Protection Parties"), respectively, have liens, security interests, or other interests

(including, without limitation, the Adequate Protection Liens (defined below) or security interests)

whether existing on the Petition Date or hereafter created.  The Debtors require use of Cash

Collateral to operate their business.  Without the use of Cash Collateral, the Debtors will not be

able to meet their cash requirements for working capital needs, which will result in an immediate

shutdown of the Debtors' businesses.  First Capital and the DIP Lender do not consent to the use of

Cash Collateral except on the terms and for the purposes specified herein.

N.     Purpose and Necessity of Financing.   Given the Debtors' current financial

condition, the Debtors are unable to operate by using only Cash Collateral and are unable to

provide First Capital with adequate protection for the use of its Cash Collateral. Moreover, the

Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an

administrative expense. Financing on a post-petition basis is not otherwise available without the

Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all

administrative expenses of the kinds specified in §§ 503(b) and 507(b) of the Bankruptcy Code,

other than as described below, and securing such indebtedness and obligations with the security

interests in and the liens upon the property described below pursuant to §§ 364(c) and 364(d) of the

Bankruptcy Code.

O.     Notice. It appears that notice of the Preliminary Hearing and the relief requested

in the Motion has been given to (i) the Office of the United States Trustee, (ii) the creditors holding the 30 largest unsecured claims on a consolidated basis against the Debtors; and (iii) known holders of pre-petition liens against the Debtors' property. No Committee has been appointed in the Chapter 11 Cases.

P.    <u>Good Faith</u>. Based on the record presented to this Court by the Debtors, it appears that the Post-Petition Financing and use of Cash Collateral have been negotiated in good faith and at arm's-length between the Debtors and First Capital, and any credit extended and loans made to the Debtors pursuant to the Interim Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, § 364(e) of the Bankruptcy Code.

Q.    <u>Good Cause and Consideration</u>. Based on the record before this Court, it appears that the terms of this Interim Order, including, without limitation, the terms of the Post-Petition Financing and use of Cash Collateral, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

R.    <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Interim Order. The permission granted herein to use Cash Collateral and obtain the Post-Petition Financing and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for the flow of supplies and services to the Debtors necessary to sustain the Debtors' business operations and enhance the Debtors' prospects for a successful completion of the Chapter 11 Cases.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and the undersigned consents of the Debtors, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED DETERMINED AND DECREED** that:

1.     <u>Motion Granted</u>.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.

2.     <u>Authorization</u>.  The Debtors are expressly authorized and empowered to (i) obtain the Post-Petition Financing, use the Cash Collateral, and perform their obligations strictly pursuant to the provisions of this Interim Order; (ii) perform their obligations under the Pre-Petition First Capital Loan Documents as such documents are, or may be, amended and modified pursuant to the terms of this Interim Order; and (iii) enter into such other agreements, instruments and documents as may be necessary or required to evidence the obligations to DIP Lender and First Capital to consummate the terms and provisions of the Motion and this Interim Order and to evidence perfection of the liens and security interests to be given to DIP Lender and First Capital (the Pre-Petition First Capital Loan Documents as modified by this Interim Order and Schedule 4 attached hereto, shall hereinafter be referred to as the "<u>DIP Loan Documents</u>").  DIP Lender may, at its option, advance the Post-Petition Financing pursuant to the same terms as the Pre-Petition First Capital Loan Documents, as modified by this Interim Order and Schedule 4 attached hereto, without the need for further execution or documentation, and all advances and borrowings under the Post-Petition Financings shall be under the Loan and Security Agreement as modified by Schedule 4 attached hereto. The borrowing(s) made under the revolving credit facility maintained under the DIP Loan Documents (the "<u>DIP Facility</u>") and all other indebtedness and obligations incurred on or after the Petition Date with respect to

loans, advances and any other indebtedness or obligations, contingent or absolute pursuant to this Interim Order and the DIP Loan Documents which may now or from time to time hereafter be owing by the Debtors to DIP Lender (including principal, accrued and unpaid interest, and fees costs and expenses, including without limitation attorney's fees and expenses) are referred to herein as the "DIP Indebtedness," and, together with the Pre-Petition Indebtedness, as the "Indebtedness." The Debtors and First Capital may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

      3.      <u>Borrowing; Use Cash Collateral</u>.  Subject to the Approved Budget (as defined in paragraph 18 below), and the terms and conditions of this Interim Order and the DIP Loan Documents, (a) First Capital hereby consents to the Debtors' limited use of Cash Collateral, and (b) DIP Lender will provide the DIP Facility, on a revolving basis, in accordance with the terms of the DIP Loan Documents.

      4.      <u>Application of Proceeds</u>.

      (a)      Proceeds or payments received by First Capital and/or DIP Lender with respect to the Pre-Petition Collateral and DIP Facility Collateral (defined below) shall be applied as follows: (x) first, to Pre-Petition Indebtedness consisting of accrued and accruing interest, fees, costs and expenses; (y) next, to Pre-Petition Indebtedness consisting of principal; and (z) last, to the outstanding balance of the DIP Facility, first to all accrued and accruing interest, fees, costs and expenses, and then to principal. If the source of any such proceeds or payments is not clearly identifiable as attributable to the Pre-Petition Collateral or the DIP Facility Collateral (defined below), such proceeds or payments shall be deemed to be proceeds from the Pre-Petition Collateral.

(b)      The automatic stay under § 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit First Capital to retrieve, collect and apply payments and proceeds in respect of the Pre-Petition Collateral and the DIP Facility Collateral (defined below) in accordance with the terms and provisions of this Interim Order and the DIP Loan Documents.

5.      <u>Interest, Fees, Costs and Expenses</u>.  The Indebtedness shall bear interest at the applicable rates set forth in the DIP Loan Documents and the Pre-Petition First Capital Loan Documents; <u>provided</u>, <u>however</u>, that no event of default occurring prior to the Petition Date under the Pre-Petition First Capital Loan Documents (including the filing of the Bankruptcy Cases) shall cause interest to be charged at the non-default rate.  DIP Lender and First Capital shall be entitled to recover all of their reasonable attorney's fees and other professional fees as well as all costs and expenses incurred in connection with the Indebtedness to the extent provided in the DIP Loan Documents and Pre-Petition First Capital Loan Documents, as applicable. In consideration for providing the Post-Petition Financing, DIP Lender shall be paid all fees specified in the DIP Loan Documents in accordance with the terms therein for such payment. In addition, for agreeing to provide the DIP Facility, DIP Lender shall be entitled to an origination fee in the amount of $45,000 (.25% of the total amount of the DIP Facility), which fee shall be included in the DIP Indebtedness and shall be fully earned and non-refundable upon entry of the Final Order (defined below).

6.      <u>Termination of the DIP Facility</u>.  DIP Lender's obligation to provide the DIP Facility shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all Indebtedness shall be immediately due and payable in cash upon the earliest to occur of the following (the "<u>Termination Event</u>"):

(i)     If a Final Order (as defined below) in a form acceptable to DIP Lender has not been entered by October 9, 2014;

(ii)    the date of final indefeasible payment and satisfaction in full in cash of the Indebtedness;

(iii)   the effective date of any confirmed plan of reorganization in the Chapter 11 Cases;

(iv)    the consummation of the sale or other disposition of all or substantially all of the assets of the Debtors;

(v)     the occurrence of any breach by the Debtors of this Interim Order (including, but not limited to, the Debtors' failure to adhere to the Approved Budget as set forth in ordering paragraph 17 of this Interim Order or violation of any of the covenants provided for in ordering paragraph 19 of this Interim Order) or the Final Order (defined below), or under any of the DIP Loan Documents;

(vi)    the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;

(vii)   upon and following the entry of an order authorizing the appointment in any of the Debtors' Chapter 11 Cases of a trustee or an examiner with enlarged powers (beyond those set forth in § 1106(a)(3) and (4) of the Bankruptcy Code), relating to the operation of the business of the Debtors without the prior written consent of DIP Lender (which consent may be withheld, or, if given revoked, by DIP Lender in its sole discretion), or if any Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);

(viii)  this Interim Order or the Final Order (defined below) is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of DIP Lender (which consent may be withheld in its sole discretion);

(ix)    the Court enters an order granting a party relief from the automatic stay with respect to any portion of the Pre-Petition Collateral or the DIP Facility Collateral (defined below) provided that the value of the relevant collateral is more than $50,000; this or any other Court enters an order or judgment in any of the Chapter 11 Cases modifying, limiting, subordinating or avoiding the priority of any Indebtedness or the perfection, priority or validity of First Capital's or DIP Lender's Pre-Petition or DIP Facility Liens (defined below) or imposing, surcharging or assessing against First Capital and DIP Lender or their claims or any Pre-Petition or DIP Facility Collateral (defined below) any fees, costs or

expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise;

(x)    October 9, 2014, if the Debtors have not entered into one or more agreements for the sale of substantially all of their assets on terms and conditions which are acceptable to DIP Lender (the "Asset Sales");

(xi)    October 17, 2014, if the Court has not entered an order establishing procedures relating to the conducting of an auction in connection with the Asset Sales (the "Asset Sale Procedures");

(xii)    November 21, 2014, if the Court has not entered one or more orders approving the Asset Sales, providing for the sale of substantially all of their assets on terms and conditions which are acceptable to DIP Lender (the "Sale Order"); or

(xiii)    November 28, 2014, if the Asset Sales have not closed.

7.    Liens to Secure the DIP Indebtedness.  As security for the DIP Indebtedness, DIP Lender is hereby granted the following security and liens (the "DIP Facility Liens") in all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, including without limitation, all collateral of the kinds, categories, and types described in the Pre-Petition Collateral, which are hereby incorporated by reference, all real property owned by the Debtors, and all causes of action (excluding, pending the Final Order, actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under §§ 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, "Avoidance Actions")) and actions and recoveries thereon against third parties, tax refund claims, commercial tort claims and insurance proceeds, and the proceeds, products, rents and profits of all of the foregoing (all of the foregoing, the "DIP Facility Collateral"), subject only to the liens of GM in the Post-Trigger GM Inventory and, in the event of the termination of the DIP Facility, the payment of the Carve Out (as defined in paragraph 15):

(a)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority senior security interest in and lien upon all pre-and post-petition property noted

above of the Debtors, whether existing on the Petition Date or thereafter acquired, that, as of the Petition Date, is not subject to valid, perfected and non-avoidable liens;

(b)    Pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected security interest in and lien upon all pre-and post-petition property noted above of the Debtors, whether now existing or hereinafter acquired, that is subject to valid, perfected and unavoidable liens in existence as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, immediately junior in priority to such valid, perfected and unavoidable liens;

(c)    Pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority senior priming lien (the "Priming Liens") on all of the DIP Facility Collateral, including the Pre-Petition Collateral, which shall be senior to all other security interests and liens in property of the Debtors' estates, except with respect to the liens of GM in the Post-Trigger GM Inventory; and

(d)    In addition, other than with respect to the liens of GM in the Post-Trigger GM Inventory, or as may be provided in a written instrument, agreement or other document executed by DIP Lender, neither the Pre-Petition Liens nor the DIP Facility Liens shall be subject to subordination to any other liens, security interests or claims under Section 510 of the Bankruptcy Code or otherwise. Any security interest or lien upon the Pre-Petition Collateral or the DIP Facility Collateral which is avoided or otherwise preserved for the benefit of the Debtors' estates under Section 551 or any other provision of the Bankruptcy Code shall be subordinate to the Pre-Petition Liens, the DIP Facility Liens and the Adequate Protection Liens (defined below).

8.    Adequate Protection Liens

(a)    As adequate protection of First Capital's interests in the Pre-Petition Collateral, including use of the Cash Collateral, pursuant to §§ 361, 363 and 552(b) of the Bankruptcy Code, First Capital is hereby granted valid, binding, enforceable and perfected additional and replacement liens (the "First Capital Senior Adequate Protection Liens") in all property of the Debtors' estates (excluding, pending the Final Order, the Avoidance Actions), including the DIP Facility Collateral, to the extent of any decrease in the value of First Capital's interests in the Pre-Petition Collateral occurring subsequent to the Petition Date, with such decrease in value to include decreases resulting from the Debtors' use (if any) of Cash Collateral, the granting of priming liens under the Bankruptcy Code, the depreciation, use, sale, loss, decline in market price of the Pre-Petition Collateral or otherwise. The First Capital Senior Adequate Protection Liens shall enjoy the same validity and extent as the liens First Capital held on the Petition Date. The First Capital Senior Adequate Protection Liens are (a) subject only to (i) GM's liens in the Post-Trigger GM Inventory; (ii) the Carve-Out (as defined in paragraph 15); and (iii) the DIP Facility Liens.

(b)    As adequate protection of the secured interests asserted by GM, Ford, the Pre-Petition Non-Seller Subordinated Note Holders, and the Pre-Petition Seller Subordinated Secured Debt Holders (collectively, the "Subordinated Secured Debt Holders"), including use of the Cash Collateral of the Subordinated Secured Debt Holders, the Subordinated Secured Debt Holders are hereby granted valid, binding, enforceable and perfected additional and replacement liens (the "Subordinated Adequate Protection Liens"; collectively, with the First Capital Senior Adequate Protection Liens,

the "Adequate Protection Liens") in all property of the Debtors' estates (excluding

Avoidance Actions), including any proceeds thereof, to the extent of any decrease in the

value of the Subordinated Secured Debt Holders' secured interests occurring subsequent

to the Petition Date, with such decrease in value to include decreases resulting from the

Debtors' use (if any) of the Subordinated Secured Debt Holders' Cash Collateral, the

depreciation, use, sale, loss, decline in market price of such collateral or otherwise. With

respect to such collateral, the Subordinated Adequate Protection Liens shall enjoy the

same validity and extent as the liens the Subordinated Secured Debt Holders held against

such collateral on the Petition Date. The Subordinated Adequate Protection Liens are

subject and subordinate only to (i) the DIP Facility Liens of DIP Lender; (ii) the Pre-

Petition Liens of First Capital; (iii) the Senior Adequate Protection Liens of First

Capital; (iv) the Carve-Out (as defined in paragraph 15); and (v) the liens of GM in the

Post-Trigger GM Inventory.

      9.    Section 507(b) Priority Administrative Claims.  If, notwithstanding the provision

of the First Capital Senior Adequate Protection Liens, such First Capital Senior Adequate

Protection Liens do not provide adequate protection of First Capital's valid, enforceable and

unavoidable interests in the Pre-Petition Collateral, First Capital shall (i) have a claim allowed

under § 507(a)(2) of the Bankruptcy Code (the "507(b) Claim"), and, except with respect to being

subordinated to the Carve Out, such 507(b) Claim shall be entitled to priority over every other

claim allowable under such § 507(a)(2); and (ii) notwithstanding anything herein to the contrary,

be entitled to seek further adequate protection of their interests and such further relief as is

consistent therewith.

      10.    Superpriority Claims.  Subject to the Carve-Out described in ordering paragraph

15 below, all of the DIP Indebtedness shall have the highest administrative priority under §

364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of

administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326,

330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or

otherwise (whether incurred in the Chapter 11 Case or any successor case), and shall at all times

be senior to the rights of the Debtors, any successor trustee or estate representative in the

Chapter 11 Cases or any successor case (the "Superpriority Claims"). Except for the Carve-Out,

nothing in this Interim Order or the Approved Budget (as defined below) shall constitute the

consent by DIP Lender or First Capital to the imposition of any costs or expense of

administration or other charge, fees, liens, assessment or claim (including, without limitation,

any amounts set forth in the Approved Budget) against DIP Lender or First Capital, their claims

or collateral (including the Pre-Petition Collateral and the DIP Facility Collateral) under §

506(c) of the Bankruptcy Code or otherwise be subject in any way to the equitable doctrine of

"marshalling" or any similar doctrine.

    11.    Perfection of DIP Facility Liens and Adequate Protection Liens. The DIP Facility

Liens and the Adequate Protection Liens shall be, and they hereby are, deemed duly perfected

and recorded under all applicable federal or state or other laws as of the date hereof, and no

notice, filing, mortgage recordation, possession, control, certificate of title, further order,

landlord or warehousemen lien waivers or other third party consents or waivers  or other act,

shall be required to effect such perfection; provided, however, that notwithstanding the

provisions of § 362 of the Bankruptcy Code, (i) DIP Lender may, at its sole option, file or record

or cause the Debtors to obtain any such landlord or warehousemen lien waivers or other third

party consents or waivers or execute, file or record, at the Debtors' expense, any such UCC

financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the Debtors to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Facility Collateral, and the Debtors are directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or waivers or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Facility Collateral, all such landlord or warehouse lien waivers or other third party consents or waivers, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in these Chapter 11 Cases as of the commencement of these Chapter 11 Cases but with the priorities as set forth herein. DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and such filing or recording shall be accepted and shall constitute further evidence of DIP Lender's interest in the DIP Facility Collateral.

12.    Waiver.  The Debtors and their estates (and any party in interest acting on behalf of the Debtors) hereby irrevocably waive, and are barred from asserting or exercising any right (a) without First Capital's or DIP Lender's prior written consent (which may be withheld in their sole discretion) or (b) without prior indefeasible payment and satisfaction in full of the Indebtedness: (i) to grant or impose, or request that the Court grant or impose, under § 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Facility Collateral,

25

which are pari passu with or senior to the DIP Facility Liens or the First Capital Senior Adequate Protection Liens; (ii) to return goods pursuant to § 546(g) of the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise; (iii) to seek a surcharge of the Pre-Petition Collateral or the DIP Facility Collateral under § 506(c) of the Bankruptcy Code; (iv) to seek non-consensual use of Cash Collateral under § 363 of the Bankruptcy Code; (iv) to modify or affect any of the rights of First Capital or DIP Lender under this Interim Order or any DIP Loan Documents by any order entered in any of the Chapter 11 Cases or any successor cases; or (v) propose a plan of reorganization or liquidation, or seek an extension of the exclusive right to file a plan or solicit acceptances with respect to any plan of reorganization or liquidation without First Capital's or DIP Lender's written consent.

13.    <u>Sale Out of the Ordinary Course of Business</u>.  The Debtors may not propose a sale of any of their assets outside the ordinary course of business unless (a) DIP Lender provides its written consent to such sale; (b) all proceeds (net of reasonable, ordinary and customary costs of sale (excluding Professional fees, other than for any broker's commission)) realized from any Court-approved sale are transferred to First Capital and DIP Lender for immediate application in reduction of the Indebtedness, in the manner set forth in this Interim Order, until such time as the Indebtedness shall have been satisfied in full, and shall not be permitted to be used by the Debtors under any circumstances except as otherwise provided by this Interim Order; and (c) the proposed sale expressly provides that First Capital and DIP Lender may exercise their right to credit bid their Indebtedness under § 363(k) of the Bankruptcy Code.

14.    Modification of Automatic Stay; Other Remedies.

(a)    Except as set forth in subparagraph (b) of this paragraph, which governs any action of First Capital and DIP Lender to foreclose on their liens on any Pre-Petition Collateral or DIP Facility Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby vacated as to First Capital and DIP Lender to permit them to perform in accordance with, and exercise, enjoy and enforce its rights, benefits, privileges and remedies pursuant to this Interim Order and the DIP Loan Documents without further application or motion to, or order from, the Court, and, regardless of any change in circumstances (whether or not foreseeable), neither § 105 of the Bankruptcy Code, any other provision of the Bankruptcy Code, or any other law shall be utilized to prohibit First Capital and DIP Lender from the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies. First Capital and DIP Lender are hereby granted leave to, among other things, (a) receive and apply payments to the Indebtedness from collections on and proceeds of the Pre-Petition Collateral and the DIP Facility Collateral in the manner specified in this Interim Order and the DIP Loan Documents, (b) file or record any financing statements, mortgages or other instruments or other documents to evidence the First Capital Senior Adequate Protection Liens or the DIP Facility Liens, (c) to charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Interim Order as provided therein, (d) to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order, and (e) upon the occurrence of a Termination Event, and without application or motion to, or order from the Court or any other court, (i)

terminate the DIP Facility and the DIP Loan Documents, (ii) declare all Indebtedness immediately due and payable, and (iii) revoke the Debtors' right, if any, under this Interim Order and/or the other DIP Loan Documents to use Cash Collateral.

(b)    Upon the occurrence of a Termination Event and five (5) business days after First Capital or DIP Lender have filed with the Bankruptcy Court, and served by hand delivery, facsimile or overnight mail on counsel to the Debtors, the Committee (if any) and the Office of the United States Trustee, an affidavit identifying any act which gave rise to the occurrence of a Termination Event, the automatic stay under § 362 of the Bankruptcy Code shall be deemed vacated and modified with respect to First Capital and DIP Lender for the purpose of exercising all of their rights and remedies under the Pre-Petition First Capital Loan Documents, the DIP Loan Documents, this Interim Order or applicable law, including foreclosing or otherwise enforcing their liens on any or all of the Pre-Petition Collateral and the DIP Facility Collateral, and First Capital and DIP Lender shall be and hereby are authorized, in their sole discretion, to take any and all action and remedies which they deem appropriate to effectuate these rights and remedies; provided that the Debtors, the Committee (if any), and/or the United States Trustee have not obtained an order of this Court (following proper notice to First Capital, DIP Lender and their counsel and a hearing) reimposing the automatic stay upon First Capital and DIP Lender within such five (5) day notice period. The Debtors shall have the burden of proof at any hearing on such request and the only issue that may be raised or addressed at such hearing is whether the Termination Event has occurred. Subject to the Debtors' right in the foregoing sentence, the Debtors shall cooperate with First Capital and DIP Lender in connection with any enforcement action by such parties by, among other things, (i) providing access

to its premises to representatives of First Capital and DIP Lender, (ii) providing First Capital and DIP Lender or their designees access to the Debtors' books and records, (iii) performing all other obligations set forth in the Pre-Petition First Loan Documents, this Interim Order and/or the other DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the Pre-Petition Collateral and the DIP Facility Collateral until First Capital and DIP Lender can make adequate provision to protect and safeguard the Pre-Petition Collateral and the DIP Facility Collateral, and the Debtors shall not otherwise interfere or encourage others to interfere with First Capital's or DIP Lender's enforcement of their rights.

15.    <u>Carve-Out</u>.

(a)    The DIP Liens and Superpriority Claims conferred upon DIP Lender, and all liens in favor of First Capital shall be subject and subordinate to the payment of the following to the extent that there are not sufficient unencumbered funds in the Debtors' estates (and, in the case of all professionals, including attorneys, accountants, appraisers, consultants and investment bankers (collectively, the "<u>Professionals</u>"), sufficient retainers) to pay such amounts: (i) the fees and expenses incurred by the following Professionals of the Debtors that are approved for payment by final order of the Court and do not exceed $250,000 in the aggregate: (1) GGG Partners, LLC, (2) Scroggins & Williamson, P.C., and (3) McNees Wallace & Nurick LLC; (ii) the fees and expenses incurred by the Professionals of, if one is appointed, the Committee that are approved for payment by final order of the Court and do not exceed $30,000 in the aggregate; (iii) fees required to be paid to the Clerk of the Court; and (iv) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (the amounts described in the preceding clauses (i)

through (iv) are collectively called the "Carve-Out"). Any payments made or funds set aside by the Debtors on account of fees and expenses for Professionals from proceeds of the Indebtedness or Cash Collateral, during the pendency of the Chapter 11 Cases shall reduce the applicable Carve-Out.

(b)　Notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, no funds from the DIP Facility or proceeds of the Cash Collateral (including any pre-petition retainer funded by First Capital) pursuant to the Pre-Petition Loan Documents, nor any Pre-Petition Collateral or DIP Facility Collateral (or proceeds thereof) may be used to pay any claims for services rendered by or any other costs incurred in connection with any of the Debtors' Professionals, the Committee's Professionals, or any other entity (1) commencing or continuing any claims, causes of actions or contested matters against First Capital and DIP Lender, including, without limitation, discovery proceedings subsequent to the commencement of any such claims, causes of action or contested matters (excluding, however, informal discovery and review of relevant agreements, instruments, documents and filings prior to the commencement of any such claims, causes of action or contested matters); (2) preventing, hindering or delaying performance or enforcement by First Capital and DIP Lender of their rights or remedies under this Interim Order, any of the DIP Loan Documents, any of the Prepetition First Capital Loan Documents or any other agreement with Debtor; (3) challenging any liens or security interests in favor of First Capital or the DIP Liens or the Superpriority Claims of DIP Lender; (4) asserting or joining in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which

would be to obtain any order, judgment, determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Indebtedness or the liens and security interests of First Capital and DIP Lender in the Pre-Petition Collateral or in the DIP Facility Collateral; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by First Capital or DIP Lender of any of their rights and remedies under the Pre-Petition Loan Documents, this Interim Order and/or the DIP Loan Documents or First Capital's or DIP Lender's enforcement or realization upon any of the liens on or security interests in any Pre-Petition Collateral or DIP Facility Collateral; or (5) any other purpose prohibited by the DIP Loan Documents.

16.    <u>Cash Collection Procedures</u>.  From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Facility Collateral or services provided by the Debtors and all other cash or cash equivalents which shall at any time come into the possession or control of the Debtors, or to which the Debtors shall become entitled at any time shall be deposited in the same bank accounts into which the collections and proceeds of the Pre-Petition Collateral were deposited under the Pre-Petition First Capital Loan Documents (or in such other accounts as are designated by First Capital or DIP Lender from time to time and/or as are approved by order of the Court authorizing the Debtors to maintain bank accounts and cash management systems which order is in form and substance acceptable to First Capital and DIP Lender), and such collections and proceeds upon such deposit shall become the sole and exclusive property of First Capital or DIP Lender and shall be applied against the Indebtedness as provided in this Interim Order and the DIP Loan Documents. All cash and cash equivalents of the Debtors currently in any account of the Debtors or otherwise in the possession or control

of the Debtors constitute proceeds of the Pre-Petition Collateral and shall be immediately remitted to First Capital for application against the Indebtedness. All financial institutions in which any lockboxes, blocked accounts or other accounts of the Debtors are located are hereby authorized and directed to comply with any request of First Capital or DIP Lender to turnover to First Capital and DIP Lender all funds therein without offset or deduction of any kind.

17.    Budget; Use of Cash Collateral and DIP Facility Proceeds.

(a)    Attached as Exhibit A hereto and incorporated herein by reference is a budget (which has been approved by DIP Lender) setting forth by line item and grouped by category all projected cash receipts, sales and cash disbursements for the time period from the Petition Date through January 2, 2015 (the "Initial Approved Budget"). The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which First Capital and DIP Lender agree in their sole discretion (each such additional budget, a "Supplemental Approved Budget"). The aggregate of all items approved by DIP Lender and First Capital in the Initial Approved Budget and any and all Supplemental Approved Budgets (acceptable to First Capital and DIP Lender in their sole discretion) shall constitute an "Approved Budget."

(b)    The Debtors may use Cash Collateral and the proceeds of the DIP Facility exclusively to pay for the expenses incurred by Debtors as provided for in the Approved Budget. Debtors represent and warrant that (a) the expenditures set forth in the Approved Budget constitute all of the Debtors' projected expenses during the period of the Approved Budget, and (b) the Debtors reasonably believe that the Cash Collateral and the sums to be advanced by DIP Lender pursuant to the DIP Facility shall be sufficient to pay all of the

expenses set forth in the Approved Budget. The Debtors shall use commercially reasonable best efforts to ensure that their sales and cash receipts shall not be less than as set forth in the Approved Budget and the Debtors' expenses shall not exceed those set forth in the Approved Budget, in all cases subject to the Approved Sales Variance, the Approved Cash Receipts Variance, and the Approved Disbursements Variance (all as defined below, and collectively, the "Approved Variances"). Notwithstanding the foregoing, DIP Lender shall have no obligation to provide the DIP Facility if the Indebtedness exceeds the Borrowing Base, as that term is defined in the Loan and Security Agreement.  As used herein, the Approved Variances include, and are defined and calculated as follows:

(i)    "Approved Sales Variance" means (i) a negative variance of less than 25% between Debtors' actual sales and Debtors' projected sales measured commencing as of the end of the first week covered by the Approved Budget; (ii) a negative variance of less than 20% between Debtors' projected sales and Debtors' projected sales measured cumulatively from the commencement of the Chapter 11 Cases concluding with the end of the second week covered by the Approved Budget; (iii) a negative variance of less than 15% between Debtors' projected sales and Debtors' projected sales measured cumulatively from the commencement of the Chapter 11 Cases concluding with the end of the third week covered by the Approved Budget; and (iv) a negative variance of less than 10% between Debtors' projected sales and Debtors' projected sales measured cumulatively from the commencement of the Chapter 11 Cases concluding with the end of any week covered by the Approved Budget during which the variance is being calculated beyond the third week;

(ii)    "Approved Cash Receipts Variance" means (i) a negative variance of less than 25% between Debtors' actual cash receipts and Debtors' projected cash receipts measured commencing as of the end of the first week covered by the Approved Budget; (ii) a negative variance of less than 20% between Debtors' actual cash receipts and Debtors' projected cash receipts measured cumulatively from the commencement of the Chapter 11 Cases concluding with the end of the second week covered by the Approved Budget; (iii) a negative variance of less than 15% between Debtors' actual cash receipts and Debtors' projected cash receipts measured cumulatively from the commencement of the

33

Chapter 11 Cases concluding with the end of the third week covered by the Approved Budget; and (iv) a negative variance of less than 10% between Debtors' actual cash receipts and Debtors' projected cash receipts measured cumulatively from the commencement of the Chapter 11 Cases concluding with the end of any week covered by the Approved Budget during which the variance is being calculated beyond the third week;

(iii)    "Approved Disbursements Variance" means a positive variance of (A) less than 10% between Debtors' actual disbursements and Debtors' projected disbursements, on an aggregate basis for each category of line items as shown in an Approved Budget, and (B) less than 10% of the Debtors' actual disbursements and Debtors' projected disbursements, on a cumulative basis, each measured commencing as of the end of the second week covered by the Approved Budget and each week thereafter for both (i) the two-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the Chapter 11 Cases concluding with the week during which the variance is being calculated.

18.    <u>Financial Reporting</u>.  In addition to all of the financial reports the Debtors are required to provide to First Capital and DIP Lender pursuant to the Pre-Petition First Capital Loan Documents, which financial reports the Debtors shall continue to provide to First Capital timely in accordance with the Pre-Petition First Capital Loan Documents, the Debtors shall also provide the following reports to DIP Lender: (i) no later than 5:00 p.m. (Eastern Time), a borrowing base certificate on the day prior to any business day which the Debtors wish to obtain an advance of funds, along with a log of the daily disbursements and collections; (ii) no later than 5:00 p.m. (Eastern time) each Wednesday, a comparison of the items in the Budget for the preceding week to the Debtors' actual performance that includes a narrative summary of any material variances from the Budget for the preceding week; (iii) no later than 5:00 p.m. (Eastern time) each Monday, a detailed report from the Debtors' investment bankers that summarizes the status of the Debtors' efforts to sell substantially all of its assets as a going concern, which report shall include (w) a tracking chart reflecting what communications, if any, the investment banker

34

had with interested parties during the prior week; (x) copies of expressions of interest or letters of intent received by the Debtors from third parties; (y) a summary of the due diligence activities conducted by interested parties in the preceding week; and (z) a time table for execution of definitive agreements with potential parties and the filing of pleadings with the Court seeking approval of the sale; (iv) no later than the 30th day of each month, beginning September 30, 2014, the Debtors' financial statements (including detail by operating division and consolidated balance sheets, income statements and cash flow statements) for the immediately preceding month in the same format as the Debtors have been providing to First Capital prior to the Petition Date; and (v) the Debtors' monthly operating reports no later than 5:00 p.m. (Eastern Time) as and when such reports are required to be filed with the Court.

      19.    <u>Covenants</u>.  The Debtor shall timely comply with all of the covenants set forth in the Pre-Petition First Capital Loan Documents (other than (i) covenants relating to the filing of these Chapter 11 cases or relating to the financial condition of the Debtors to the extent inconsistent with the terms of this Interim Order or (ii) as modified by this Interim Order), this Interim Order and the DIP Loan Documents.

      20.    <u>DIP Lender and First Capital's Reservation of Rights; No Waiver</u>.  DIP Lender and First Capital do not waive, and expressly reserve, any and all claims, defenses, rights and remedies they have pursuant to any or all of the Pre-Petition First Capital Loan Documents, the DIP Loan Documents, the Bankruptcy Code and/or other applicable law against the Debtors and any officer, director, employee, agent or other representative of the Debtors. In addition, the rights and obligations of the Debtors and the rights, claims, liens, security interests and priorities of DIP Lender and First Capital arising under this Interim Order are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests

and priorities granted by the Debtors, in their pre-petition capacity, under the Pre-Petition First Capital Loan Documents. Notwithstanding anything to the contrary contained in the Interim Order, DIP Lender and First Capital reserve the right to seek additional relief from the Court on any issue that may arise in connection with the Chapter 11 Cases.

21.    <u>Order Binding on Successors</u>.  The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender, First Capital and the Debtors, and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtors' estates or of any estate in any successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents, except as set forth in paragraph 15 above regarding the Carve-Out.

22.    <u>Releases and Validation of Pre-Petition Indebtedness and Pre-Petition Liens;</u> <u>Allowance of Pre-Petition Indebtedness as Fully Secured Claim</u>.  Subject to the rights of the Committee (or any creditor or party in interest, if no Committee is appointed), if any, acting on behalf of the estate pursuant to paragraph 24 below, the Debtors and their estates, hereby: (a) release and discharge First Capital, together with its affiliates, agents, attorneys, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Pre-Petition First Capital Loan Documents, any aspect of the pre-petition relationship between First Capital and the Debtors, or any other acts or omissions by First Capital in connection with any of the Pre-Petition First Capital Loan Documents or its pre-petition relationship with the Debtors; (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidabilily (under §§ 510, 544, 545, 547, 548, 550, 551, 552 or 553 of the Bankruptcy Code or otherwise) of the Pre-Petition Indebtedness and the

security interests in and liens on the Pre-Petition Collateral in favor of First Capital (which liens and security interests are senior in priority); and (c) agree, without further Court order and without the need for the filing of any proof of claim, to the allowance of the pre-petition claim of First Capital pursuant to §§ 502 and 506 of the Bankruptcy Code on account of the Pre-Petition Indebtedness as fully secured claims according to First Capital's books and records, the amount of which, including interest, is not less than approximately $12,995,703 (inclusive of $2,500,000 in reimbursement obligations for undrawn letters of credit) as of the Petition Date, plus accrued pre-petition fees, expenses and other amounts chargeable under the Pre-Petition Loan Documents.

23.    No Deemed Control.  By consenting to entry of this Interim Order, making advances under the DIP Facility or administering the financing relationship with Debtor pursuant to the DIP Loan Documents, DIP Lender shall not be deemed to be in control of the Debtors or their operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar state or federal statute) with respect to the operation or management of the Debtors.

24.    Objections by Parties in Interest.  Except as set forth in paragraph J and ordering paragraph 22 of this Interim Order, all of the provisions of this Interim Order shall be final and binding on the Debtors and all creditors and other parties in interest. The Committee shall have until thirty (30) days from its appointment, or if no Committee is appointed, any creditor or party in interest shall have until sixty (60) days from the Petition Date, within which to file, on behalf of the Debtors, and to serve upon counsel for First Capital, objections or complaints respecting (a) the claims, causes of actions and defenses released by the Debtors pursuant to ordering

paragraph 22 above or (b) the validity, extent, priority, avoidability, or enforceability of the Pre-Petition Indebtedness or the Pre-Petition Liens in the Pre-Petition Collateral. In the event that no objections or complaints are filed with this Court and served upon First Capital within the time period set forth above, the provisions of paragraph 22 and the stipulations of the Debtors in paragraph J of this Interim Order shall become final and binding on all such parties.

25.    Effect of Modification of Interim Order.  The Debtors shall not, without DIP Lender or First Capital's prior written consent (which shall be given or refused in their sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and First Capital shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

26.    Safe Harbor.  The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors and First Capital have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in §

364(e) of the Bankruptcy Code.

      27.     <u>Subsequent Hearing; Procedure for Objections and Entry of Final Order</u>.  The

Motion is set for a final hearing ("<u>Final Hearing</u>") before this Court at ___ _._. on September __,

2014 (such date or such later date to which the Final Hearing is adjourned or continued with First

Capital's consent, the "<u>Final Hearing Date</u>"), at which time any party in interest may present any

timely filed objections to the entry of a final order, in form and substance, acceptable to First

Capital in its sole discretion (the "<u>Final Order</u>"). The Debtors shall promptly serve a notice of

entry of this Order and the Final Hearing, together with a copy of this Interim Order, by regular

mail upon (i) the parties identified in paragraph E, F, G, H, and I hereof; (ii) appropriate state and

federal taxing authorities; (iii) the creditors holding the 30 largest unsecured claims on a

consolidated basis against the Debtors, or the Committee, if appointed; and (iv) any other party

which theretofore has filed in the Chapter 11 Cases a request for special notice with this Court

and served such request upon Debtors' counsel. The notice of the entry of this Interim Order and

the Final Hearing shall state that objections to the entry of a Final Order on the Motion shall be

in writing and shall be filed with the United States Bankruptcy Clerk for the Northern District of

Georgia no later than September __, 2014, which objections shall be served so that the same are

received on or before 4:00 p.m. (Eastern Time) of such date by (i) J. Robert Williamson,

Scroggins & Williamson, 1500 Candler Building, 127 Peachtree Street, N.E., Atlanta, Georgia

30303 (ii) Darryl S. Laddin,  Arnall Golden Gregory LLP, 171 17th Street, NW, Suite 2100,

Atlanta, Georgia 30363; (iii) [Committee Counsel Address] (iv) the United States Trustee, 362

Richard Russell Federal Building, 75 Spring Street, S. W., Atlanta, Georgia 30303. Any

objections by creditors or other parties in interest to any of the provisions of this Order may be

deemed waived unless filed and served in accordance with this paragraph.

28.    <u>Controlling Effect of Order</u>.  To the extent any provisions in this Interim Order conflict with any provisions of the Motion, the provisions of this Interim Order shall control.

29.    <u>Order Effective</u>.  This Interim Order shall be effective as of the date of signature by the Court.

**[END OF DOCUMENT]**

Prepared and presented by:


SCROGGINS & WILLIAMSON, P.C.


_____
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
ASHLEY REYNOLDS RAY
Georgia Bar No. 601559
1500 Candler Building
127 Peachtree Street, N.E.
Atlanta, GA  30303
(404) 893-3880
Counsel for the Debtors

SCHEDULE 1

Pre-Petition Non-Seller Subordinated Notes:

(1) that certain Subordinated Note executed in favor of Bahman and Yasmin Mossavar-Rahmani dated as of 7/31/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(2) that certain Subordinated Note executed in favor of Fribourg, Ltd. dated as of 6/22/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(3) that certain Subordinated Note executed in favor of the Ghassem Ladjevardi Trust dated as of 5/28/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(4) that certain Subordinated Note executed in favor of C.H. Miller Hardware, Inc. dated as of 6/15/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(5)  that certain Subordinated Note executed in favor of Dr. Dariush Owlia dated as of 5/28/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(6) that certain Subordinated Note executed in favor of Dr. Robert W. Kahan dated as of 5/28/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(7) that certain Subordinated Note executed in favor of United American Securities, Inc. dated as of 8/15/11, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(8) that certain Subordinated Note executed in favor of Thomas Miller dated as of 8/15/09, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(9) that certain Subordinated Note executed in favor of EFG Bank dated as of 6/17/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(10) that certain Subordinated Note executed in favor of Charles and Nancy Moore dated as of 5/28/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(11) that certain Subordinated Note executed in favor of George Sample dated as of 8/18/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(12) that certain Subordinated Note executed in favor of Seyed H. Aleali dated as of 8/9/10, as amended by that certain First Amendment to Subordinated Note dated as of 1/1/12, as amended by that certain Second Amendment to Subordinated Note dated as of 8/13/13;

(13) that certain Subordinated Note executed in favor of David Goodman dated as of 7/1/09, as amended by that certain First Amendment to Subordinated Note dated as of 6/21/13;

(14) that certain Subordinated Note executed in favor of David Goodman dated as of 8/15/09, as amended by that certain First Amendment to Subordinated Note dated as of 6/21/13; and

(15) that certain Subordinated Note executed in favor of David Goodman dated as of 6/15/10, as amended by that certain First Amendment to Subordinated Note dated as of 6/21/13.

<u>SCHEDULE 2</u>

Pre-Petition Seller Subordinated Secured Debt Documents:

(1) that certain Promissory Note executed in favor of Robert Anthony Delmonico dated as of 8/1/08, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(2) that certain Promissory Note executed in favor of Robert Alfred Delmonico dated as of 8/1/08, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(3) that certain Promissory Note executed in favor of Danielle Delmonico dated as of 8/1/08, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(4) that certain Promissory Note executed in favor of Ralph S. Carratura dated as of 8/1/08, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(5) that certain Promissory Note executed in favor of Nicole M. Carratura dated as of 8/1/08, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(6) that certain Promissory Note executed in favor of Joseph Horvath dated as of 3/30/07, as amended by that certain Amendment to Promissory Note dated as of 8/13/13; [6]

(7) that certain Non-Competition and Non-Solicitation Agreement executed by and between Joseph Horvath and Shirley Horvath and Miller Auto dated as of 3/1/07, as amended by that certain Amendment to Non-Competition and Non-Solicitation Agreement dated as of 8/13/13;

(8) that certain Promissory Note executed in favor of Cook Brothers Automotive, Inc. dated as of 8/31/06, as amended by that certain Amendment to Promissory Note dated as of 8/13/13; [7]
(9) that certain Non-Competition and Non-Solicitation Agreement executed by and between Richard T. Cook, Jr. and Miller Auto dated as of 8/31/06, as amended by that certain Amendment to Non-Competition and Non-Solicitation Agreement dated as of 8/13/13;

(10) that certain Non-Competition and Non-Solicitation Agreement executed by and between Gary W. Cook and Miller Auto dated as of 8/31/06, as amended by that certain Amendment to Non-Competition and Non-Solicitation Agreement dated as of 8/13/13.

---

[6]     The Debtors do not believe the Horvaths have a properly perfected security interest in any assets of the Debtors.
[7]     The Debtors do not believe the Cook Brothers have a properly perfected security interest in any assets of the Debtors.

<u>SCHEDULE 3</u>

Pre-Petition Seller Subordinated Unsecured Debt Documents:

(1) that certain Promissory Note executed in favor of C & N Auto Parts, Inc. dated as of 3/29/10, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(2) that certain Promissory Note executed in favor of Perimeter Auto Parts, LLC dated as of 5/15/10, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(3) that certain Promissory Note executed in favor of Ken Smith Auto Parts, Inc. dated as of 5/24/10, as amended by that certain Amendment to Promissory Note dated as of 8/1/13;

(4) that certain Promissory Note executed in favor of Automotive Color Technology L.L.C. dated as of 11/7/08, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(5) that certain Promissory Note executed in favor of Benjamin G. Johnston dated as of 8/2/10, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

(6) that certain Promissory Note executed in favor of Bowsman Enterprises, LLC dated as of 4/17/09, as amended by that certain Amendment to Promissory Note dated as of 7/12/13;

(7) that certain Amended & Restated Promissory Note executed in favor of Kelly Auto Parts, Inc. dated as of  8/13/13;

(8) that certain Promissory Note executed in favor of Dorothy Stong dated as of 2/6/09, as amended by that certain Amendment to Promissory Note dated as of 8/13/13;

## SCHEDULE 4

The definition of Borrowing Base, as set forth in Item 1 of the Schedule to the Loan and Security Agreement, is modified as follows:

Through November 30, 2014, in Item 1(a)(ii)(B), the words "the lesser of:" are hereby deleted and Item 1(a)(ii)(B)(2) is hereby deleted. Thereafter, such deleted provisions are reinstated.  The definition of Borrowing Base as set forth in Item 1 of the Schedule to the Loan and Security Agreement may be further modified upon agreement between the Debtors and the DIP Lender, which shall have the right to agree or not agree to any modification in its sole discretion.

Exhibit "A" to Interim Order

**MAPCO Consolidated**
**New 15 Week Forecast**

| Week Ended | 9/12/2014 | 9/19/2014 | 9/26/2014 | 10/3/2014 | 10/10/2014 | 10/17/2014 | 10/24/2014 | 10/31/2014 | 11/7/2014 | 11/14/2014 | 11/21/2014 | 11/28/2014 | 12/5/2014 | 12/12/2014 | 12/19/2014 | 12/26/2014 | 1/2/2015 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | | | | | |
| Cash: CC Sales | 101,000 | 101,000 | 101,000 | 82,000 | 82,000 | 82,000 | 82,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 80,000 | 80,000 | 80,000 | 80,000 | 107,000 | 1,481,000 |
| Adams Credit Sales | 1,180,000 | 1,180,000 | 750,000 | 617,000 | 1,180,000 | 706,000 | 766,000 | 1,176,000 | 1,101,000 | 870,000 | 870,000 | 531,000 | 982,000 | 570,000 | 465,000 | 465,000 | 1,058,400 | 14,639,000 |
| Pittsburgh Credit Sales | 563,000 | 466,000 | 379,000 | 384,000 | 1,008,000 | 489,000 | 480,000 | 934,000 | 431,000 | 366,000 | 366,000 | 335,000 | 819,000 | 377,000 | 320,000 | 315,000 | 807,000 | 9,128,000 |
| Huntington Credit Sales | 144,000 | 60,000 | 115,000 | 115,000 | 115,000 | 162,000 | 137,000 | 180,000 | 128,000 | 129,000 | 129,000 | 139,000 | 344,000 | 158,000 | 102,000 | 102,000 | 102,000 | 2,774,000 |
| Trade Receipts | 171,000 | 144,000 | 320,000 | 320,000 | 320,000 | 162,000 | 151,000 | 151,000 | 151,000 | 1,777,000 | 1,256,000 | 1,256,000 | 344,000 | 1,583,000 | 134,000 | 134,000 | 1,371,000 | 28,602,000 |
| Unused Line | 2,418,000 | 1,851,000 | 1,855,000 | 1,290,000 | 2,570,000 | 1,814,000 | 1,351,000 | 2,593,000 | 1,777,000 | 1,256,000 | 1,256,000 | 1,087,000 | 2,208,000 | 1,533,000 | 1,104,000 | 946,000 | 1,971,000 | 26,802,000 |
| **Total Cash Receipts** | 2,418,000 | 1,851,000 | 1,855,000 | 1,290,000 | 2,570,000 | 1,814,000 | 1,351,000 | 2,593,000 | 1,777,000 | 1,256,000 | 1,256,000 | 1,087,000 | 2,208,000 | 1,533,000 | 1,104,000 | 946,000 | 1,971,000 | 26,802,000 |
| **Cash Disbursements** | | | | | | | | | | | | | | | | | | |
| GM/AC Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Food/Motorcraft | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Unused Line | 565,000 | 565,000 | 565,000 | 460,000 | 460,000 | 460,000 | 460,000 | 475,000 | 475,000 | 475,000 | 475,000 | 475,000 | 960,000 | 400,000 | 400,000 | 520,000 | 7,450,000 | |
| Pre-Filing A/P | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| All Other Inventory Purchases | 565,000 | 565,000 | 565,000 | 460,000 | 460,000 | 460,000 | 460,000 | 475,000 | 475,000 | 475,000 | 475,000 | 475,000 | 960,000 | 400,000 | 400,000 | 520,000 | 7,450,000 | |
| Payment to Vendors for Inventory | 1,365,000 | 1,365,000 | 1,360,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,120,000 | 1,135,000 | 1,135,000 | 1,135,000 | 1,135,000 | 1,135,000 | 960,000 | 960,000 | 960,000 | 1,265,000 | 18,085,000 | |
| Gross Payroll, Taxes and Fees | 350,000 | 350,000 | - | 335,000 | - | 350,000 | 335,000 | - | 335,000 | - | 350,000 | - | 350,000 | - | 350,000 | - | 350,000 | 2,755,000 |
| Commissions | 60,000 | 60,000 | - | - | - | 60,000 | - | - | - | - | 60,000 | - | 60,000 | - | 60,000 | - | 300,000 | |
| Employee Benefits | 18,000 | 18,000 | - | - | 18,000 | - | 18,000 | - | 18,000 | - | 18,000 | - | 18,000 | - | 18,000 | - | 72,000 | |
| Contract Labor | 20,000 | 20,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 128,000 | |
| **Subtotal Labor Related** | 448,000 | 448,000 | 6,000 | 341,000 | 6,000 | 484,000 | 341,000 | 6,000 | 341,000 | 6,000 | 416,000 | 6,000 | 484,000 | 6,000 | 416,000 | 6,000 | 3,255,000 | |
| Sale & Other Tax Remittances | 70,000 | 71,500 | 50,000 | 10,750 | 50,000 | 71,500 | 50,000 | 10,750 | 71,500 | 50,000 | 10,750 | 50,000 | 71,500 | 50,000 | 71,500 | 43,000 | 286,000 | |
| Selling, General & Administrative | 70,000 | 50,000 | 50,000 | 42,104 | 50,000 | 50,000 | 50,000 | 42,104 | 50,000 | 50,000 | 42,104 | 50,000 | 42,104 | 50,000 | 42,104 | 870,000 | 184,416 | |
| Facility Costs | 35,000 | 25,000 | 25,000 | 1,979 | 50,000 | 25,000 | 145,000 | 1,979 | 25,000 | 145,000 | 1,979 | 145,000 | 1,979 | 50,000 | 1,979 | 915,000 | 7,916 | |
| Freight | 35,000 | 180,000 | 25,000 | 180,000 | 180,000 | 180,000 | 25,000 | 180,000 | 25,000 | 25,000 | 180,000 | 25,000 | 180,000 | 25,000 | 145,000 | 1,345,000 | 23,000 | |
| CapEx | - | 5,000 | - | 5,000 | - | 5,000 | - | 5,000 | 5,000 | - | 5,000 | - | 5,000 | 25,000 | 5,000 | 20,000 | 5,210 | |
| Other | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 101,000 | 15,000 | 15,000 | 564,398 | 81,000 | |
| **Subtotal Other Expenditures** | 155,000 | 346,500 | 153,577 | 890,000 | 184,000 | 346,500 | 153,577 | 270,000 | 191,500 | 153,577 | 285,000 | 361,000 | 186,500 | 153,577 | 235,000 | 4,003,348 | | |
| US Trustee Fees | - | - | - | - | 10,400 | - | - | - | - | 14,790 | - | - | - | - | - | 10,400 | | |
| Unsecured Creditor Committee | - | - | - | - | - | - | - | - | - | - | - | 97,000 | - | - | 10,000 | 486,371 | | |
| Filing & Professional Related | 120,081 | 5,000 | - | 12,000 | 115,000 | 128,400 | - | 18,000 | 155,000 | 185,000 | 14,790 | 97,000 | - | 10,000 | 546,771 | | | |
| **Subtotal Filing Related** | 120,081 | 5,000 | - | 12,000 | 115,000 | 128,400 | - | 18,000 | 155,000 | 185,000 | 14,790 | 97,000 | - | 10,000 | 546,771 | | | |
| **Total Operating Disbursements** | 873,081 | 1,784,500 | 1,524,577 | 1,863,000 | 1,310,000 | 2,053,900 | 1,275,577 | 1,714,000 | 1,401,000 | 1,785,500 | 1,401,000 | 1,708,867 | 1,852,000 | 1,553,500 | 1,552,500 | 1,599,577 | 1,506,000 | 23,467,079 |
| Payments to Secured Debt Holder - First Capital | | | | | | | | | | | | | | | | | | |
| First Capital Admin Fee & Annual Fee | - | - | - | 10,750 | - | - | - | 10,750 | - | - | 10,750 | - | 10,750 | - | - | 10,750 | 43,000 | |
| First Capital Loan Interest | - | - | - | 42,104 | - | - | - | 42,104 | - | - | 42,104 | - | 42,104 | - | - | 42,104 | 168,416 | |
| First Capital Unused Line Fee | - | - | - | 1,979 | - | - | - | 1,979 | - | - | 1,979 | - | 1,979 | - | - | 1,979 | 7,916 | |
| LOC Fee | 1,042 | - | - | 1,042 | - | 9,000 | - | 1,042 | - | 9,000 | - | 1,042 | - | 9,000 | - | 1,042 | 5,210 | |
| Other Fees from FCC | - | 54,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 81,000 | |
| Notes Payments: | | | | | | | | | | | | | | | | | | |
| Seller Notes and Other Notes Payable | 1,042 | 54,000 | - | 55,875 | - | - | 691,571 | - | 9,000 | - | - | - | 9,000 | - | - | 55,875 | | |
| **Total Debt Service** | 1,042 | 54,000 | - | 55,875 | - | - | 691,571 | 45,423 | 55,875 | 9,000 | 1,782,196 | 435,329 | 55,875 | 9,000 | 55,875 | 365,542 | | |
| **Total Disbursements** | 874,123 | 1,788,500 | 1,524,577 | 1,918,875 | 1,310,000 | 2,084,900 | 1,279,577 | 1,714,000 | 1,456,875 | 1,785,500 | 1,401,000 | 1,708,867 | 1,256,875 | 1,861,000 | 1,553,300 | 1,599,577 | 1,561,875 | 23,832,621 |
| **Net Cash Flow** | 1,543,878 | 62,500 | 327,923 | (392,952) | 1,260,000 | (230,900) | 45,423 | 1,278,571 | (468,000) | 1,076,125 | (12,500) | (145,000) | (423,867) | 951,125 | (328,000) | (48,500) | (823,577) | 409,125 |
| **Cash Balance** | 500,000 | 562,500 | 627,623 | (192,952) | 867,048 | 646,148 | 691,571 | 1,204,686 | 1,047,196 | 1,376,454 | 1,048,454 | 999,954 | 376,377 | 785,502 | | | | |