**EXHIBIT "B"**

**EXECUTION VERSION**

## LOAN AND SECURITY AGREEMENT

Dated as of August 13, 2013

Between

# MILLER AUTO PARTS & SUPPLY COMPANY, INC., JOHNSON INDUSTRIES, INC., MILLER AUTO PARTS & PAINT COMPANY, INC., AUTOPARTSTOMORROW.COM, LLC

(collectively, Borrowers)

and

# FCC, LLC, d/b/a First Capital

(Lender)

## TABLE OF CONTENTS

**Page**

1.  DEFINITIONS ................................................................................................. 1

2.  BORROWING .................................................................................................. 13

3.  INTEREST AND FEES .................................................................................... 18

4.  REPRESENTATIONS AND WARRANTIES OF BORROWER ...................... 20

5.  COLLATERAL ................................................................................................ 22

6.  FINANCIAL COVENANTS ........................................................................... 23

7.  COLLATERAL COVENANTS ....................................................................... 24

8.  NEGATIVE COVENANTS ............................................................................. 26

9.  REPORTING AND INFORMATION ............................................................. 29

10. INSPECTION RIGHTS; EXPENSES; ETC. .................................................. 30

11. RIGHTS OF SETOFF, APPLICATION OF PAYMENTS, ETC. ................... 31

12. ATTORNEY-IN-FACT .................................................................................. 31

13. DEFAULTS AND REMEDIES ...................................................................... 32

14. INDEMNIFICATION ..................................................................................... 35

15. GENERAL PROVISIONS .............................................................................. 36

16. LETTERS OF CREDIT .................................................................................. 40

**Attachments:**

**Schedule**
**Exhibit A – Legal Description of Real Estate**

**Exhibit B - Form of Borrowing Base Certificate**
**Exhibit C - Form of Compliance Certificate**
**Exhibit D – Seller Subordinated Debt**
**Exhibit E – Noteholder Subordinated Debt**

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into as of August 13, 2013, by and among MILLER AUTO PARTS & SUPPLY COMPANY, INC., a Delaware corporation ("Parent"), JOHNSON INDUSTRIES, INC., a Georgia corporation ("Industries"), MILLER AUTO PARTS & PAINT COMPANY, INC., a Delaware corporation ("APPC"), AUTOPARTSTOMORROW.COM, LLC, a Delaware limited liability company ("APT") (Parent, Industries, APPC and APT are each individually, a "Borrower", and collectively, the "Borrowers"), and FCC, LLC, d/b/a FIRST CAPITAL, a Florida limited liability company ("Lender").

### RECITALS:

WHEREAS, Borrowers have requested that Lender provide Borrowers with a secured lending facility arrangement on the terms set forth herein, which Borrowers will use for the purposes permitted hereunder; and

WHEREAS, in order to utilize the financial powers of Borrowers in the most efficient and economical manner, and in order to facilitate the financing of Borrowers' working capital needs, Lender will, at the request of Borrowers, extend financial accommodations to Borrowers based on the borrowing base of Borrowers in accordance with the provisions set forth in this Agreement; and

WHEREAS, Borrowers' business is a mutual and collective enterprise and Borrowers believe that the consolidation of all loans and other financial accommodations under this Agreement will enhance the aggregate borrowing powers of Borrowers and facilitate the administration of their loan relationship with Lender, all to the mutual advantage of Borrowers; and

WHEREAS, each Borrower acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to Borrowers as provided in this Agreement, by virtue of Borrowers' various inter-relationships as joint guarantors or joint obligors and the beneficiaries thereof, as lessors and lessees, as suppliers and customers, and as joint venturers; and

WHEREAS, Lender's willingness to extend financial accommodations to Borrowers, and to administer Borrowers' collateral security therefor, on a combined basis as more fully set forth in this Agreement, is done solely as an accommodation to Borrowers and at Borrowers' request and in furtherance of Borrowers' mutual and collective enterprise.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

NOW, THEREFORE, Borrowers and Lender hereby agree as follows:

1.      **Definitions**.  For purposes of this Agreement:

"Accounts" means all presently existing or hereafter arising accounts receivable due to each Borrower (including medical and health-care-insurance receivables), book debts, notes, drafts and acceptances and other forms of obligations now or hereafter owing to each Borrower, whether or not arising from the sale or lease of goods or the rendition of services by such Borrower (including any obligation that might be characterized as an account, contract right, general intangible or chattel paper under the UCC), all of each Borrower's rights in, to and under all purchase orders now or hereafter received by such Borrower for goods and services, all proceeds from the sale of Inventory, all monies due or to become due to each Borrower under all contracts for the sale or lease of goods or the rendition of services by such Borrower (whether or not yet earned) (including the right to receive the proceeds of said purchase orders and contracts), all collateral security and guarantees of any kind given by any obligor with respect to any of the foregoing, all amounts payable to any Borrower under any insurance policy and all goods returned to or reclaimed by each Borrower that correspond to any of the foregoing.

"Affiliate" means, with respect to a Person, (a) any family member, officer, director, employee or managing agent of such Person, and (b) any other Person (i) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such given Person, (ii) that, directly or indirectly beneficially owns or holds 10% or more of any class of voting stock, membership interests, partnership interests or other interest of such Person or any subsidiary of such Person, or (iii) 10% or more of the voting stock, membership interests, partnership interests or other interest of which is directly or indirectly beneficially owned or held by such Person or a subsidiary of such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting stock, membership interests, partnership interests or other interest, by contract or otherwise.

"Agreement Date" means the date as of which this Agreement is dated.

"Alison Brooke Goodman Trust" means that certain trust described under paragraph 3 of the Goodman Will.

"Borrowers' Agent" means Parent, in its capacity as agent for the Borrowers in accordance with **Section 2(l)**.

"Borrowing Base" has the meaning set forth in **Item 1 of the Schedule**.

"Borrowing Base Certificate" means the certificate, substantially in the form of Exhibit B, with appropriate insertions, to be submitted to Lender by Borrowers' Agent pursuant to this Agreement and certified as true and correct by the Chief Executive Officer or the Chief Financial Officer of Borrowers' Agent.

"Business Day" means any day excluding Saturday, Sunday, and any day which is a legal holiday under the laws of the State of Georgia or which is a day on which Lender is otherwise closed for transacting business with the public.

"Buckley Note" means that certain Promissory Note dated February 10, 2010, in the principal sum of One Hundred Eighty-Four Thousand Nine Hundred Twenty-Four and 25/100 Dollars ($184,924.25), executed by Gregory Buckley, individually, and made payable to the order of Parent.

"Collateral" has the meaning set forth in **Section 5(a)**.

"Core Parts Inventory" means Inventory of a Borrower consisting or comprised of battery cores or core parts that are used or have been reconditioned or otherwise retrofitted.

"Customer" means any customer of any Borrower.

"David K. Goodman, Jr. Educational Trust" means that certain trust described under paragraph 9 of the Goodman Will.

"Default" has the meaning set forth in **Section 13(a)**.

"Eligible Accounts" means those Accounts arising from the sale of Inventory or performance of services in the ordinary course of each Borrower's business, net of all credits and rebates; provided, however, that Eligible Accounts shall not include the following:

(a)      any Account which has remained unpaid for more than the number of days specified in **Item 2(a) of the Schedule**;

(b)      Accounts with respect to which the Customer is an Affiliate of any Borrower;

(c)      Accounts with respect to which services or goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Customer may be conditional;

(d)      Accounts with respect to which the Customer (i) does not maintain its chief executive office in the United States, or (ii) is not organized under the laws of the United States of America or any state thereof; or (iii) is the government of any foreign country or of any state, province, municipality, or other political subdivision thereof; except to the extent that (A) such Account is secured or payable by a letter of credit satisfactory to Lender in its discretion, or (B) the applicable Customer is organized under the laws of Canada and (I) such Account would otherwise constitute an Eligible Account, (II) such Account is payable in United States dollars, (III) such Account is paid directly to a lockbox designated by Lender and (IV) the aggregate amount of all such Accounts does not exceed $100,000;

(e)      any and all Accounts as to which the perfection, enforceability, or validity of Lender's Collateral or security interest in such Account, or Lender's right or ability to obtain direct payment to Lender of the proceeds of such Account, is governed by any federal or state statutory requirements other than those of the Uniform Commercial Code, including any Account subject to the Federal Assignment of Claims Act of 1940; provided, however, that an Account shall not be deemed ineligible by reason of this clause (e) if such Borrower has completed all of

the steps necessary, in the discretion of Lender, to comply with the Federal Assignment of Claims Act of 1940 with respect to such Account;

(f)     Accounts with respect to which the Customer is any state of the United States or any city, town, municipality, county or division thereof, where the dollar value of the aggregate amount of such Accounts is greater than two percent (2%) of Borrowers' total Accounts, but only to the extent of such excess;

(g)     Accounts which may be subject to any offset or recoupment by the Customer, whether as the result of goods sold or services rendered by the Customer to such Borrower, any contractual arrangement between the Customer and such Borrower (including any lease) or otherwise;

(h)     all of the Accounts owed by a Customer if the percentage of the aggregate outstanding dollar amount of such Accounts owed by such Customer not considered as Eligible Accounts under clause (a) above, determined as a percentage of all Accounts, is equal to or greater than the Cross Aging Percentage specified in **Item 2(b) of the Schedule**;

(i)     Accounts for which services have not yet been rendered to the Customer or the goods sold have not yet been delivered to the Customer (commonly referred to as "pre-billed accounts");

(j)     Accounts owed by a Customer where the dollar value for the aggregate amount of Accounts owed by such Customer is greater than the percentage of Borrowers' Eligible Accounts (in the aggregate) specified in **Item 2(c) of the Schedule**, but only to the extent of such excess, provided, however, that Lender may consent in writing to a higher percentage for Customers (or a specific Customer);

(k)     any Account with respect to all or part of which a check, promissory note, draft, trade acceptance, or other instrument for the payment of money has been received, presented for payment, and returned uncollected for any reason;

(l)     any Account with respect to which such Borrower has extended the time for payment without the consent of Lender, provided, however, such Borrower shall be permitted to extend the time for payment of any such Account without the consent of Lender so long as such extended due date is not more than ninety (90) days after the date of the original invoice therefor;

(m)     any Account with respect to which any one or more of the following events has occurred to the Customer on such Account:  death or judicial declaration of incompetency of a Customer who is an individual; the filing by or against the Customer of a request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as a bankrupt, winding-up, or other relief under the bankruptcy, insolvency, or similar laws of the United States, any state or territory thereof, or any foreign jurisdiction, now or hereafter in effect; the making of any general assignment by the Customer for the benefit of creditors; the appointment of a receiver or trustee for the Customer or for any of the assets of the Customer, including, without limitation, the appointment of or taking possession by a "custodian," as defined in the

Bankruptcy Code; the institution by or against the Customer of any other type of insolvency proceeding (under the bankruptcy laws of the United States or otherwise) or of any formal or informal proceeding for the dissolution or liquidation of, settlement of claims against, or winding up of affairs of, the Customer; the sale, assignment, or transfer of all or any material part of the assets of the Customer; the nonpayment generally by the Customer of its debts as they become due; or the cessation of the business of the Customer as a going concern;

(n)      any Account which arises out of finance or similar charges;

(o)      any Account in which Lender does not have a duly perfected, first-priority security interest, subject to no other Lien other than a Permitted Lien subject to a Subordination Agreement;

(p)      any Account which arises under a contract or arrangement covered by a performance or surety bond on behalf of such Borrower, unless the Person providing such performance or surety bond has delivered an acceptable Lien waiver to Lender;

(q)      any Account which is evidenced by a note, draft, trade acceptance, or other instrument for the payment of money where such instrument, document, chattel paper, note, draft, trade acceptance or other instrument has not been endorsed and delivered by such Borrower to Lender; or

(r)      those Accounts where Lender, in Lender's reasonable discretion, has notified such Borrower that the Account or Customer is not acceptable to Lender.

"Eligible Inventory" means and includes that Inventory of each Borrower (other than packaging materials, labels and supplies) located in the continental United States which Lender, in its discretion, deems to be Eligible Inventory.  Without limiting the generality of the foregoing, no Inventory shall be Eligible Inventory unless:

(a)      it is finished goods;

(b)      at all times it strictly complies with all of such Borrower's warranties, covenants and representations to Lender;

(c)      it is in good, new and salable condition and, unless such Inventory is in its original packaging, has not been returned by any Customer;

(d)      it is not obsolete or unmerchantable, in Lender's discretion;

(e)      it meets all standards imposed by any governmental agency or authority;

(f)      it is at all times subject to Lender's duly perfected, first-priority security interest and there exists no other Lien thereon other than a Permitted Lien subject to a Subordination Agreement;

(g)      it is in such Borrower's possession and control situated at a location disclosed to Lender in compliance with this Agreement, the Inventory is not in transit, such Borrower's books reflect the Inventory, the Inventory is insured to the full value thereof, and the insurance policy lists Lender as loss payee;

(h)      it is not in the hands of any third party, including a warehouseman, finisher, consignee, bailor, etc., unless such arrangement is fully disclosed to Lender in writing and such Borrower shall have provided to Lender such waivers, acknowledgments and other items requested by Lender in its discretion;

(i)      it is not subject to any license or other agreement that limits, conditions, or restricts such Borrower's or Lender's right to sell or otherwise dispose of such Inventory;

(j)      such Borrower owns such Inventory and such Inventory is not in such Borrower's possession based upon any consignment, guaranteed sale, or similar basis;

(k)      it is not of a type that Lender, in its reasonable discretion, has determined is not Eligible Inventory;

(l)      it does not constitute Core Parts Inventory;

(m)      it does not constitute merchandise received but not yet counted as Inventory on such Borrower's balance sheet; and

(n)      it does not constitute a promotional or reward item or similar merchandise as part of Borrowers' "Goodie Room" program.

"Eligible Slow-Moving Inventory" means any item of Eligible Inventory which is Slow-Moving Inventory.

"Equipment" means all of each Borrower's machinery, apparatus, equipment, motor vehicles, tractors, trailers, rolling stock, fittings, fixtures and other tangible personal property of every kind and description, together with all parts, accessories and special tools and all increases and accessions thereto and substitutions and replacements therefor.

"Equity Interests" shall mean 100% of the equity interests owned by Parent in each of the other Borrowers.

"Equity Interest Pledge Agreement" shall mean that certain Equity Interest Pledge Agreement executed on the Agreement Date by Parent in favor of Lender, with respect to the respective Equity Interests of each of the other Borrowers, as the same may be amended or replaced from time to time.

"Fixed Charge Coverage Ratio (Including Restructuring Charges)" equals the ratio of Borrowers' (i) net income (excluding extraordinary gains, but including, for the avoidance of doubt, restructuring charges), plus interest expense, plus taxes, plus depreciation and amortization, plus payments of principal and/or interest received on the HC/Hendrick Note, to

(ii) interest expense, plus principal payments made or scheduled to be made with respect to indebtedness (other than scheduled but unpaid amounts on Subordinated Debt) plus payments on capitalized leases, plus taxes, plus dividends and distributions, plus unfinanced capital expenditures.

"Ford Motor Company" shall mean Ford Motor Company, a Delaware corporation.

"Ford Motor Company Distribution Documents" shall, collectively, mean (i) those certain Motorcraft Warehouse Distributor Sales Agreements and related invoices and documents entered into by and between Ford Motor Company with Parent and/or Industries from time to time to the extent permitted pursuant to the Ford Motor Company Subordination Agreement.

"Ford Motor Company Documents" shall, collectively, mean the Ford Motor Company Distribution Documents, the Ford Motor Company Letter of Credit Agreements, the Ford Motor Company Security Agreements and each and every document executed or delivered in connection therewith.

"Ford Motor Company Letter of Credit Agreements" shall, collectively, mean that certain Letter of Credit Agreement dated as of August 12, 2013, by and among Ford Motor Company, Parent and Industries and each and every document executed or delivered in connection therewith.

"Ford Motor Company Security Agreements" shall, collectively, mean (i) that certain Security Agreement executed by Parent in favor of Ford Motor Company dated May 6, 2010, and (ii) that certain Security Agreement executed by Industries in favor of Ford Motor Company dated May 6, 2010.

"Ford Motor Company Subordinated Obligations" shall mean all of the indebtedness and other obligations owed by Parent and Industries to Ford Motor Company pursuant to the Ford Motor Company Documents, the repayment of which is subordinated to the repayment of the Obligations pursuant to the terms of the Ford Motor Company Subordination Agreement.

"Ford Motor Company Subordination Agreement" shall mean that certain Intercreditor and Subordination Agreement dated on or about even date hereof executed by Parent, Industries and Ford Motor Company, in favor of Lender, as the same may be amended or replaced from time to time in accordance with the terms thereof.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board that are applicable to the circumstances as of the date of determination and applied on a consistent basis.

"General Intangibles" means all of each Borrower's present and future general intangibles and all other presently owned or hereafter acquired intangible personal property of each Borrower (including payment intangibles, all rights under insurance policies and any and all choses or things in action, goodwill, patents and patent applications, tradenames, servicemarks, trademarks

and trademark applications, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, infringement claims, software, computer programs, computer discs, computer tapes, literature, reports, catalogs, deposit accounts, tax refunds and tax refund claims) other than Goods and Accounts, as well as each Borrower's books and records relating to any of the foregoing.

"General Motors" shall mean General Motors LLC, a Delaware limited liability company.

"General Motors Distribution Agreements" shall, collectively, mean those certain ACDelco Dedicated Distribution Agreements and related invoices and documents entered into by and between General Motors LLC, GM Customer Care & Aftersales ACDelco and Parent and/or Industries from time to time to the extent permitted pursuant to this Agreement.

"General Motors Side Letter" shall mean that certain letter agreement dated on or about even date hereof executed by Lender and General Motors.

"Georgia Sales Tax Audit Payment Plan" shall mean the payment plan by and between Industries and the Georgia Department of Revenue regarding an audit for the period of August 1, 2009 to December 31, 2012 resulting in a Notice of Assessment dated March 1, 2013, in the amount of $191,751.30.

"Goodman Estate" means the estate of David K. Goodman, Jr.

"Goodman Will" means the Last Will and Testament of David K. Goodman, Jr., dated May 20, 2008.

"Goods" means all of each Borrower's present and hereafter acquired goods, as defined in the UCC, wherever located, including imbedded software to the extent included in "goods" as defined in the UCC, manufactured homes, and standing timber that is cut and removed for sale.

"HC/Hendrick Note" means that certain Promissory Note dated January 31, 2011, in the principal sum of One Million Three Hundred Thousand and No/100 Dollars ($1,300,000.00), executed by HC Parts, LLC, a Georgia limited liability company, and Hendrick Automotive Group, a New York general partnership, and made payable to the order of Industries.

"Holdco" means Golden Eagle Asset Management, Inc., a Delaware corporation.

"Holdco Subordinated Management Fee" shall mean the management fee owed by Parent to Holdco, the repayment of which is subordinated to the repayment of the Obligations pursuant to the terms of the Holdco Subordination Agreement.

"Holdco Subordination Agreement" shall mean that certain letter agreement dated on or about even date hereof executed by Parent and Holdco, in favor of Lender, as the same may be amended or replaced from time to time in accordance with the terms thereof.

"Intellectual Property Security Agreement" means that certain Intellectual Property Security Agreement executed on the Agreement Date by Borrowers in favor of Lender.

"Intercompany Subordination Agreement" means that certain Intercompany Subordination Agreement executed on the Agreement Date by and among Borrowers and Lender.

"Inventory" means all of each Borrower's inventory as defined in the UCC, together with all of each Borrower's present and future inventory, including goods held for sale or lease or to be furnished under a contract of service and all of each Borrower's present and future raw materials, work in process, finished goods, shelving and racking upon which the inventory is stored and packing and shipping materials, wherever located, and any documents of title representing any of the above.

"Letter of Credit" means a standby letter of credit issued by an issuing bank selected by Lender for the account of a Borrower pursuant to **Section 16**.

"Letter of Credit Obligation" means, in respect of each Letter of Credit, the undrawn face amount of such Letter of Credit, plus the amount of all drawings under such Letter of Credit for which Lender has not been reimbursed by Borrowers pursuant hereto.

"Letter of Credit Sub-Facility Amount" means $3,750,000.

"Letter of Credit Request" means a request for the issuance of a Letter of Credit, duly executed by an authorized officer of Borrowers' Agent in form, substance and detail satisfactory to Lender in its discretion, delivered to Lender pursuant to **Section 16**, together with the letter of credit application accompanying such request.

"Lien" means any security interest, security title, mortgage, deed to secure debt, deed of trust, lien, pledge, charge, conditional sale or other title retention agreement, or other encumbrance of any kind in respect of any property, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or hereafter acquired and whether arising by agreement or operation of law.

"Loan Documents" means, collectively, this Agreement, the Equity Interest Pledge Agreement, the Intellectual Property Security Agreement, each Support Guaranty, the Subordination Agreements, the Negative Pledge Agreement, the General Motors Side Letter and any other agreements, instruments, certificates (including each Borrowing Base Certificate) and other documents executed and/or delivered in connection with this Agreement, including collateral documents, letter of credit agreements, security agreements, pledges, guaranties, mortgages, deeds of trust, assignments, subordination agreements, intercreditor agreements and all other agreements executed and/or delivered by any Obligor or any Support Guarantor under any support agreement, or any Affiliate of any Obligor or Support Guarantor pursuant hereto or in connection herewith.

"Material Equity Owner of Holdco" shall mean any equity owner of Holdco that, as of the Agreement Date, owns five percent (5%) or more of the outstanding and issued capital stock of Holdco.

"Maximum Line Amount" means $18,000,000.

"Miller Chemical Settlement Agreement" means that certain Settlement Agreement dated July 31, 2013, by and between APPC and Miller Chemical & Supply Company, LLC, a Delaware limited liability company.

"Negative Pledge Agreement" means that certain Negative Pledge Agreement dated on or about even date hereof executed by Parent in favor of Lender with respect to the Real Estate.

"Negotiable Collateral" means all of each Borrower's present and future letters of credit, advises of credit, notes, drafts, instruments, and documents, including, without limitation, bills of lading, leases, and chattel paper, and each Borrower's books and records relating to any of the foregoing.

"Net Orderly Liquidation Value" means the orderly liquidation value of Eligible Inventory determined, from time to time, pursuant to an appraisal performed by an appraiser satisfactory to Lender, which appraisal shall include, without limitation, as a factor in the determination of orderly liquidation value, all costs and expenses projected to be incurred in the conduct of any liquidation of all or any portion of the Eligible Inventory. Periodic adjustments to the Net Orderly Liquidation Value of Eligible Inventory for purposes of the Borrowing Base and the advance rates applicable to Eligible Inventory and Eligible Slow-Moving Inventory shall be made by Lender from time to time, in its discretion, in order to reflect the results of the most current annual inventory appraisal conducted by Lender pursuant to **Section 7(e)**.

"Noteholders" shall mean, collectively, each of the Persons listed as a "Noteholder" on Exhibit E attached hereto.

"Noteholder Subordinated Debt" shall mean all of the indebtedness owed by certain of the Borrowers to the Noteholders, as more particularly set forth on Exhibit E attached hereto, the repayment of which is subordinated to the repayment of the Obligations pursuant to the terms of the applicable Noteholder Subordination Agreements.

"Noteholder Subordination Agreements" shall mean those certain Intercreditor and Subordination Agreements dated on or about even date hereof executed by certain of the Borrowers and the Noteholders, as applicable, in favor of Lender, as the same may be amended or replaced from time to time in accordance with the terms thereof.

"Obligations" means all indebtedness, obligations and liabilities of any Borrower to Lender and its Affiliates of every kind and description, direct or indirect, secured or unsecured, joint or several, absolute or contingent, due or to become due, including any overdrafts, whether for payment or performance, now existing or hereafter arising, whether presently contemplated or not, regardless of how the same arise, or by what instrument, agreement or book account they may be evidenced, or whether evidenced by any instrument, agreement or book account, including, but not limited to, all loans (including any loan by modification, renewal or extension), all Letter of Credit Obligations, all indebtedness arising from any derivative transactions, all undertakings to take or refrain from taking any action, all indebtedness, liabilities or obligations owing from any Borrower to others which Lender may have obtained by purchase, negotiation, discount, assignment or otherwise, and all interest, taxes, fees, charges,

expenses and attorney's fees (whether or not such attorney is a regularly salaried employee of Lender or any of its Affiliates) chargeable to any Borrower or incurred by Lender under this Agreement or any other document or instrument delivered in connection herewith.

"Obligor" means each Borrower or any other Person primarily or secondarily, directly or indirectly, liable on any of the Obligations, or any other Person which has granted a Lien on any assets of such Person as collateral for any of the Obligations, and "Obligors" means all of the foregoing Persons collectively.

"Pennsylvania Sales Tax Audit" means the audit of the Borrowers being conducted by the Pennsylvania Department of Revenue with respect to sales and use taxes collected for the period from 2009 through 2012.

"Permitted Liens" means (a) Liens or charges for current taxes, assessments or other governmental charges which are not delinquent or remain payable without any penalty, or the validity of which is contested in good faith by appropriate proceedings upon stay of execution of the enforcement thereof and for which appropriate reserves have been established in accordance with GAAP; (b) deposits or pledges to secure (i) statutory obligations, (ii) surety or appeal bonds, or (iii) bonds for release of attachment, stay of execution or injunction; (c) statutory Liens on property arising in the ordinary course of business which, in the aggregate, do not materially impair the use of such property or materially detract from the value of such property; (d) Liens existing on the Agreement Date and described on **Item 3 of the Schedule**; (e) Liens on Equipment securing all or part of the purchase price of such Equipment; provided, however, that (i) such Lien is created contemporaneously with the acquisition of such Equipment, (ii) such Lien attaches only to the specific items of Equipment so acquired, and (iii) such Lien secures only the indebtedness incurred to acquire such Equipment; and (f) Liens in favor of Lender.

"Person" means an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other entity.

"Real Estate" means the real property and improvements located thereon, as more particularly described on Exhibit A attached hereto.

"Revolving Loan" means a revolving loan made by Lender to Borrowers pursuant to **Section 2(a)** hereof.

"Sellers" shall mean, collectively, each of the Persons listed as a "Seller" on Exhibit D attached hereto.

"Seller Subordinated Debt" shall mean all of the indebtedness owed certain of the Borrowers to the Sellers, as more particularly set forth on Exhibit D attached hereto, the repayment of which is subordinated to the repayment of the Obligations pursuant to the terms of the applicable Seller Subordination Agreements.

"Seller Subordination Agreements" shall mean those certain Intercreditor and Subordination Agreements dated on or about even date hereof executed by certain of the

Borrowers and Sellers, as applicable, in favor of Lender, as the same may be amended or replaced from time to time in accordance with the terms thereof.

"Slow-Moving Inventory" means any item of Inventory of any Borrower which has an excess of seven hundred twenty (720) days of supply, but only to the extent of such excess.

"Subordinated Debt" means all of the indebtedness and other obligations owed by any Borrower to any other Person, specifically including, the Ford Motor Company Subordinated Obligations, the Holdco Subordinated Management Fee, the UAS Subordinated Management Fee, the Noteholder Subordinated Debt, the Seller Subordinated Debt, the repayment of which is subordinated to the repayment of the Obligations pursuant to the terms of an executed subordination agreement approved by Lender in its discretion.

"Subordination Agreements" shall mean, collectively, the Ford Motor Company Subordination Agreement, the Holdco Subordination Agreement, the UAS Subordination Agreement, the Noteholder Subordination Agreements and the Seller Subordination Agreements, and any other a subordination agreement approved by Lender in its discretion with respect to Subordinated Debt.

"Support Guarantors" means, jointly, severally and collectively, Randolph J. Kulamer, Charles D. Lightner and George M. Hare, each an individual resident of the State of Georgia.

"Support Guaranty" means each Support Agreement executed on the Agreement Date by each Support Guarantor in favor of Lender, as the same may be amended or replaced from time to time.

"Termination Date" has the meaning set forth in **Item 7 of the Schedule**.

"UAS" means United American Securities, Inc., a Delaware corporation.

"UAS Subordinated Management Fee" shall mean the management fee owed by Parent to UAS, the repayment of which is subordinated to the repayment of the Obligations pursuant to the terms of the UAS Subordination Agreement.

"UAS Subordination Agreement" shall mean that certain letter agreement dated on or about even date hereof executed by Parent and UAS, in favor of Lender, as the same may be amended or replaced from time to time in accordance with the terms thereof.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of Georgia or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests; provided, however, that to the extent that the UCC is used to define any term herein or in any other documents and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern.

**Other Definitional Provisions.**    References to the "Schedule" or any "Section" or "Exhibit" refer to the Schedule or a section or exhibit, respectively, of this Agreement unless

otherwise specifically provided. Any of the terms defined in **Section 1** may, unless the context otherwise requires, be used in the singular or the plural depending on the reference. In this Agreement: words importing any gender include the other genders; the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to agreements and other contractual instruments shall be deemed to include subsequent amendments, assignments, and other modifications thereto, but only to the extent such amendments, assignments and other modifications are not prohibited by the terms of this Agreement; references to any Person includes their respective permitted successors and assigns or people succeeding to the relevant functions of such Persons; any and all terms which are defined in the UCC and are not defined herein shall be construed and defined in accordance with the definition of such terms under the UCC; all references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations; and all references to time of day shall refer to Atlanta, Georgia time.

2.     **Borrowing**.

(a)     **Amount Available to Be Borrowed**. From time to time Borrowers' Agent may request, and Lender will, subject to the other terms and conditions of this Agreement, make Revolving Loans to Borrowers up to an amount equal to the Borrowing Base at any time. Any request for a Revolving Loan hereunder must be received by Lender, together with the accompanying Borrowing Base Certificate and all other required information, no later than 11:00 a.m., Atlanta, Georgia time on a Business Day in order for such Revolving Loan to be made on such day. Revolving Loans that are repaid may be re-borrowed upon the terms and conditions of this Agreement.

(b)     **Standards**. Lender will determine eligibility and the loan value of Collateral, in its sole discretion, consistent with Lender's experience, prudent business judgment and standards of commercial reasonableness applicable to asset-based credits and in good faith. Any Revolving Loans requested by Borrowers' Agent and made by Lender or at any time outstanding in excess of the Borrowing Base or any other limitation set forth in this Agreement will, nevertheless, be subject to the terms of this Agreement, will constitute Obligations for all purposes and be entitled to the benefits of the Collateral.

(c)     **Persons Authorized to Request Revolving Loans**. Borrowers hereby authorize and direct Lender to make Revolving Loan advances to or for the benefit of Borrowers upon receipt of instructions from any of the authorized representatives of Borrowers' Agent listed on **Item 4 of the Schedule**. Lender shall have no liability whatsoever to any Borrower or any other Person for acting upon any such instructions which Lender, in good faith, believes were given by any such person, and Lender shall have no duty to inquire as to the propriety of any disbursement. Lender is hereby authorized to make the Revolving Loans provided for herein based on instructions received by facsimile, electronic mail, telephone or other method of communication from any of such persons. Although Lender shall make a reasonable effort to determine the person's identity, Lender shall not be responsible for determining the authenticity of any such instructions, and Lender may act on the instructions of anyone it perceives to be one of the persons authorized to request Revolving Loans hereunder. Lender shall have the right to accept the instructions of any of the foregoing persons unless and until Lender actually receives from Borrowers' Agent (in

accordance with the notice provisions of this Agreement) written notice of termination of the authority of that person. Borrowers may change persons designated to give Lender borrowing instructions only by causing Borrowers' Agent to deliver to Lender written notice of such change. Borrowers will ensure that each telephone instruction from any person designated in or pursuant to this paragraph shall be followed by written confirmation of the request for disbursement in such form as Lender makes available to Borrowers' Agent from time to time for such purpose; provided, however, that Borrowers' Agent's failure to provide written confirmation of any telephonic instruction shall not invalidate such telephonic instruction.

(d)    **Application of Remittances**.    Borrowers will use only invoices in forms that Lender has approved, and Borrowers' billings on such invoices will be conclusive evidence of assignment and transfer hereunder to Lender of the Accounts represented thereby, whether or not any Borrower executes any other instrument with regard to any specific Account. Borrowers will cause all of their cash receipts including the proceeds of Accounts and all other Collateral to be forwarded by all Customers directly to a lockbox designated by Lender. Such lockbox shall be maintained by a bank designated by Lender and all payments received in such lockbox shall be deposited in a bank account in Lender's name and owned by Lender at such bank designated by Lender for application to the Obligations. All checks, cash or other remittances received by any Borrower, whether for application to Accounts or otherwise, will be received by such Borrower in trust for Lender, and such Borrower will turn over to Lender the identical remittances as speedily as possible, appropriately endorsed, if necessary. Borrowers agree to pay interest on each remittance, including wire transfers, from the date of Lender's receipt thereof plus the number of days set forth on **Item 5 of the Schedule** at the rate applicable to Revolving Loans outstanding hereunder, as set forth in **Section 3** below. Collections shall be deemed received by Lender for all purposes under this Agreement two (2) Business Days after such collections are posted to the depository account related to the lockbox required hereunder, provided, however, solely for purposes of determining borrowing availability hereunder, collections shall be deemed received upon being posted to the depository account related to the lockbox required hereunder. Borrowers will account fully and faithfully for and promptly pay or turn over to Lender proceeds in whatever form received of the sale or other disposition of any Collateral, and Borrowers agree that the inclusion of proceeds in "Collateral" will not be deemed to mean that Lender consents to any Borrower's disposition of Collateral other than in accordance with the terms of this Agreement.

(e)    **Conditions to Obligation to Make Revolving Loans**.    Borrowers acknowledge that Lender's obligation to make loans to Borrowers (or to issue or create or cause the issuance or creation by Lender or its Affiliates of letters of credit or acceptances for any Borrower's account) is subject to the following terms and conditions:

(i)    Lender has no obligation to make the initial loan to Borrowers or to extend any other financial accommodation to Borrowers unless and until (A) Borrowers deliver to Lender, in form and substance satisfactory to Lender in its discretion, each agreement, instrument, legal opinion and other document specified on **Item 6 of the Schedule** , and (B) each other condition precedent specified on **Item 6 of the Schedule** has been satisfied in a manner satisfactory to Lender in Lender's discretion.

(ii)    Lender's obligation to make any Revolving Loans to Borrowers and extend other financial accommodations to Borrowers (including the initial Revolving Loans) is subject to the conditions that, as of the date of any such loan or other accommodation, no Default (and no event or circumstance which, with the giving of notice or passage of time, would constitute a Default) will have occurred and be continuing hereunder, there will have occurred no material adverse change in any Borrower's financial condition or operations or in any Borrower's business prospects as compared to the state of facts existing on the Agreement Date, and Obligors' and Support Guarantors' representations and warranties set forth in this Agreement (including any amendment, modification, supplement or extension hereof) and the other Loan Documents will be true and correct in all material respects as if made on and as of the date of each subsequent credit request (<u>provided</u>, however, that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects).  Each request for a borrowing or other financial accommodation by Borrowers' Agent or any Borrower will be deemed to be a reaffirmation of all of Borrowers' warranties and representations hereunder.

(f)    **Repayment of Revolving Loans**.  In the event of any breach by any Borrower of any provision hereof or upon termination of this Agreement, Borrowers will repay upon demand all of the Obligations.  If no demand is earlier made, Borrowers will repay all Obligations in full, without demand or notice, on the last day of the term of this Agreement (as provided in clause (g) below).  If at any time for any reason, the aggregate outstanding principal amount of all Revolving Loans exceeds the Borrowing Base or any other limitation on the amount available to be borrowed hereunder, Borrowers will immediately, without notice or demand, repay the outstanding principal amount of the Revolving Loans, together with accrued and unpaid interest on the amount repaid, in an amount equal to such excess (it being understood that such excess amount, regardless of how it arose, shall nevertheless constitute an Obligation hereunder and be secured by all of the Collateral).  In addition, Borrowers shall make mandatory principal payments on the Revolving Loans in amounts equal to 100% of the amount of any (i) tax refund received by any Borrower, (ii) payments of principal and/or interest received by any Borrower under the Buckley Note and the HC/Hendrick Note, and (iii) payments received by any Borrower pursuant to the Miller Chemical Settlement Agreement.  Borrowers shall make each payment required hereunder or under any other Loan Document without setoff, deduction or counterclaim.

(g)    **Maturity**.  This Agreement will continue in full force and effect from the Agreement Date until the termination date provided for in **Item 7 of the Schedule**.

(h)    **Voluntary Termination**.  Borrowers may terminate this Agreement at any time upon at least ninety (90) days' prior written notice from Borrowers' Agent to Lender.  On the date specified in such notice, termination will be effective, so long as Borrowers have paid to Lender, in same day funds, an amount equal to the aggregate principal amount of all loans outstanding on such date, together with accrued interest thereon, the originals of all Letters of Credit and bankers acceptances, if any, issued, created or guaranteed by Lender or any of its Affiliates for any Borrower's account have been returned for cancellation or have been presented and paid by Borrowers or other arrangements satisfactory to Lender have been made, all other Obligations outstanding and unpaid have been paid in full in cash, and Borrowers have provided

Lender an indemnification agreement satisfactory to Lender with respect to returned and dishonored items and such other matters as Lender shall require.

(i)    **Termination on Default**.  Notwithstanding the foregoing, should a Default occur and be continuing, Lender will have the right to terminate this Agreement at any time without notice.

(j)    **Survival**.  Notwithstanding termination, all the terms, conditions, and provisions hereof (including Lender's security interest in the Collateral, but excluding any obligations of Lender hereunder) will continue to be fully operative until all Obligations have been fully disposed of, concluded, paid, satisfied, and liquidated.  Lender shall have no obligation to release its Liens on any Collateral until (i) the Obligations have been repaid in full in cash in immediately available funds, (ii) Lender shall have received cash collateral for, or other arrangements satisfactory to Lender shall have been made with respect to, contingent Obligations, (iii) the line of credit contemplated hereby shall have been terminated, and (iv) Borrowers, Support Guarantors and all other Obligors shall have executed a general release of all claims and causes of action against Lender and its Affiliates in form and substance acceptable to Lender.

(k)    **Payments as Revolving Loans**.  Borrowers' failure to pay any amount due from Borrowers under this Agreement or any other Loan Document, whether for principal, interest, fees, premiums, costs, expenses or otherwise, shall be deemed to be a request by Borrowers for a Revolving Loan hereunder, and Lender may charge Borrowers' loan account for any such amount.    Additionally, if Lender determines in its discretion that extensions of credit are necessary to protect the Collateral or to enhance the likelihood of repayment in full of the Obligations, Lender is hereby authorized to make such extensions of credit and charge them to Borrowers' loan account.

(l)    **Borrowers' Agent**.  Each Borrower other than Parent hereby appoints Parent, and Parent shall act under this Agreement and the other Loan Documents, as, the agent, attorney-in-fact and legal representative of all Borrowers for all purposes, including requesting Revolving Loans and receiving account statements and other notices and communications to Borrowers (or any of them) from Lender.  Lender may rely, and shall be fully protected in relying, on any request for an advance, disbursement instruction, report, information or any other notice or communication made or given by Parent, whether in its own name, as Borrowers' Agent, or on behalf of on behalf of one or more Borrowers, and Lender shall not have any obligation to make any inquiry or request any confirmation from or on behalf of any other Borrower as to the binding effect on it of any such request, instruction, report, information, other notice or communication, nor shall the joint and several character of Borrowers' obligations hereunder be affected, provided, that the provisions of this paragraph shall not be construed so as to preclude any Borrower from taking actions permitted to be taken by a "Borrower" hereunder.

(m)    **Joint and Several Liability**.

(i)    **Joint and Several Liability**.  All Revolving Loans made to Borrowers and all of the other Obligations of Borrowers, including all interest, fees and expenses with

respect thereto, shall constitute one joint and several direct and general obligation of all Borrowers. Notwithstanding anything to the contrary contained herein, each Borrower shall be jointly and severally, with each other Borrower, directly and unconditionally liable to Lender for all Obligations, it being understood that the advances to each Borrower inure to the benefit of all Borrowers, and that Lender is relying on the joint and several liability of Borrowers as co-makers in extending the Revolving Loans hereunder. Each Borrower hereby unconditionally and irrevocably agrees that upon default in the payment when due (whether at stated maturity, by acceleration or otherwise) of any principal of, or interest on, any Obligation payable to Lender, it will forthwith pay the same, without notice or demand, unless such payment is then prohibited by application of law (provided such Obligation shall not be extinguished by any such prohibition).

(ii)    **No Reduction in Obligations**.  No payment or payments made by any Borrower or any other Person or received or collected by Lender from any Borrower or any other Person by virtue of any action or proceeding or any setoff or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of each Borrower under this Agreement, and each Borrower shall remain liable for all of the Obligations until the Obligations are paid in full.

(n)    **Obligations Absolute**.  Each Borrower agrees that the Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Lender with respect thereto, unless such payment is then prohibited by applicable law (provided such Obligation shall not be extinguished by any such prohibition). All Obligations shall be conclusively presumed to have been created in reliance hereon. The Obligations and other liabilities under this Agreement and the other Loan Documents shall be absolute and unconditional irrespective of:  (a) any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto; (b) any change in the time, manner or place of payments of, or in any other term of, all or any part of the Obligations, or any other amendment or waiver thereof or any consent to departure therefrom, including any increase in the Obligations resulting from the extension of additional credit to any Borrower or otherwise; (c) any taking, exchange, release of or non-perfection in any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Obligations; (d) any change, restructuring or termination of the corporate structure or existence of any Borrower; or (e) any other circumstance which may otherwise constitute a defense available to, or a discharge of, any Borrower. This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by Lender upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

(o)    **Waiver of Suretyship Defenses**.  Each Borrower agrees that the joint and several liability of Borrowers provided for in this Agreement shall not be impaired or affected by any modification, supplement, extension or amendment of any contract or agreement to which one or more other Borrowers may hereafter agree (other than an agreement signed by Lender specifically releasing such liability), nor by any delay, extension of time, renewal, compromise or other indulgence granted by Lender with respect to any of the Obligations, nor by any other

agreements or arrangements whatever with one or more other Borrowers or with any other Person, each Borrower hereby waiving all notice of such delay, extension, release, substitution, renewal, compromise or other indulgence, and hereby consenting to be bound thereby as fully and effectually as if it had expressly agreed thereto in advance. The liability of each Borrower is direct and unconditional as to all of the Obligations and may be enforced without requiring Lender first to resort to any other right, remedy or security. Each Borrower hereby expressly waives promptness, diligence, notice of acceptance and any other notice (except to the extent expressly provided for herein or in another Loan Document) with respect to any of the Obligations, this Agreement or any other Loan Document and any requirement that Lender protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Borrower or any other Person or any Collateral, including any rights any Borrower may otherwise have under O.C.G.A. § 10-7-24 or any successor statute or any analogous statute in any jurisdiction under the laws of which any Borrower is incorporated or in which any Borrower conducts business.

(p)    **Contribution and Indemnification among Borrowers**.    Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. To the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Revolving Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then, to the extent that such Borrower has not received the benefit of such repaid Obligations (whether through an inter-company loan or otherwise), the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's "Allocable Amount" (as defined below) and the denominator of which fraction is the sum of the Allocable Amounts of all of the Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the greater of (a) the amount of such repaid Obligations actually received by such Borrower (whether through an inter-company loan or otherwise), and (b) maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (i) rendering such Borrower "insolvent" within the meaning of Title 11 of the United States Code (the "Bankruptcy Code"), Section 2 of the Uniform Fraudulent Transfer Act (the "UFTA"), or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (ii) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 4 of the UFCA, or (iii) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA. All rights and claims of contribution, indemnification and reimbursement under this paragraph shall be subordinate in right of payment to the prior payment in full of the Obligations.

3.    **Interest and Fees**.

(a)    **Interest on Revolving Loans**.    Borrowers will pay Lender or, at Lender's option, Lender may charge Borrowers' loan account with, interest on the average daily net principal amount of Revolving Loans outstanding hereunder, calculated monthly and payable on the first day of each calendar month, at a rate (computed on the basis of the actual number of days elapsed

over a year of 360 days) equal to the sum of LIBOR (as defined below), plus (ii) the interest margin specified in **Item 8 of the Schedule** (the "Interest Margin"). LIBOR may not be the lowest or best rate at which Lender calculates interest or extends credit. LIBOR for each calendar month shall be adjusted (if necessary) on the first (1st) day of such calendar month and shall be equal to LIBOR in effect as of the close of business on the last Business Day of the immediately preceding calendar month. As used herein, "LIBOR" means, at any time, an interest rate per annum equal to the interest rate per annum (rounded upwards, if necessary, to the nearest 1/100th of 1%) as published in the "Money Rates" section of The Wall Street Journal (or another national publication selected by Lender) as the one-month London Interbank Offered Rate for United States dollar deposits (or, if such page shall cease to be publicly available or, if the information/description contained on such page, in Lender's sole judgment, shall cease to accurately reflect such London Interbank Offered Rate, then such rate as reported by any publicly available recognized source of similar market data selected by Lender that, in Lender's reasonable judgment, accurately reflects such London Interbank Offered Rate).

(b)    **Market Disruption Event**.    If, at any time, Lender determines (which determination shall be conclusive and binding) that (i) by reason of circumstances affecting the London interbank market generally, adequate and fair means do not exist for ascertaining LIBOR for the following month as provided in subsection (a) hereof, or (ii) disruptions in the short term money markets have materially and adversely affected Lender's cost of funds such that the interest rate hereunder does not adequately or fairly reflect Lender's cost of making, funding or maintaining the loan hereunder, a "Market Disruption Event" will be deemed to have occurred and Lender shall promptly notify Borrowers' Agent thereof. The rate of interest hereunder (the "Adjusted Rate of Interest") shall be adjusted and shall thereafter be a rate equal to the sum of (x) the rate that Lender determines (which determination shall be conclusive and binding), expressed as a percentage rate per annum, to be the cost to Lender of funding the loan from whatever source it may reasonably elect, plus (y) the Interest Margin. Lender shall give prompt notice to Borrowers' Agent of the Adjusted Rate of Interest. Borrowers shall begin to be charged interest at the Adjusted Rate of Interest effective as of the first day of the month following the month in which Lender provides notice thereof to Borrowers' Agent; provided, however, that if Borrowers are unwilling to accept the Adjusted Rate of Interest, Borrowers' Agent may terminate this Agreement and prepay all amounts due hereunder by providing Lender written notice within thirty (30) days of the effective date of the Adjusted Rate of Interest without paying a prepayment fee; provided, however, that such prepayment must occur not more than ninety (90) days after the effective date of the Adjusted Rate of Interest.

(c)    **Default Interest**.    To the extent permitted by law and without limiting any other right or remedy of Lender hereunder, whenever there is a Default under this Agreement, the rate of interest on the unpaid principal balance of the Obligations shall, at the option of Lender, be increased by adding the default margin identified in **Item 9 of the Schedule** to the interest rate otherwise in effect hereunder. Lender may charge such default interest rate retroactively beginning on the date the applicable Default first occurred or existed. Borrowers acknowledge that: (i) such additional rate is a material inducement to Lender to make the Revolving Loans described herein; (ii) Lender would not have made the Loans in the absence of the agreement of Borrowers to pay such additional rate; (iii) such additional rate represents compensation for increased risk to Lender that the Revolving Loans will not be repaid; and (iv) such rate is not a

penalty and represents a reasonable estimate of (A) the cost to Lender in allocating its resources (both personnel and financial) to the ongoing review, monitoring, administration and collection of the Revolving Loans, and (B) compensation to Lender for losses that are difficult to ascertain. In the event of termination of this Agreement by either party hereto, Lender's entitlement to this charge will continue until all Obligations are paid in full.

(d)    **Fees**.  Borrowers will pay to Lender the fees set forth in **Item 10 of the Schedule**.

(e)    **No Usury**.  Borrowers acknowledge that Lender does not intend to reserve, charge or collect interest on money borrowed under this Agreement at any rate in excess of the rates permitted by applicable law and that, should any interest rate provided for in this Agreement exceed the legally permissible rate(s), the rate will automatically be reduced to the maximum rate permitted under applicable law.  If Lender should collect any amount from Borrowers which, if it were interest, would result in the interest rate charged hereunder exceeding the maximum rate permitted by applicable law, such amount will be applied to reduce principal of the Obligations or, if no Obligations remain outstanding, will be refunded to Borrowers.

(f)    **Monthly Statements**.  Lender will render a statement to Borrowers' Agent each month for Revolving Loans, payments, and other transactions pursuant to this Agreement, and such statement rendered by Lender will be binding upon all Borrowers unless Lender is notified in writing to the contrary within thirty (30) days after the date such statement is rendered.

4.    **Representations and Warranties of Borrower**.

(a)    **Authority, Compliance with Laws, Litigation, No Material Adverse Change, Etc**.  Borrowers represent and warrant to Lender that:  (i) each Borrower's exact legal name, type of organization, state of organization and organizational identification number are fully and accurately set forth on **Item 11 of the Schedule**, and each Borrower is duly organized and validly existing under the laws of such state of organization; (ii) the execution, delivery, and performance of this Agreement and the other Loan Documents are within each Borrower's corporate powers, have been duly authorized, do not violate any Borrower's constituent documents, any law or regulation, including without limitation, any law or regulation relating to occupational health and safety or protection of the environment, applicable to any Borrower, or any indenture, agreement, or undertaking to which any Borrower is a party or by which any Borrower or any Borrower's property is bound; (iii) this Agreement and the other Loan Documents to which any Obligor or Support Guarantor is a party constitute valid, binding and enforceable obligations of such Obligor or Support Guarantor in accordance with the terms hereof and thereof, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, moratorium or other similar laws applicable to creditors' rights generally or by generally applicable equitable principles affecting the enforcement of creditors' rights; (iv) no Borrower has any subsidiaries or other investments in other Persons, except as set forth on **Item 12 of the Schedule**; (v) each Borrower is in compliance in all material respects with all laws, rules and regulations applicable to such Borrower, including laws, rules or regulations concerning the environment, occupational health and safety and pensions or other employee benefits; (vi) except as set forth on **Item 13 of the Schedule**, there is no litigation or investigation pending against any Borrower (or, so far as any Borrower is aware, threatened)

which, if it were decided adversely to such Borrower could reasonably be expected to have a material adverse effect on such Borrower, such Borrower's financial or operational condition or such Borrower's prospects (taking into account any insurance coverage that has been acknowledged by the insurer); (vii) other than debt that is to be repaid from the proceeds of the first advance hereunder, no Borrower is indebted to any other Person for money borrowed nor has any Borrower issued any guaranty of payment or performance by any other Person, except as set forth on **Item 14 of the Schedule**; (viii) since the date of the financial statements of Borrowers most recently delivered to Lender, there has been no material adverse change in any Borrower's business, any Borrower's financial or operational condition or any Borrower's business prospects; and (ix) after giving effect to the Loans to be incurred and the Letters of Credit to be issued on the Agreement Date, each Borrower has assets of a fair salable value which exceeds the amount required to pay its debts as they mature (including subordinated, unmatured and unliquidated liabilities) during the term of this Agreement, and each Borrower is able to, and during the term of this Agreement anticipates that it will be able to, meet its debts as they mature.

(b)    **Title to Assets, Other Collateral Matters**.  Borrowers represent and warrant to Lender that:  (i) Borrowers have good and marketable title to the Collateral, free of all Liens except for Permitted Liens, and no financing statement, mortgage, notice of Lien, deed of trust, security agreement, or any other agreement or instrument creating or giving notice of any Lien against any of the Collateral has been signed, authorized or delivered by any Borrower, except in Lender's favor or with respect to Permitted Liens; (ii) with regard to each Account as it arises, except as set forth on a Borrowing Base Certificate including such Account:  (A) Borrowers will have made delivery of the goods or will have rendered the services ordered; (B) the Customer will have accepted the goods and/or services; and (C) no Customer disputes with respect to an amount exceeding $10,000, individually, or $50,000, in the aggregate, will exist in any respect, including, without limitation, disputes as to price, terms, warranties, quantity or quality, and claims of set-off, release from liability or defense based upon any act of God or a public enemy or war or because of the requirements of law or of rules, orders, or regulations having the force of law; (iii) all Inventory is in good condition, meets all applicable governmental standards and is currently usable or saleable in the ordinary course of the applicable Borrower's business for a price approximating at least such Borrower's cost thereof; (iv) all Equipment is in good condition and state of repair, ordinary wear and tear excepted; (v) all Collateral meets applicable government standards; (vi) in the past five (5) years, except as set forth on **Item 15 of the Schedule** (A) no Borrower has used any other legal, trade or fictitious names, and (B) no Borrower has been a party to any merger or purchased assets from any other Person other than in the ordinary course of business; and (vii) each Borrower's chief executive office and principal place of business, all Inventory, all Equipment and all other Collateral is located at the addresses (including the county) set forth on **Item 16 of the Schedule** and has not been located at any other location during the five year period prior to the Agreement Date.

(c)    **Ownership Structure**.  Borrowers represent and warrant that (i) **Item 17 of the Schedule** accurately describes the ownership of each Borrower's and Holdco's capital stock, membership interests or other equity interests, and (ii) the individual(s) listed on **Item 17 of the Schedule** have, directly or indirectly, voting and managerial control of each Borrower and Holdco.

(d)      **Labor Relations**.  Except as set forth in **Item 13 of the Schedule**, Borrowers represent and warrant that there are no strikes, lockouts or other material labor disputes or grievances against any Borrower, or, to the Borrowers' knowledge, threatened against or affecting any Borrower, and no significant unfair labor practice, charges or grievances are pending against any Borrower, or to the Borrowers' knowledge, threatened against any of them before any Governmental Authority, in each case either on an individual basis or in the aggregate, with respect to which the liability of Borrowers is or may be in excess of $5,000.  All payments due from any Borrower pursuant to the provisions of any collective bargaining agreement have been paid or accrued as a liability on the books of such Borrower, except where the failure to do so could not reasonably be expected to have a material adverse effect on such Borrower.

(e)      **Additional Representations**.  Borrowers represent and warrant to Lender that: (i) no Borrower is engaged as one of such Borrower's principal activities in owning, carrying or financing the purchase or ownership by others of "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System); (ii) no Borrower owns any real property or leases any real property other than as listed on **Item 18 of the Schedule**; (iii) a true, correct and complete list of any warehousemen, processors, consignees or other bailees with possession or control of any Inventory is set forth on **Item 18 of the Schedule**; (iv) a list and brief description of all bank accounts maintained by any Borrower with any bank or financial institution is set forth on **Item 19 of the Schedule**; (v) no Borrower has entered into any agreement with any Person obligating any Borrower to pay to such Person any management, consulting or similar fees other than those more specifically described in the Holdco Subordination Agreement and the UAS Subordination Agreement; and (vi) each Borrower is solvent and has sufficient revenues to pay such Borrower's obligations as they come due.

5.      **Collateral**.

(a)      **Grant of Security Interest**.  To induce Lender to accept this Agreement and to make Revolving Loans to Borrowers from time to time pursuant to its terms, each Borrower hereby grants to Lender, for itself and as agent for any Affiliate of Lender, a security interest in, and assigns, mortgages and pledges to Lender, for itself and as agent for any Affiliate of Lender, all of such Borrower's right, title and interest in and to all of such Borrower's property, whether real or personal, tangible or intangible, now owned or existing or hereafter acquired or arising, including all of the following (collectively, the "Collateral"):

(i)      all Accounts, Inventory, Equipment, Goods, General Intangibles and Negotiable Collateral;

(ii)      all investment property, securities and securities accounts and financial assets, as well as all bank and depository accounts and all funds on deposit therein;

(iii)      all chattel paper (whether tangible or electronic) and contract rights;

(iv)     all guaranties, collateral, Liens on real or personal property, leases, letters of credit, letter-of-credit rights, supporting obligations, and all other rights, agreements, and property securing or relating to payment of Accounts or any other Collateral;

(v)     all documents, books and records relating to any Collateral or to Borrower's business;

(vi)     the Equity Interests;

(vii)     the Buckley Note;

(viii)     the HC/Hendrick Note;

(ix)     all motor vehicles and other rolling stock of any kind;

(x)     all other property of Borrower's now or hereafter in the possession or control of Lender or any of Lender's Affiliates (including cash, money, credits and balances of each Borrower held by or on deposit with Lender or any Affiliate of Lender);

(xi)     all other assets of any Obligor in which Lender receives a security interest to secure all or part of the Obligations or which hereafter come into the possession, custody or control of Lender or any Affiliate of Lender;

(xii)     all of each Borrower's commercial tort claims listed on (A) **Item See Schedule 19** attached hereto and incorporated herein by this reference.

**20 of the Schedule** (which each Borrower represents and warrants is a true, accurate and complete list of all of such Borrower's commercial tort claims as of the Agreement Date) or (B) any other writing provided to Lender pursuant to **Section 7(g)**; and

(xiii)     all proceeds and products of all of the foregoing in any form, including amounts payable under any policies of insurance insuring all or any of the foregoing against loss or damage, all parts, accessories, attachments, special tools, additions, replacements, substitutions and accessions to or for all or any of the foregoing, all condemnation or requisition payments with respect to all or any of the foregoing and all increases and profits received from all or any of the foregoing.

(b)     **Obligations**.   Such grant, assignment, mortgage and transfer is made for the purpose of securing and the Collateral secures and will continue to secure all of the Obligations.

6.     **Financial Covenants**.   Borrowers shall comply with each of the financial covenants set forth on **Item None**

**21 of the Schedule**.

7.     **Collateral Covenants**.

(a)     **Accounts**.  Borrowers will notify Lender promptly of and settle all Customer disputes in excess of $10,000, individually, or $50,000, in the aggregate, but, upon the occurrence of a Default (as defined herein) and during the continuance thereof, if Lender so elects, Lender will have the right at all times to settle, compromise, adjust, or litigate all Customer disputes (regardless of the amount) directly with the Customer or other complainant upon such terms and conditions as Lender deems advisable without incurring liability to any Borrower for Lender's performance of such acts.  Lender may, at any time and from time to time, contact Customers to verify Accounts and/or to notify Customers of Lender's security interest in the Accounts and to instruct such customers to pay such Accounts to the lockbox established pursuant to **Section 2**.  All of each Borrower's books and records concerning Accounts and a copy of each Borrower's general ledger will be maintained at the address of Borrowers' chief executive office set forth on **Item 16 of the Schedule**.  All Accounts included on any Borrowing Base Certificate will be, except as indicated on such Borrowing Base Certificate or subsequently in writing to Lender, bona fide and existing obligations of Customers arising out of the sale of goods and/or the rendering of services by a Borrower in the ordinary course of such Borrower's business, owned by and owing to such Borrower without material defense, setoff or counterclaim, and will be subject to a perfected, first-priority security interest in Lender's favor and will be free and clear of all other Liens except for Permitted Liens.

(b)     **Inventory**.  All Inventory will at all times be located at one of the Inventory locations set forth on **Item See** Schedule 15 attached hereto and incorporated herein by this reference.

**16 of the Schedule** as the current location of Borrowers' chief executive office or a current location of other Collateral, will be subject to a perfected, first-priority security interest in Lender's favor and will be free and clear of all other Liens other than Permitted Liens.  Sales of Inventory will be made in compliance with all material requirements of applicable law.

(c)     **Equipment**.  Borrowers will maintain all Equipment used or useful in Borrowers' business in workable condition, ordinary wear and tear excepted, subject to a perfected, first-priority security interest in Lender's favor and free and clear of all other Liens (other than Permitted Liens), at one of the locations set forth on **Item 17 of the Schedule** as the current location of Borrowers' chief executive office or a current location of other Collateral.

(d)     **Defense of Title**.  All Collateral will at all times be owned by Borrowers, and Borrowers will defend Borrowers' title to the Collateral against the claims of third parties.  Borrowers will at all times keep accurate and complete records of the Collateral.

(e)     **Perfection; Further Assurances**.  No Borrower will change its name, state of organization, type of organization or organizational identification number.  Borrowers' Agent will give Lender at least thirty (30) days' prior written notice of any change in the location of any Borrower's principal place of business or chief executive office, any change in the locations of any Borrower's Inventory or Equipment (provided that, Inventory and Equipment may be moved between approved locations as set forth on **Items 16 and 17 of the Schedule**, provided further

that, Lender shall have first received confirmation of satisfactory insurance coverage with respect to such location and an acceptable Lien waiver or subordination agreement in Lender's favor with respect to such Collateral from any landlord, warehouseman, processor or other third party operator of such premises, in each case, in form and substance satisfactory to Lender) and any acquisition by any Borrower of any interest in real property.  Each Borrower will, at Borrowers' expense, promptly execute and deliver from time to time at Lender's request and pay the costs of filing such additional financing statements, mortgages, or other evidences of Liens as may be necessary or desirable to perfect or continue perfection of Lender's security interest in Borrowers' property or, at Lender's request, to create and perfect a Lien on newly acquired real property.  Borrowers will use all reasonable efforts to obtain from any landlord, warehouseman, processor or other third party operator of premises on which any Collateral is located an acceptable Lien waiver or subordination agreement in Lender's favor with respect to such Collateral.  All Collateral is and will continue to be, except as expressly consented to by Lender, personal property and will not, by reason of attachment or connection to any realty, either become or be deemed to be a fixture or appurtenance to such realty and will at all times be readily removable without material damage to any realty.  In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, Borrowers shall, immediately upon written request therefor from Lender, endorse and assign such Negotiable Collateral over to Lender and deliver actual physical possession of the Negotiable Collateral to Lender.  Borrowers shall at any time and from time to time take such steps as Lender may request for Lender (i) to obtain an acknowledgment, in form and substance satisfactory to Lender, of any bailee having possession of any of the Collateral that such bailee holds such Collateral for Lender, (ii) to obtain "control" of any investment property, deposit accounts, letter-of-credit rights or chattel paper (including electronic chattel paper) in accordance with Article 9 of the UCC, with any agreements establishing control to be in form and substance satisfactory to Lender, (iii) to have Lender's Lien noted on each certificate of title evidencing any Collateral, and (iv) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and of the preservation of its rights therein.  Lender may, from time to time at Borrowers' expense, obtain an appraisal on some or all of the Collateral.  Without limiting the generality of the foregoing, Lender shall conduct inventory appraisals at Borrowers' expense.  Provided no Default exists, Lender shall conduct not more than two (2) such inventory appraisals per year, in accordance with Lender's credit policy standards.

(f)      **Insurance**.  Borrowers will obtain and maintain in full force and effect insurance covering the Collateral and the Real Estate against all commercially standard insurable risks to which the Collateral and the Real Estate is exposed, including loss, damage, fire, theft, and such commercially standard insurable risks, in such amounts, with such companies, under such policies and in such form as will be reasonably satisfactory to Lender, which policies will name Lender as an additional insured and provide that loss thereunder will be payable to Lender as Lender's interests may appear upon a lender's loss payee endorsement acceptable to Lender.  Borrowers will also obtain and maintain in full force and effect liability insurance (including product liability and product recall insurance) and such other types of insurance as Lender may reasonably require (such as business interruption insurance), in each case against such risks, in such amounts, with such companies, under such policies and in such form as will be reasonably satisfactory to Lender.  All proceeds of any such insurance will be paid over to Lender directly,

and Lender may apply such proceeds to payment of the Obligations, whether or not due, in such order of application as Lender determines or, in Lender's sole discretion, apply such proceeds, in whole or in part, to the replacement, restoration or rebuilding of the lost or damaged property; provided, however, that as long as no event of Default has occurred and is continuing, Lender shall permit Borrowers to apply such proceeds to the replacement, restoration or rebuilding of the lost or damaged property, provided that such proceeds shall be applied to such replacement, restoration or rebuilding of the lost or damaged property no more than forty-five (45) days after receipt of such proceeds by Borrowers. Borrowers will provide to Lender from time to time certificates showing such coverage in effect and, at Lender's request, the underlying policies.

(g)    **Commercial Tort Claims**.    If any Borrower shall at any time acquire a commercial tort claim, Borrowers shall immediately notify Lender in a writing signed by the applicable Borrower of the details thereof and grant to Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Lender.

(h)    **Financing Statements**.    Lender may at any time and from time to time file financing statements, continuation statements and amendments thereto that describe the Collateral as "all assets" of Borrowers or words of similar effect and which contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether the applicable Borrower is an organization, the type of organization and any organization identification number issued to any Borrower, and each Borrower hereby ratifies and re-authorizes all such financing statements filed by Lender on or prior to the Agreement Date. Each Borrower agrees to furnish any such information to Lender promptly upon request. Any such financing statements, continuation statements or amendments may be signed by Lender on behalf of any Borrower or filed by Lender without the signature of any Borrower and may be filed at any time in any jurisdiction. Each Borrower acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement naming any Borrower as the debtor and Lender as the secured party without the prior written consent of Lender, and each Borrower agrees that it shall not do so without the prior written consent of Lender.

8.    **Negative Covenants**.

(a)    **No Merger or Disposition of Assets**.    Without the prior written consent of Lender (which consent shall be in Lender's sole discretion), no Borrower will merge or consolidate with any other Person, or purchase all or substantially all of the assets of any other Person, or sell, transfer, lease, abandon, or otherwise dispose of a substantial portion of any Borrower's assets or any of the Collateral or any interest therein, except that, so long as no Default has occurred and is continuing, each Borrower may sell Inventory and sell and/or replace Equipment in the ordinary course of Borrowers' business.

(b)    **No Debt or Liens; Taxes**.    No Borrower will obtain or attempt to obtain from any Person other than Lender any loans, advances, or other financial accommodations or indebtedness of any kind, nor will any Borrower enter into any direct or indirect guaranty of any

obligation of another Person, other than (i) the Ford Motor Company Subordinated Obligations, (ii) the Holdco Subordinated Management Fee, (iii) the UAS Subordinated Management Fee, (iv) the Noteholder Subordinated Debt, (v) the Seller Subordinated Debt and (vi) indebtedness in connection with purchase money security interests constituting Permitted Liens (and capital leases) not to exceed, in aggregated principal amount for all Borrowers on a consolidated basis, the amount set forth on **Item 22 of the Schedule** at any one time outstanding.  No Borrower shall make any payments of any kind on any Subordinated Debt unless and until all Obligations have been indefeasibly paid in full and the commitment of Lender to make the Revolving Loans pursuant to this Agreement has been terminated, provided however, Borrowers may (i) make regularly scheduled payments of principal and interest on the Seller Subordinated Debt, provided that (A) no Default exists or would result therefrom, (B) Lender shall have received Borrowers' audited financial statements, which shall be certified without qualification by an independent practicing certified public accountant acceptable to Lender, for the fiscal year ending December 31, 2013, (C) Borrowers shall have at least $2,000,000 of unused borrowing availability hereunder for each and every week of Borrowers' thirteen (13) week forecast, after giving effect to any such payment, and (D) before and after giving effect to any such payment, Borrowers shall maintain a Fixed Charge Coverage Ratio (Including Restructuring Charges) of not less than 1.25 to 1.00; and (ii) pay amounts due and owing in the ordinary course of business to Ford Motor Company pursuant to the Ford Motor Company Distribution Documents.  No Borrower will permit any of the Collateral or the Real Estate to be subject to any Lien other than Permitted Liens.  Each Borrower shall pay when due (or before the expiration of any extension period) any tax or other assessment (including all required payments or deposits with respect to withholding taxes), and Borrowers will, upon request by Lender, promptly furnish Lender with proof satisfactory to Lender that Borrowers have made such payments and deposits.

(c)     **No Distributions**.  No Borrower will retire, repurchase or redeem any of such Borrower's capital stock or other ownership interest in such Borrower, nor declare or pay any dividend in cash or other property (other than additional shares of capital stock or additional ownership interests) to any owner or holder of such Borrower's shares or other ownership interest; provided, however, that so long as no Default exists and such Borrower is effectively treated as a Subchapter S corporation or limited liability company under the Internal Revenue Code, such Borrower may make distributions or pay dividends to its shareholders or members in an amount not to exceed the federal and state income tax liability of such shareholders or members which is directly attributable to such Borrower's operations and financial results (which amount shall not, in any event, exceed 40% of such Borrower's net income, determined in accordance with GAAP, for the period for which such taxes are calculated), provided further that, in the event such Borrower shall have a net operating loss for any taxable year, such Borrower shall cause each shareholder or member to immediately refund to such Borrower in cash (as equity and not as subordinated indebtedness) the amount of any tax refund actually received by such shareholder or member in respect of previously paid federal or state income taxes as a result of carrying back such net operating loss.

(d)     **No ERISA Liabilities**.  Borrowers will make timely payments of all contributions required to meet the minimum funding standards for Borrowers' employee benefit plans subject to the Employee Retirement Income Security Act of 1974 (as amended, "ERISA") and will promptly report to Lender the occurrence of any reportable event (as defined in ERISA) and any

giving or receipt by any Borrower of any governmental notice (other than routine requests for information) in respect of any such plan.

(e)    **Transactions with Affiliates**.  No Borrower will engage in any transaction with any of such Borrower's or any other Borrower's officers, directors, employees, owners or other Affiliates, except for an "arms-length" transaction on terms no less favorable to such Borrower than would be granted to such Borrower in a transaction with a Person who is not an Affiliate of any Borrower, which transaction shall be approved by such Borrower's disinterested directors and shall be disclosed in a timely manner to Lender prior to the consummation of the transaction. Without limiting the generality of the foregoing, no Borrower will pay any management, consulting or similar fees to any other Borrower or Affiliate of any Borrower, including without limitation, to Holdco or UAS.

(f)    **Loans/Investments**.  No Borrower will make any loans or advances to or extend any credit to any Person except (i) the extension of trade credit in the ordinary course of business; and (ii) advances to employees not to exceed an aggregate outstanding amount of $10,000 at any one time outstanding for all employees.  No Borrower shall purchase, acquire or otherwise invest in any Person except: (A) existing investments in such Borrower's subsidiaries described on **Item 12 of the Schedule**; (B) direct obligations of the United States of America maturing within one year from the acquisition thereof; (C) certificates of deposit issued by, or investment accounts in, banks or financial institutions having a net worth of not less than $50,000,000; (D) commercial paper rated A-1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc., and (E) investments in other Borrowers.  Without limiting the generality of the foregoing, no Borrower shall create any new subsidiary or make loans to, transfer any money or other assets to or otherwise invest in any subsidiary that is not a Borrower.

(g)    **Capital Expenditures**.  Borrowers shall not make or incur capital expenditures in an aggregate amount in excess of the amount set forth on **Item 23 of the Schedule** during any fiscal year.

(h)    **Compensation**.  No Borrower shall increase the total compensation paid to its officers or directors (or any of their relatives), including salaries, withdrawals, fees, bonuses, commissions, drawing accounts and other payments, whether directly or indirectly, in money or otherwise, during any fiscal year of Borrowers during the term of this Agreement in an aggregate amount for all such officers and directors in excess of limit specified in **Item 24 of the Schedule**.

(i)    **Amendments of Documents**.  No Borrower shall amend or modify (i) its articles of incorporation, articles of organization, bylaws, operating agreement or other constituent documents, (ii) any Subordinated Debt, (iii) any note, instrument or agreement in connection with any other Subordinated Debt, (iv) the Ford Motor Company Documents, or (v) the General Motors Distribution Agreement, without the prior written consent of Lender; provided, however, and notwithstanding the foregoing, amendments and modifications to the Ford Motor Company Documents and the General Motors Distribution Agreements shall only require ten (10) days' advance written notice to, and not the prior written consent of, Lender, so long as such amendment or modification, as applicable, could not reasonably be expected to have a material adverse effect on Borrowers, Lender, the Collateral or Lender's Lien on the Collateral.

(j)      **Use of Proceeds**.  Borrowers shall not use the proceeds of any Revolving Loans hereunder for any purpose other than (i) to pay fees and expenses in connection with the transactions contemplated to occur on the Agreement Date, (ii) to payoff Borrowers' existing loans with PNC Bank and (iii) for general working capital purposes.

(k)      **Holdco Covenants**.  Without the prior written consent of Lender (which consent shall be in Lender's sole discretion), Holdco shall not (i) hold any assets other than the Equity Interests of Parent, (ii) grant Liens to other Persons (other than Lender) on the Equity Interests of any Borrower, (iii) dispose of any of the Equity Interests of any Borrower, (iv) engage in any business other than owning 100% of the Equity Interest of Parent and activities incidental or related thereto, or (v) have any liabilities other than (A) tax liabilities in the ordinary course of business, and (B) corporate, administrative and operating expenses in the ordinary course of business.  Without limiting the generality of the foregoing, without the prior written consent of Lender (which consent shall be in Lender's sole discretion), Holdco shall not create any new subsidiary or make loans to, transfer any money or other assets to or otherwise invest in any subsidiary that is not a Borrower.

9.      **Reporting and Information**.

(a)      **Financial Statements**.  Borrowers will submit to Lender as soon as available, and in any case not later than thirty (30) days after the end of each month, a balance sheet, a detailed statement of profit and loss and a statement of cash flows, in each case prepared in accordance with GAAP on a consolidated basis and certified by the chief financial or accounting officer of Parent as presenting fairly, in accordance with GAAP, Borrowers' financial condition as of the last day of such month and Borrowers' results of operations for such month and for the portion of Borrowers' fiscal year ending with such month.  Borrowers will also submit to Lender annual financial statements within one hundred twenty (120) days after the end of each fiscal year, including a balance sheet, the related statement of profit and loss and shareholders' equity and a statement of cash flows, in each case prepared in accordance with the requirements set forth on **Item 25 of the Schedule** on a consolidating and consolidated basis.  Borrowers will also submit to Lender annually at least thirty (30) days prior to Borrowers' fiscal year end forecasted financial statements for the upcoming fiscal year, containing a projected balance sheet and profit and loss statement on a consolidated basis.  Together with each monthly and annual financial statement, Borrowers will deliver to Lender the certification of the chief financial or accounting officer of Parent in the form of Exhibit C attached hereto to the effect that Borrowers are in compliance with the terms and conditions of this Agreement, and setting forth in detail the calculation of all financial covenants, or, if Borrowers are not in compliance, describing the nature of any noncompliance and the steps Borrowers are taking or propose to take to remedy the same.  Each Borrower shall also submit to Lender a copy of its annual tax return each year not later than fourteen (14) days after the date of its filing.

(b)      **Collateral Reports**.  Concurrent with the execution of this Agreement by Borrowers and concurrent with each request for a loan pursuant to **Section 2(a)**, but no less frequently than as required by **Item 26 of the Schedule**, Borrowers shall deliver to Lender a fully completed Borrowing Base Certificate certified by the Chief Executive Officer or Chief Financial Officer of Parent as being true and correct.  Concurrent with the delivery of each such Borrowing

Base Certificate, Borrowers shall provide a written report to Lender of all materially significant returns, disputes and claims, together with sales and other reports relating to the Accounts and Inventory as required by Lender.  Borrowers shall deliver to Lender within ten (10) days after the end of each month a report, reflecting the status as of the end of each month and certified by the Chief Executive Officer or Chief Financial Officer of Parent, as being true and correct, containing (i) a current detailed aging, by total and by Customer, of Borrowers' Accounts, (ii) a current detailed aging, by total and by vendor, of Borrowers' accounts payable, and (iii) a detailed report of Borrowers' Inventory, setting forth the quantity, type and cost thereof, and a detailed listing of all Slow-Moving Inventory, all of which shall be set forth in a form and shall contain such information as is acceptable to Lender.  Borrowers will also conduct a physical inventory count no less frequently than annually, adjust Borrowers' records to reflect the results of the count and deliver to Lender monthly a list of locations of Inventory and the types and values of Inventory at each such location, in such form as Lender may require.  At Lender's request, Borrowers shall conduct such physical inventory counts and deliver such information more or less often than described above and such other information with respect to the Collateral, Obligors or Obligors' business or financial condition as Lender may reasonably request.

      (c)    **Obligor Financials**.  [Intentionally deleted].

      (d)    **Other Information**.  Borrowers will notify Lender as promptly as possible of any Default, any receipt by any Borrower of notice from any Governmental Authority that any Borrower has or may have violated any law, rule or regulation applicable to any Borrower or the terms or conditions of any permit or license any Borrower holds or is required to hold in connection with the conduct of such Borrower's business, any amendment to any Borrower's constituent documents and any change in any Borrower's management or ownership, and the commencement of any material litigation, claim or action against any Borrower.  In addition, Borrowers will notify Lender immediately upon (i) receipt by any Borrower of any notice with respect to the Pennsylvania Sales Tax Audit and (ii) settlement or other resolution of such Pennsylvania Sales Tax Audit.  Borrowers will notify Lender promptly after any Borrower receives notice of the appointment of any Goodman Will Trustee (as such term is defined in **Section 15(p)**).

      10.    **Inspection Rights; Expenses; Etc.**

      (a)    **Field Examinations; Inspections**.  Lender shall have the right without hindrance or delay to conduct field examinations to inspect the Collateral, all other assets of Borrowers or any portion thereof, Borrowers' books and records and all other aspects of Borrowers' business, and to examine and make copies of Borrowers' records, the Collateral and all other assets of Borrowers or any portion thereof, in each case wherever located, and to enter upon any Borrower's premises for such purposes, with forty-eight (48) hours' prior written notice, during business hours; provided, however, that upon the occurrence of an event of Default, no such notice shall be required.  Lender shall use its commercially reasonable efforts to not unreasonably interrupt or disturb the business operations of Borrowers during any such inspection.  Borrowers will assist Lender in whatever way necessary to make each such examination and inspection, and Borrowers agree, jointly and severally, to pay for such examinations as more fully described in **Item 27 of the Schedule**.  Lender may discuss each Borrower's financial condition with

Borrowers' independent accountants without liability to Lender or such accountants. Lender shall have full access to all records available to Borrowers from any credit reporting service, bureau or similar service and shall have the right to examine and make copies of any such records. Lender may exhibit a copy of this Agreement to such service and such service shall be entitled to rely on the provisions hereof in providing access to Lender as provided herein.

(b)     **Performance by Lender.** Lender may, from time to time at Lender's option, perform any agreement of any Borrower hereunder which any Borrower fails to perform and take any other action which Lender deems necessary for the maintenance or preservation of any of the Collateral or Lender's interest therein, and Borrowers agree to reimburse Lender immediately on demand for all of Lender's expenses in connection with the foregoing (including, without being limited to, reasonable fees and expenses of legal counsel), together with interest thereon at the default rate of interest provided for herein from the date any such expense is incurred until reimbursed by Borrowers.

11.     **Rights of Setoff, Application of Payments, Etc.** Lender will be entitled to hold or set off all sums and all other property of any Borrower at any time to any Borrower's credit or in Lender's possession (or the possession of any of Lender's Affiliates) by pledge or otherwise or upon or in which Lender may have a Lien, as security for any and all of the Obligations. Lender will have the right and is hereby irrevocably authorized and directed to charge to Borrowers' loan account the amounts of any and all such Obligations. Recourse to the Collateral or other security for the Obligations will not at any time be required and each Borrower hereby waives any right of marshalling that Borrowers may have. Each Borrower's obligation to pay or repay the Obligations is unconditional. Borrowers agree that Lender may take such action with regard to the custody and collection of Accounts assigned to Lender as Lender may deem necessary. Each Borrower agrees that failure to take any action with regard to any given Account will not be unreasonable until and unless Lender receives a written request for specific action from Borrowers' Agent with regard thereto and fails to respond thereto within a commercially reasonable time. Each Borrower irrevocably waives the right to direct the application of any and all payments and collections at any time or times hereafter received by Lender from or on behalf of any Borrower (including any rights any Borrower may have under Section 13-4-42 of the Official Code of Georgia), and each Borrower hereby irrevocably agrees that Lender shall have the continuing exclusive right to apply and reapply any and all such payments and collections received at any time or times hereafter by Lender or its agent against the Obligations, in such manner and in such order as Lender may deem advisable.

12.     **Attorney-in-Fact.** Each Borrower hereby appoints and constitutes Lender as such Borrower's attorney-in-fact:  (a) at any time, (i) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders, and other evidences of payment that come into Lender's possession and to deposit or otherwise collect the same; (ii) to send verifications of accounts to Customers; and (iii) to execute in such Borrower's name any financing statements, affidavits and notices with regard to any and all Lien rights; and (b) while any Default exists and is continuing, (i) to receive, open, and dispose of all mail addressed to such Borrower; (ii) to notify the postal authorities to change the address and delivery of mail addressed to such Borrower to such address as Lender may designate; (iii) to sign such Borrower's name on any invoice or bill of lading relating to the Collateral, on drafts against Customers, and notices to

Customers; (iv) to sign any agreement or certificate in connection with any insurance policy of such Borrower (including any documentation to receive benefit payments due thereunder or to cancel such insurance policy and receive a refund of the unearned premium with respect thereto); and (v) to do all other acts and things necessary to carry out this Agreement. All acts of said attorney-in-fact are hereby authorized, ratified and approved, and said attorney-in-fact will not be liable for any errors or mistake of fact or law. This power, being coupled with an interest, is irrevocable while any of the Obligations remain unpaid or Lender has any commitment to any Borrower under this Agreement or otherwise.

13. **Defaults and Remedies**.

(a) **Defaults**. For purposes of this Agreement, "Default" means the occurrence of any of the following events: (i) non-payment when due of any amount payable on any of the Obligations or breach of any covenant or failure to perform any agreement or failure to meet any of any Borrower's, Holdco's or any other Obligor's obligations contained herein, in any other Loan Document or in any other agreement out of which any of the Obligations arose; (ii) non-payment within three (3) Business Days of when due of the premium on any insurance policy required to be maintained hereunder, unless the failure to make such payment on the due date causes such insurance policy to lapse; (iii) any statement, representation, or warranty made in writing in this Agreement, any other Loan Document or in any other writing or statement at any time furnished or made or deemed furnished or made by any Borrower, any Support Guarantor or any other Obligor to Lender proves to have been untrue in any material respect as of the date furnished or made or deemed furnished or made; (iv) any Borrower's default under any other agreement for borrowed money or any other agreement involving more than the amount set forth on **Item 28 of the Schedule**, but excluding any payment default arising due to any prohibition of payment created by this Agreement or any ancillary agreement executed pursuant to this Agreement or any condition or requirement imposed on Borrower by Lender (e.g., payments prohibited by the terms of a subordination agreement); (v) suspension of the operation of any Borrower's present business; (vi) any Obligor becomes insolvent or unable to pay its debts as they mature, or admits in writing that it is insolvent or unable to pay its debts, makes an assignment for the benefit of creditors, makes a conveyance fraudulent as to creditors under any state or federal law, or a proceeding is instituted by or against any Obligor alleging that such Obligor is insolvent or unable to pay debts as they mature, or a petition under any provision of Title 11 of the United States Code, as amended, is filed by or against any Obligor, which proceeding, solely in the case of an involuntary bankruptcy proceeding filed against any Obligor, is not vacated, discharged or stayed within sixty (60) days; (vii) entry of any final, non-appealable judgment in excess of the amount set forth on **Item 29(a) of the Schedule** against any Obligor, entry of any judgment in excess of the amount set forth on **Item 29(b) of the Schedule** against any Obligor, or creation, assertion, or filing of any judgment or tax Lien against the property of any Obligor, which in the case of any such judgment remains undischarged for ten (10) days after such entry or filing; (viii) death of any Obligor who was a natural person, or death or withdrawal of any partner of any Obligor which is a partnership, or dissolution, merger, or consolidation of any Obligor which is a corporation, partnership or limited liability company; (ix) transfer of a substantial part (determined by market value) of the property of any Obligor; (x) sale, transfer or exchange, either directly or indirectly, of any stock or equity ownership interest

of any Obligor (without limiting the generality of the foregoing, a Default shall exist if any of the current Material Equity Owners of Holdco shall cease to own their respective shares of capital stock of Holdco (provided that shares owned by the Goodman Estate may be disposed of in accordance with the Goodman Will and applicable law) or if Bahman Mossavar-Rahmani shall cease to have direct or indirect voting control of Holdco, or if Holdco shall cease to own, directly or indirectly, at least 100% of the capital stock of Parent or cease to have direct or indirect voting control of Parent, or Parent shall cease to own, directly or indirectly, at least 100% of the capital stock or membership interests, as the case may be, of each other Borrower or cease to have direct or indirect voting control of each other Borrower); (xi) termination, unenforceability or withdrawal of any guaranty or support guaranty for the Obligations, or failure of any Support Guarantor or Obligor to perform any of its obligations under such a guaranty or support guaranty or assertion by any Support Guarantor or Obligor that it has no liability or obligation under such a guaranty or support guaranty; (xii) appointment of a receiver for the Collateral or for any other property in which any Borrower has an interest; (xiii) seizure of ten percent (10%) or more of the Collateral by any Person other than Lender; (xiv) any person identified on **Item 30 of the Schedule** shall for any reason cease to hold the office of the applicable Borrower set forth opposite such person's name on **Item 30 of the Schedule** (or any such person shall cease to perform the duties generally associated with such office) and a replacement satisfactory to Lender shall not be appointed within sixty (60) days; (xv) the occurrence of any act, omission, event or circumstance which has or could reasonably be expected to have a materially adverse effect on any Borrower or any other Obligor; (xvi) payment by any Borrower on any Subordinated Debt in violation of the applicable Subordination Agreement, or the termination, unenforceability or other invalidity of any Subordination Agreement or assertion by any party (other than Lender) that any Subordination Agreement (or any material provision thereof) is unenforceable or invalid; (xvii) the Pension Benefit Guaranty Corporation or the Department of Labor commences proceedings under ERISA to terminate any of any Borrower's employee pension benefit plans; (xviii) any liabilities in excess of $50,000 are claimed by any Person against any Borrower in connection the Pennsylvania Sales Tax Audit, which liabilities remain unpaid ten (10) days after the expiration of any applicable appeal period; provided, however, that Borrower shall be expressly permitted to enter into a payment plan with respect to any such liabilities and shall not be considered in default hereof as long as Borrower does not default under such payment plan and such payment plan does not result in the creation, assertion, or filing of any judgment or tax Lien against the property of any Obligor; (xix) the occurrence of any default under the Georgia Sales Tax Audit Payment Plan, (xx) the occurrence of any default under the Ford Motor Company Documents or termination or cessation of the business relationship with Ford Motor Company or (xxi) termination or cessation of the business relationship with General Motors.

(b)    **Remedies**.  If a Default occurs and is continuing, in each case without demand or notice to any Borrower, any Support Guarantor, any other Obligor or any other Person (unless such notice is expressly required hereunder or under applicable law):

(i)    Lender may terminate Lender's commitment, if any, to make Revolving Loans or to extend other financial accommodations to Borrowers, and may declare the entire principal amount of all Revolving Loans outstanding hereunder, all interest thereon, any unpaid fees and all other Obligations of any kind or nature to be, and thereupon the same will immediately become, due and payable in full; and, in the event of a Default described under

clause (vi) of **Section 13(a)**, such termination and acceleration shall automatically occur without any notice, demand or presentment of any kind. Borrowers agree to deposit with Lender a cash sum equal to the amount of letters of credit and acceptances issued or guaranteed by Lender or any Affiliate of Lender which have not been drawn upon or matured, which funds will be used to reimburse Lender or such Affiliate of Lender upon drawing under any letter of credit or maturity of any acceptances.

(ii)　　Lender may decrease the advance rates set forth in the definition of "Borrowing Base" in Lender's discretion.

(iii)　　Lender or Lender's designee may notify Customers that the Accounts have been assigned to Lender and that Lender has a security interest therein, collect them directly, and charge the collection costs and expenses to Borrowers' loan account.

(iv)　　Lender may (A) exercise any of its remedies under any other Loan Document, (B) apply any cash collateral to the Obligations (without limiting the foregoing, Lender may instruct any bank or other financial institution holding any cash, certificate of deposit or other Collateral to pay over such Collateral to Lender), and (C) draw on any letter of credit issued for the benefit of Lender in connection with this Agreement or any other Loan Document and apply the proceeds thereof to the Obligations.

(v)　　Lender may make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral. Borrowers authorize Lender to enter each premises where any Collateral is located, take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest or compromise any Lien which in Lender's opinion appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith.

(vi)　　Lender may ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale and sell the Collateral. Any such sale may be either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms. It is not necessary that the Collateral be present at any such sale.

(vii)　　Lender may, without regard to any waste, adequacy of the security or solvency of any Borrower, apply for the appointment of a receiver of the Collateral, to which appointment Borrowers hereby consent, whether or not foreclosure or repossession proceedings have been commenced hereunder or under any other Loan Document and whether or not a foreclosure sale or secured party sale has occurred;

(viii)　　Lender may cancel any insurance policy of any Borrower's in exchange for a refund of the unearned premium with respect thereto, and each Borrower hereby authorizes any insurance company which has issued any such policy to make such payment directly to Lender for application to the Obligations.

(ix)　　Lender may, at Lender's option, exercise any of the remedies available to Lender as a secured party under the Uniform Commercial Code as in effect in any applicable

jurisdiction, or otherwise available to Lender under applicable law. Borrowers agree, upon Default, to cease the sale or other disposition of the Collateral, except with Lender's prior written consent, and to assemble at Borrowers' expense all the Collateral at a convenient place acceptable to Lender. Lender may charge to Borrowers' loan account and Borrowers will pay Lender upon demand all costs and expenses, including reasonable attorneys' fees, in connection with: (A) the liquidation of any Collateral; (B) obtaining or enforcing payment of the Obligations; (C) the settlement, adjustment, compromise, or litigation of Customer disputes; or (D) the prosecution or defense of any action or proceeding either against Lender or against any Borrower concerning any matter growing out of or in connection with this Agreement and/or any Collateral and/or any Obligations. If at any time Lender pays any state, city, local, federal, or other tax or levy attributable to the Collateral, Borrowers will repay to Lender the amount of tax so paid by Lender. Borrowers agree that Lender may apply any proceeds from disposition of the Collateral first to satisfy obligations secured by Liens prior to Lender's security interest. Borrowers will remain liable and will pay on demand any deficiencies arising upon the liquidation of any Collateral held by Lender.

(c) **Notices**. If any notice of intended disposition of the Collateral or of any other act by Lender is required by law and a specific time period is not stated therein, such notice, if given five days before such disposition or act, in accordance with the provisions of **Section 15(a)**, will be deemed reasonably and properly given.

(d) **License**. Each Borrower hereby grants to Lender a license or other right to use, without charge, each Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale and selling any Collateral and each Borrower's rights under all licenses, and all franchise agreements shall inure to Lender's benefit.

(e) **Remedies Cumulative**. Lender's rights and remedies under this Agreement and all other Loan Documents shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any default on Borrowers' part shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election or acquiescence by it.

14. **Indemnification**. Borrowers jointly and severally agree to defend, indemnify, and hold harmless Lender and Lender's directors, officers, employees, Affiliates, representatives, attorneys and agents (each an "Indemnified Person") from and against any and all penalties, fines, liabilities, damages, costs, or expenses of whatever kind or nature (collectively, "Losses") asserted against any such Indemnified Person, arising out of, or in any way related to this Agreement or any other Loan Document, or the transactions contemplated hereby or thereby, including by reason of the violation of any law or regulation relating to the protection of the environment or the presence, generation, disposal, release, or threatened release of any hazardous materials in connection with any Borrower's business on, at or from any property at any time owned or operated by any Borrower, including, without limitation, reasonable attorneys' and consultants' fees, investigation and laboratory fees, court costs, and litigation expenses actually

incurred, and, further, including by reason of the assertion by any party (other than Lender) that any Subordination Agreement (or any material provision thereof) is unenforceable or invalid. Without limiting the foregoing, Borrowers represent and warrant that there has been no loan broker or investment banker involved in connection with the transactions contemplated hereby, and Borrowers jointly and severally agree to indemnify and hold Lender harmless from any claim of compensation payable to any loan broker or investment banker in connection with the transactions contemplated hereby. Notwithstanding anything in this Section 14 to the contrary, Borrowers shall have no indemnification liability to an Indemnified Person for Losses arising or related to the gross negligence or willful misconduct of any Indemnified Person.

      15.    **General Provisions**.

      (a)    **Notices**.  Except as specifically provided in this Agreement or in any of the other Loan Documents, all notices and communications hereunder and thereunder will be in writing or by telephone subsequently confirmed in writing.  Notices in writing will be delivered personally or sent by overnight courier service, by certified or registered mail, postage pre-paid, or by facsimile transmission and will be deemed received, in the case of personal delivery, when delivered; in the case of overnight courier service, on the next Business Day after delivery to such service; in the case of mailing, on the fourth Business Day after mailing; and, in the case of facsimile transmission, upon transmittal if confirmed by the sender's facsimile device; provided, however, that in the case of notices to Lender, Lender will be charged with knowledge of the contents thereof only when such notice is actually received by Lender.  A telephonic notice to Lender as understood by Lender will be deemed to be the controlling and proper notice in the event of a discrepancy with or failure to receive a confirming written notice.  Notices to Lender or Borrowers will be sent to the addresses set forth on **Item 31 of the Schedule**, or any other address for Borrowers or Lender of which the other is notified by like notice.

      (b)    **No Waiver**.  No waiver hereunder will be valid unless in writing signed by Lender and then only to the extent therein stated.  No delay or failure on Lender's part in the exercise of any right or remedy hereunder will operate as a waiver thereof or of Lender's right to exercise any other right or remedy.

      (c)    **Time of Essence**.  Time is of the essence of this Agreement.

      (d)    **Severability**.  Wherever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement will be prohibited by or invalid under applicable law, such provision will be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

      (e)    **Successors and Assigns**.  Each Borrower's and Lender's rights and obligations hereunder and under the other Loan Documents will inure to the benefit of such Borrower's and Lender's respective successors and assigns, provided, however, that Borrowers acknowledge and agree that without Lender's prior written consent, which may be withheld for any reason or no reason, no Borrower may assign Borrowers' rights or obligations or any part thereof hereunder or under any other Loan Document to any other Person.  Notwithstanding anything herein or in any

other Loan Document to the contrary, Lender may, without the consent of any Borrower, grant a security interest in, sell or assign, grant or sell participations or otherwise transfer all or any portion of its rights and obligations hereunder and/or under one or more of the other Loan Documents to one or more other Persons.

(f)    **Governing Law; Submission to Jurisdiction; Service; Etc.**  This Agreement and the other Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict of law provisions and principles) of the State of Georgia. Each Borrower hereby consents to the non-exclusive jurisdiction of any United States Federal Court sitting in or with direct or indirect jurisdiction over the Northern District of Georgia or any Georgia state court sitting in Cobb County, Georgia in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents, and each Borrower irrevocably agrees that all claims and demands in respect of any such action, suit or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such action, suit or proceeding brought in any such court or that such court is an inconvenient forum.  Each Borrower waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to Borrowers' Agent at the address for Borrowers' Agent for notices pursuant to this Agreement, and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the United States mails.  Nothing herein shall limit the right of Lender to bring proceedings against any Borrower or any of its Affiliates in the courts of any other jurisdiction.  Any judicial proceeding commenced by any Borrower against Lender or any other holder of any Obligations, or any Affiliate of Lender or any other holder of any Obligations, involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Loan Document shall be brought only in a United States Federal Court sitting in or with direct jurisdiction over the Northern District of Georgia or any Georgia state court sitting in Cobb County, Georgia.  Nothing in this Agreement shall be deemed or operate to affect the right of the Lender to serve legal process in any other manner permitted by law or to preclude the enforcement by Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement or any other Loan Document to enforce same in any other appropriate forum or jurisdiction.

(g)    **Waiver of Jury Trial**.    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER AND LENDER HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, THE OBLIGATIONS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR ANY PARTY'S ACTIONS IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT HEREOF OR THEREOF. EACH BORROWER AND LENDER ACKNOWLEDGES THAT SUCH WAIVER IS MADE WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE NATURE OF THE RIGHTS AND BENEFITS WAIVED HEREBY, AND WITH THE BENEFIT OF ADVICE OF COUNSEL OF ITS CHOOSING.

(h)    **Waiver of Hearing**.    EACH BORROWER HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVES ALL RIGHTS WHICH BORROWERS HAVE UNDER CHAPTER 14 OF TITLE 44 OF THE OFFICIAL CODE OF GEORGIA OR UNDER ANY SIMILAR PROVISION OF APPLICABLE LAW TO NOTICE AND TO A JUDICIAL HEARING PRIOR TO THE ISSUANCE OF A WRIT OF POSSESSION ENTITLING LENDER, ITS SUCCESSORS AND ASSIGNS TO POSSESSION OF THE COLLATERAL UPON THE OCCURRENCE OF A DEFAULT AND DURING THE CONTIUANCE THEREOF.    WITHOUT LIMITING THE GENERALITY OF THE FOREGOING AND WITHOUT LIMITING ANY OTHER RIGHT WHICH LENDER MAY HAVE, EACH BORROWER CONSENTS THAT, UPON THE OCCURRENCE OF A DEFAULT AND DURING THE CONTINUANCE THEREOF, IF LENDER FILES A PETITION FOR AN IMMEDIATE WRIT OF POSSESSION IN COMPLIANCE WITH SECTIONS 44-14-261 AND 44-14-262 OF THE OFFICIAL CODE OF GEORGIA OR UNDER ANY SIMILAR PROVISION OF APPLICABLE LAW AND THIS WAIVER OR A COPY HEREOF IS ALLEGED IN SUCH PETITION AND ATTACHED THERETO, THE COURT BEFORE WHICH SUCH PETITION IS FILED MAY DISPENSE WITH ALL RIGHTS AND PROCEDURES HEREIN WAIVED AND MAY ISSUE FORTHWITH AN IMMEDIATE WRIT OF POSSESSION IN ACCORDANCE WITH CHAPTER 14 OF TITLE 44 OF THE OFFICIAL CODE OF GEORGIA OR IN ACCORDANCE WITH ANY SIMILAR PROVISION OF APPLICABLE LAW, WITHOUT THE NECESSITY OF AN ACCOMPANYING BOND AS OTHERWISE REQUIRED BY SECTION 44-14-263 OF THE OFFICIAL CODE OF GEORGIA OR IN ACCORDANCE WITH ANY SIMILAR PROVISION OF APPLICABLE LAW.

(i)    **Expenses**.    Borrowers shall pay on demand all of Lender's costs and expenses in connection with underwriting and performing due diligence with respect to the transactions contemplated hereby and the preparation, reproduction, execution, delivery, administration and enforcement of this Agreement, including the reasonable fees and out-of-pocket expenses of Lender's counsel, in each case whether incurred on, prior or subsequent to the Agreement Date. In addition, Borrowers shall pay any and all stamp and other taxes and recording and filing fees payable in connection with the execution and delivery of all other instruments and documents to be delivered hereunder.    Such amounts may be charged by Lender to Borrowers' account as one or more Revolving Loans hereunder.    All provisions in this Agreement providing for the payment or reimbursement of Lender's attorneys' fees and expenses shall include, without limitation, such fees and expenses incurred pursuant to or in connection with proceedings brought under 11 U.S.C., the Federal Bankruptcy Code.

(j)    **Limitation of Liability for Certain Damages**.    In no event shall Lender or any of its Affiliates or any of their respective officers, directors, employees or agents be liable on any theory of liability for any special, indirect, consequential, exemplary or punitive damages (including any loss of profits, business or anticipated savings) in connection with this Agreement or any of the transactions contemplated hereby.    Each Borrower hereby waives, releases and agrees not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(k)     **Execution in Counterparts; Execution by Fax or E-Mail; Waiver of Acceptance**.  This Agreement may be executed in separate counterparts, all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement or any other Loan Document by facsimile or e-mail shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other Loan Document.  Any party delivering an executed counterpart of this Agreement or any other Loan Document by facsimile also shall deliver an original executed counterpart of this Agreement or such other Loan Document, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document.  To the fullest extent permitted by applicable law, each Borrower waives notice of Lender's acceptance of this Agreement and the other Loan Documents.

(l)     **Consent to Advertising**.  [Intentionally Deleted].

(m)     **No Third-Party Beneficiaries**.  Neither (i) any stockholder or owner of any other equity interest in any Borrower, (ii) any of any Borrower's employees or creditors (other than Lender and Lender's Affiliates), nor (iii) any other Person claiming by or through any Borrower shall be entitled to rely on this Agreement or have any rights, remedies or claims against Lender or any Affiliate of Lender under or in connection with this Agreement.

(n)     **Entire Agreement**.  This Agreement and the other Loan Documents embody the entire agreement and understanding between Lender and Borrowers and supersede all prior agreements and understandings relating to the subject matter hereof.

(o)     **Amendments to Loan Documents**.  No amendment or modification of any Loan Document, and no consent to or waiver of any Default, or consent to or waiver of the application of any covenant or representation set forth in any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or any release of Lender's Lien on any Collateral, shall be effective unless it has been agreed to by Lender and Borrowers in a written agreement that: (i) specifically states that it is intended to amend or modify specific Loan Documents, or any other document or agreement described in or related to this Agreement, or waive any Default or the application of any covenant or representation of any terms of specific Loan Documents, or is intended to release Lender's Lien on specific Collateral; and (ii) is signed by an authorized officer of all parties, or by an authorized officer of Lender with respect to a consent or waiver.  The terms of an amendment, consent or waiver memorialized in any written agreement shall be effective only to the extent, and in the specific instance, and for the limited purpose to which Lender and Borrowers have agreed.

(p)     **Post-Closing Matters**.  Each Borrower hereby covenants and agrees that:

(i)     not later than thirty (30) days after the Agreement Date, Parent shall either (1) grant Lender a first priority security deed, mortgage or deed of trust (as applicable) and lien upon the Real Estate pursuant to such documents and instruments as Lender shall require, each to be in form and substance satisfactory to the Lender, and, furthermore, deliver to Lender such other documents, certificates and information, including, without limitation, title exams, title insurance policies, appraisals and environmental reports, as Lender may reasonably request, all in

form and substance reasonably satisfactory to the Lender, or (2) pay over to Lender the net proceeds of any bona-fide sale, financing or other disposition of the Real Estate in connection with an arms-length transaction with an unaffiliated third-party purchaser or lender, and deliver to Lender such documents, certificates and information related thereto, as Lender may reasonably request, all in form and substance reasonably satisfactory to the Lender;

(ii)    not later than thirty (30) days after the Agreement Date, Borrowers shall deliver to Lender any and all original motor vehicle certificates of title covering the Collateral and any other related documents or instruments required by law to establish, preserve, protect and perfect the interests and rights created or intended to be created by this Agreement;

(iii)    not later than sixty (60) days after the Agreement Date, Borrowers shall deliver to Lender a "no action" letter with respect to the execution of a consent and release in favor of Lender, in form and substance satisfactory to Lender, by Juniata College in connection with the Goodman Estate;

(iv)    not later than ninety (90) days after the Agreement Date (which time period may be extended in Lender's discretion), a trustee shall have been appointed for each of the David K. Goodman, Jr. Educational Trust and the Alison Brooke Goodman Trust (each such trustee being hereinafter referred to as a "Goodman Will Trustee");

(v)    not later than thirty (30) days after the appointment of any Goodman Will Trustee (which time period may be extended in Lender's discretion), Borrowers shall use their best efforts to deliver to Lender a consent agreement from such Goodman Will Trustee, in form and substance satisfactory to Lender;

(vi)    not later than thirty (30) days after the Agreement Date, Borrowers shall have obtained, and shall deliver to Lender evidence thereof satisfactory to Lender, insurance covering the Collateral and the Real Estate as required under **Section 7(f)**; and

(vii)    not later than five (5) Business Days after the Agreement Date, Borrowers shall deliver to Lender tri-party agreements with Borrowers' credit card processors and/or PayPal, in form and substance satisfactory to Lender, or shall otherwise have directed all credit card and/or PayPal receivables to a lockbox designated by Lender in a manner satisfactory to Lender.

16.    **Letters of Credit**.  Upon and subject to the terms and conditions of this **Section 16**, in addition to the terms and conditions set forth elsewhere in this Agreement, Lender shall arrange for the issuance of Letters of Credit for the account of one or more Borrowers.

(a)    **Limitations on Amounts of Letters of Credit**.  Lender will not cause to be issued any Letter of Credit if the face amount of the Letter of Credit to be issued would exceed the lesser of:

(i)    the Letter of Credit Sub-Facility Amount minus the Letter of Credit Obligations, or

(ii)    the amount, if any, by which the Borrowing Base exceeds the aggregate outstanding principal balance of Revolving Loans.

(b)    **Manner of Issuance**.  Borrowers' Agent shall deliver to Lender, prior to 1:00 p.m. Atlanta, Georgia time, at least five (5) Business Days before the requested date of issuance of a Letter of Credit, a Letter of Credit Request for the issuance of such Letter of Credit setting forth (i) the beneficiary of the Letter of Credit, (ii) the stated amount thereof, (iii) the requested issue date, (iv) the requested expiration date, and (v) the purpose for such Letter of Credit.  Each such Letter of Credit Request shall be accompanied by the proposed issuer's standard form of standby or commercial letter of credit application, duly completed and executed by Borrowers' Agent (which application shall be deemed for purposes of this Agreement to constitute part of such Letter of Credit Request), together with all other documents, materials and evidences reasonably required by Lender prior to the issuance of such Letter of Credit.

(c)    **Terms of Letters of Credit**.  Each Letter of Credit shall (i) have an expiration date not later than the earlier of (A) one year after the date of issuance thereof (provided that such Letter of Credit may be subject to automatic one-year extensions so long as Lender is permitted, at its option, to terminate such Letter of Credit upon ninety (90) days' written notice prior to the then-applicable expiration date), (B) the then-effective stated termination date of this Agreement, (ii) be denominated in United States dollars, and (iii) be issued solely to (a) secure bid, tender, surety, payment, performance, litigation or similar bonds required by Borrowers in the ordinary course of business or (b) enhance repayment obligations owing by Borrowers to General Motors or Ford Motor Company.

(d)    **Drawings Under Letters of Credit**.

(i)    Borrowers shall pay to Lender for the account of the issuing bank the amount of any drawing under any Letter of Credit on the date of such drawing.  Borrowers hereby authorize Lender to make a Revolving Loan in the amount of such drawing, regardless of whether or not all conditions precedent to such Revolving Loan hereunder have been satisfied.

(ii)    The obligation of Borrowers to repay any Revolving Loans advanced pursuant to the foregoing clause (i) and any other amounts paid by Lender to any issuing bank with respect to any Letter of Credit shall be irrevocable, shall not be subject to any qualification or exception whatsoever and shall be binding in accordance with the terms and conditions of this Agreement under all circumstances, including the following circumstances:  (A) any lack of validity or enforceability of this Agreement or any of the other Loan Documents; (B) the existence of any claim, set-off, defense or right which any Borrower or the account party may have at any time against the issuer of any Letter of Credit, a beneficiary of any Letter of Credit or any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), Lender or any other Person, whether in connection with this Agreement, or any Letter of Credit, the transactions contemplated herein or any unrelated transactions; (C) any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any

respect; (D) the surrender or impairment of any security for the performance or observance of any of the terms of this Agreement or the other Loan Documents; (E) any failure of Lender or any Letter of Credit issuer to provide notice to any Borrower of any drawing under any Letter of Credit; (F) the occurrence or continuance of any Default; or (G) any other reason.

(e)     **Limitation of Liability With Respect to Letters of Credit**.   As among Borrowers, the issuing bank and Lender, Borrowers assume all risks of the acts and omissions of, or misuse of any Letter of Credit by, the beneficiaries of such Letter of Credit.  Without limiting the foregoing, neither Lender nor the issuing bank shall be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any draft, demand, application or other documents submitted by any party in connection with any Letter of Credit even if such document should in fact prove to be in any and all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity, genuineness or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or the proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of a Letter of Credit to comply fully with the conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretations of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required to make a drawing under any Letter of Credit or with respect to the proceeds thereof; (vii) the misapplication by the beneficiary of a Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of the issuing bank or Lender, including any act or omission, rightfully or wrongfully, of any present or future governmental authority. None of the above circumstances shall affect, impair or prevent the vesting of any of Lender's rights or powers under this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Borrowers and Lender have executed this Loan and Security Agreement as of the day and year first above written.

**BORROWERS**:

MILLER AUTO PARTS & SUPPLY COMPANY, INC., a Delaware corporation

By: _____
Name:  Randolph J. Kulamer
Title: CEO

[CORPORATE SEAL]

JOHNSON INDUSTRIES, INC., a Georgia corporation

By: _____
Name:  Randolph J. Kulamer
Title: CEO

[CORPORATE SEAL]

MILLER AUTO PARTS & PAINT COMPANY, INC., a Delaware corporation

By: _____
Name:  Randolph J. Kulamer
Title: CEO

[CORPORATE SEAL]

AUTOPARTSTOMORROW.COM, LLC, a Delaware limited liability company

By:    Miller Auto Parts & Supply Company, Inc., a Delaware corporation, its Sole Member

By: _____ (SEAL)
Name:  Randolph J. Kulamer
Title:  CEO

Loan and Security Agreement
5608856

## Acknowledgment and Agreement of Holdco

The undersigned Holdco acknowledges receipt of a copy of the above Loan and Security Agreement and hereby acknowledges, agrees and consents to the terms and conditions of **Section 8(k)** and **Section 13(a)(i)** thereof.

GOLDEN EAGLE ASSET MANAGEMENT, INC., a Delaware corporation

By: _____

Name: Bahram Mossavar-Rahmani

Title: Chairman

[CORPORATE SEAL]

[Signatures continue on following page]

**LENDER**:

FCC, LLC, d/b/a FIRST CAPITAL

By: _____

Name: Ralph J. Infante

Title: Senior Vice President

[Signatures continue on following page]

### NOTARY JURAT FOR EXECUTION OF
### WRITTEN OBLIGATIONS TO PAY MONEY
(Miller Auto Parts & Supply Company, Inc.)

On this the 12 day of August, 2013, before me, the undersigned, a Notary Public in and for the State of Georgia, County of Gwinnett, Randolph J. Kulamer, personally appeared, who is personally known to me or proved to me on the basis of satisfactory evidence to be the CEO of MILLER AUTO PARTS & SUPPLY COMPANY, INC., a Delaware corporation ("Borrower"), who, being by me first duly sworn, stated that:

1. He executed the foregoing Loan and Security Agreement on behalf of such corporation pursuant to its by-laws or a resolution of its board of directors, said execution taking place in the State of Georgia, County of Gwinnett; and

2. He has this day delivered the foregoing Loan and Security Agreement to FCC, LLC, d/b/a FIRST CAPITAL, at Cobb County, Georgia via overnight courier.

Signature of Borrower's Officer:

By: _____
Name: Randolph J. Kulamer
Title: CEO

Sworn to and subscribed before me this 12 day of August, 2013:

_____
Notary Signature

My Commission Expires:

_____9/8/13_____

[Affix Notarial Seal]

Loan and Security Agreement
5608856

### NOTARY JURAT FOR EXECUTION OF
### WRITTEN OBLIGATIONS TO PAY MONEY
(Johnson Industries, Inc.)

On this the _12_ day of _August_, 2013, before me, the undersigned, a Notary Public in and for the State of _Georgia_, County of _Gwinnett_, Randolph J. Kulamer, personally appeared, who is personally known to me or proved to me on the basis of satisfactory evidence to be the CEO of JOHNSON INDUSTRIES, INC., a Georgia corporation ("Borrower"), who, being by me first duly sworn, stated that:

3. He executed the foregoing Loan and Security Agreement on behalf of such corporation pursuant to its by-laws or a resolution of its board of directors, said execution taking place in the State of _Georgia_, County of _Gwinnett_; and

4. He has this day delivered the foregoing Loan and Security Agreement to FCC, LLC, d/b/a FIRST CAPITAL, at Cobb County, Georgia via overnight courier.

Signature of Borrower's Officer:

By: _____
Name: Randolph J. Kulamer
Title: CEO

Sworn to and subscribed before me this _12_ day of _August_, 2013:

_Peresha McCall_
Notary Signature

My Commission Expires:

_9/8/13_

[Affix Notarial Seal]

Loan and Security Agreement
5608856

### NOTARY JURAT FOR EXECUTION OF
### WRITTEN OBLIGATIONS TO PAY MONEY
(Miller Auto Parts & Paint Company, Inc.)

On this the 12 day of August, 2013, before me, the undersigned, a Notary Public in and for the State of Georgia, County of Gwinnett, Randolph J. Kulamer, personally appeared, who is personally known to me or proved to me on the basis of satisfactory evidence to be the CEO of MILLER AUTO PARTS & PAINT COMPANY, INC., a Delaware corporation ("Borrower"), who, being by me first duly sworn, stated that:

5.  He executed the foregoing Loan and Security Agreement on behalf of such corporation pursuant to its by-laws or a resolution of its board of directors, said execution taking place in the State of Georgia, County of Gwinnett; and

6.  He has this day delivered the foregoing Loan and Security Agreement to FCC, LLC, d/b/a FIRST CAPITAL, at Cobb County, Georgia via overnight courier.

Signature of Borrower's Officer:

By: _____
Name:  Randolph J. Kulamer
Title:  CEO

Sworn to and subscribed before me this 12 day of August, 2013:

_____
Notary Signature

My Commission Expires:

_____9/8/13_____

[Affix Notarial Seal]



Loan and Security Agreement
5608856

## NOTARY JURAT FOR EXECUTION OF
## WRITTEN OBLIGATIONS TO PAY MONEY
(Autopartstomorrow.com, LLC)

On this the 12 day of August, 2013, before me, the undersigned, a Notary Public in and for the State of Georgia, County of Gwinnett, Randolph J. Kulamer, personally appeared, who is personally known to me or proved to me on the basis of satisfactory evidence to be the CEO of Miller Auto Parts & Supply Company, Inc., the Sole Member of AUTOPARTSTOMORROW.COM, LLC, a Delaware limited liability company ("Borrower"), who, being by me first duly sworn, stated that:

7. He executed the foregoing Loan and Security Agreement on behalf of such corporation pursuant to its by-laws or a resolution of its board of directors, said execution taking place in the State of Georgia, County of Gwinnett; and

8. He has this day delivered the foregoing Loan and Security Agreement to FCC, LLC, d/b/a FIRST CAPITAL, at Cobb County, Georgia via overnight courier.

Signature of Borrower's Officer:

By: _____
Name: Randolph J. Kulamer
Title: CEO

Sworn to and subscribed before me this 12 day of August, 2013:

_____
Notary Signature

My Commission Expires:

_____9/8/13_____

[Affix Notarial Seal]

Loan and Security Agreement
5608856

## NOTARY JURAT FOR EXECUTION OF
## WRITTEN OBLIGATIONS TO PAY MONEY
(Golden Eagle Asset Management, Inc.)

On this the 12ᵗʰ day of _August_, 2013, before me, the undersigned, a Notary Public in and for the State of _New York_, County of _Kings_, _Bahman Mossarar-Rahmani_ personally appeared, who is personally known to me or proved to me on the basis of satisfactory evidence to be the _chairman_ of GOLDEN EAGLE ASSET MANAGEMENT, INC., a Delaware corporation ("Holdco"), who, being by me first duly sworn, stated that:

9. He executed the foregoing Acknowledgment and Agreement of Holdco to the above Loan and Security Agreement on behalf of such corporation pursuant to its by-laws or a resolution of its board of directors, said execution taking place in the State of _New York_, County of _Kings_; and

10. He has this day delivered the foregoing Acknowledgment and Agreement of Holdco to FCC, LLC, d/b/a FIRST CAPITAL, at Cobb County, Georgia via overnight courier.

Signature of Holdco's Officer:

By: _____
Name: Bahman Mossarar-Rahmani

Sworn to and subscribed before me this 12ᵗʰ day of _August_, 2013:

_____
Notary Signature

My Commission Expires:

April 25ᵗʰ 2015

[Affix Notarial Seal]

DANIELLE V FULLER
Notary Public, State of New York
No. 01FU6240107
Qualified in Kings County
Commission Expires April 25, 2015

## AFFIDAVIT REGARDING DELIVERY

On this the 12th day of _August_, 2013, before me, the undersigned, a Notary Public in and for the State of Georgia, County of _Cobb_, _Ralph J. Infante_ personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be a _Sr. Vice President_ of FCC, LLC, d/b/a FIRST CAPITAL, who, being by me first duly sworn, stated that he/she has received delivery of the foregoing Loan and Security Agreement on behalf of FCC, LLC, d/b/a FIRST CAPITAL in the State of Georgia, County of Cobb.

_____
Signature of Officer of FCC, LLC, d/b/a First Capital

Sworn to and subscribed before me this 12th day of _August_, 2013:

_____
Notary Signature

My Commission Expires _____

VICKI L HELLER
NOTARY PUBLIC
Dawson County
State of Georgia
My Comm. Expires January 19, 2016

[Affix Notarial Seal]

## SCHEDULE

This Schedule is a part of the foregoing Loan and Security Agreement dated as of August 13, 2013, between MILLER AUTO PARTS & SUPPLY COMPANY, INC., a Delaware corporation ("Parent"), JOHNSON INDUSTRIES, INC., a Georgia corporation ("Industries"), MILLER AUTO PARTS & PAINT COMPANY, INC., a Delaware corporation ("APPC"), AUTOPARTSTOMORROW.COM, LLC, a Delaware limited liability company ("APT") (Parent, Industries, APPC and APT are each individually, a "Borrower", and collectively, the "Borrowers"), and FCC, LLC, d/b/a FIRST CAPITAL, as lender ("Lender").

1.  **Borrowing Base**

"Borrowing Base" means, at any time, an amount equal to:

(a)  the lesser of:

    (i)  the Maximum Line Amount, and

    (ii)  the sum of:

        (A)  85% of the dollar amount of Eligible Accounts; plus

        (B)  the lesser of:

            (1)  (x)  90% of the Net Orderly Liquidation Value of Eligible Inventory (other than Eligible Slow-Moving Inventory); plus

                (y)  90% of the Net Orderly Liquidation Value of Eligible Slow-Moving Inventory; provided that, in no event shall such amount with respect to any Eligible Slow-Moving Inventory exceed the Slow-Moving Inventory Net Advance Limit (as defined below) with respect to the Applicable Period (as defined below); or

            (2)  160% of the amount available to be borrowed under clause (ii)(A) above;

minus

(b)  the sum of:

    (i)  an availability block in the amount of $250,000; plus

    (ii)  such reserves as Lender may establish from time to time in its discretion, plus

    (iii)  all other Letter of Credit Obligations and the amount available to be drawn under, plus the amount of any unreimbursed draws with respect to, any

letters of credit or acceptances which have been issued, created or guaranteed by Lender or any Affiliate of Lender for Borrower's account.

As used herein, the term "Slow-Moving Inventory Net Advance Limit" shall mean, in each case, the amounts set forth below for each applicable fiscal quarter (the "Applicable Period") set forth below:

| Applicable Period | Slow-Moving Net Advance Limit |
|---|---|
| Agreement Date to April 30, 2014 | $530,000 |
| May 1, 2014 to June 30, 2014 | $520,000 |
| July 1, 2014 to August 31, 2014 | $510,000 |
| September 1, 2014 to October 31, 2014 | $500,000 |
| November 1, 2014 to December 31, 2014 | $490,000 |
| January 1, 2015 to February 28, 2015 | $480,000 |
| March 1, 2015 to April 30, 2015 | $470,000 |
| May 1, 2015 to June 30, 2015 | $460,000 |
| July 1, 2015 to August 31, 2015 | $450,000 |
| September 1, 2015 to October 31, 2015 | $440,000 |
| November 1, 2015 to December 31, 2015 | $430,000 |
| January 1, 2016 to February 29, 2016 | $420,000 |
| March 1, 2016 to April 30, 2016 | $410,000 |
| May 1, 2016 to June 30, 2016 | $400,000 |
| July 1, 2016 to Termination Date | $390,000 |

To the extent this Agreement is renewed after the Termination Date, Slow-Moving Inventory Net Advance Limit shall be subject to additional monthly reductions in the amount of $10,000 per calendar month.

2.    **Accounts Eligibility**

(a)    **Accounts Age:**  Any Account with respect to which more than ninety (90) days have elapsed since the date of the original invoice therefor shall not constitute an Eligible Account.

(b)      **Cross-Aging Percentage:** 25%

(c)      **Concentration Limit:**      20% for Federal Express and AT&T

15% for all other Customers

3.      <u>**Permitted Liens**</u>

The following existing liens and financing statements:

| Financing Statement Number, Jurisdiction <u>and Filing Date</u> | <u>Secured Party</u> | <u>Collateral</u> |
|---|---|---|
| 0072010-008883 GA 05/14/2010 | Ford Motor Company, Ford Customer Service Division | All Ford and/or Motorcraft branded parts now owned or later acquired by debtor, all accounts receivable created by sale of such Ford and/or Motorcraft branded parts, and any insurance proceeds received for such Ford and/or Motorcraft branded parts |
| 672008-010070 GA 10/03/2008 | MB Financial Bank | True lease for equipment on or subject to Master Agreement No. 0866501, together with all equipment now or hereafter the subject of any agreement or schedule by and between the parties |
| 2010 1853757 DE 05/26/2010 | Ford Motor Company, Ford Customer Service Division | All Ford and/or Motorcraft branded parts now owned or later acquired by debtor, all accounts receivable created by sale of such Ford and/or Motorcraft branded parts, and any insurance proceeds received for such Ford and/or Motorcraft branded parts |

Security interests of Thomas Miller, Bahman and Yasmin Mossavar-Rahmani, C.H. Miller Hardware Company, Inc., Robert Kahan, Charles Moore, Nancy Moore, Dariush Owlia, The Ghassem Ladjevardi Family Inter Vivos Trust, the Goodman Estate, EFG Bank, Fribourg Limited, Seyed Aleali, George Sample, Robert Anthony Delmonico, Ralph S. Carratura, Nicole M. Carratura, Robert Alfred Delmonico and Danielle Delmonico to the extent that (i) any financing statements perfecting such security interests are filed later than the financing statements perfecting Lender's security interests and (ii) Borrowers have previously delivered an executed subordination agreement in form and substance satisfactory to Lender.

Improperly perfected security interests of Joseph Horvath, Cook Bros., Richard Cook, Gary Cook and Dorothy Stong, in each case, as has been previously disclosed to Lender; <u>provided</u>, however,

that if any of the above take the steps necessary to properly perfect their security interest, such Liens shall be permitted only to the extent that Borrowers have previously delivered an executed subordination agreement in form and substance satisfactory to Lender; provided further, however, if an executed subordination agreement has not been previously delivered, Borrower shall have a period of ten (10) Business Days in which to deliver an executed subordination agreement in form and substance satisfactory to Lender.

4.      **Persons Authorized to Request Revolving Loans**

Name:                              Title:

Randolph J. Kulamer              CEO

George M. Hare                   CFO

5.      **Collection Days:**      2 Business Days

6.      **Conditions To Initial Revolving Loans**

Items listed below are required to be delivered, in form and substance satisfactory to Lender in its sole discretion, and the other conditions described below are required to be satisfied in a manner satisfactory to Lender in its sole discretion, in each case as a condition to Lender's obligation to fund the initial loan or extend the first financial accommodation to Borrower under this Agreement.

Certified copy of articles/certificate of incorporation or other constituent documents for each Borrower

Bylaws or operating/partnership agreement for each Borrower

Secretary's certificate as to constituent documents, bylaws, authorizing action (e.g., corporate resolutions) and incumbency of officers/status and specimen signatures of authorized signers for each Borrower

Good Standing Certificate (state of organization and all other states in which each Borrower is qualified to do business)

Lien search results

Payoff letter from any lender whose loans are to be refinanced from proceeds of loans made under this Agreement

Lien termination documents from existing lender, any other creditor whose filings are to be terminated, etc.

Landlord, warehouseman or other bailee waivers

Support Guaranties

5608856v9

Subordination Agreements from Ford Motor Company, Holdco, UAS, the Noteholders and the Sellers

General Motors Side Letter

Lockbox, blocked account or agency account agreement(s)

Financial statements

Appraisal reports

Borrowing Base Certificate, together with schedules of Accounts and Inventory and other supporting documentation, in each case as of a date acceptable to Lender, which must demonstrate that Borrowers have at least $1,250,000 of unused borrowing availability hereunder after giving effect to (a) the loans to be made hereunder on the Agreement Date, (b) the payment of all fees, costs and expenses in connection with this Agreement, and (c) the payment of all of Borrower's accounts payable which are more than 60 days past due

Borrowers have established funding for the initial $500,000 Ford Letter of Credit, which funding arrangement is in a form satisfactory to Lender

Financing statements

Officer's certificate as to representations, warranties and no defaults

Opinion letter of Borrowers' and Support Guarantors' legal counsel

Amendments to Subordinated Debt documents with Sellers and Noteholders

Terminations of UCC-1 Financing Statements filed in favor of Sellers and Noteholders

All other items described on the Schedule of Closing Documents previously delivered by Lender or Lender's counsel to Borrower or Borrower's counsel

7.    **Termination Date**

This Agreement will terminate on the third (3rd) anniversary of the Agreement Date (the "Termination Date"); provided, however, that this Agreement will be renewed for succeeding one-year periods thereafter unless written notice of termination is provided by (i) Borrowers' Agent to Lender at least ninety (90) days prior to the then-effective termination date or (ii) Lender to Borrowers' Agent at least ninety (90) days prior to the then-effective termination date.

8.    **Interest Margin:**    4.00%

9.    **Default Margin:**    3.00%

10.    **Fees**

a.      In consideration of Lender's structuring, approving and committing to this Agreement, but without affecting Borrowers' obligation to reimburse Lender for costs associated with this Agreement and the transactions contemplated hereby as provided elsewhere in this Agreement, and for services performed by Lender in connection with Lender's continuing administration hereof, Borrower shall pay Lender an annual fee (i) in the amount of $180,000 upon execution of this Agreement, which will be fully earned on the Agreement Date and non-refundable when paid, and (ii) in an amount equal to 0.75% of the Maximum Line Amount, payable annually in advance on each anniversary of the Agreement Date and continuing until such time as (y) all loans hereunder shall have been repaid in full, and (z) this Agreement shall have been terminated; provided , however, that if this Agreement is not so extended, no such fee shall be payable on the third (3rd) anniversary of the Agreement Date.

b.      For services performed by Lender in connection with Lender's continuing administration hereof, Borrower shall pay to Lender a fee in an amount equal to 0.10% of the average outstanding daily balance per month, payable in advance on the first day of each calendar month beginning with the first such date following the Agreement Date and continuing until such time as (i) all Revolving Loans hereunder shall have been repaid in full, all Letters of Credit have been termination and all Letter of Credit Obligations have been repaid in full and (ii) this Agreement shall have been terminated.

c.      In consideration of the maintenance of Lender's commitment hereunder, Borrower will pay Lender a fee at the rate of .50% per annum on the daily average unused portion of the Maximum Line Amount for the immediately preceding month, payable monthly in arrears on the first day of each calendar month and on the termination date of this Agreement (with the portion of such fee payable on the termination date to be calculated for the period from the first day of the month during which the termination date occurs through the termination date), beginning on the first such date following the Agreement Date.  For purposes of computing the fee set forth in this paragraph, the face amount of any issued and outstanding Letters of Credit shall count as "usage" of the Lender's commitment hereunder.

d.      In the event that this Agreement is terminated for any reason (other than in connection with the existence of a Default) prior to the third (3rd) anniversary of the Agreement Date, Borrowers will pay to Lender on or prior to the effective date of such termination an early termination fee in the amount set forth below with respect to the corresponding date:

| Termination | Termination Fee |
| --- | --- |
| 0-12 months after the Agreement Date | 3.0% of Maximum Line Amount |
| 13-24 months after the Agreement Date | 1.5% of Maximum Line Amount |
| 25-36 months after the Agreement Date | $0 |

All of the foregoing fees constitute compensation to Lender for services rendered and are not interest or a charge for the use of money.  Each installment of such fees shall be fully earned when due and payable and shall not be subject to refund or rebate.

e.    With respect to each Letter of Credit, Borrowers shall pay to Lender a per annum fee equal to three percent (3.0%) <u>times</u> the undrawn face amount of such Letter of Credit.  Such fee shall be calculated on a daily basis and shall be payable by Borrowers monthly in arrears on the first day of each calendar month and on the date that this Agreement is terminated for any reason.  In addition, Borrowers shall pay to Lender, for the account of the issuing bank of any Letter of Credit, such issuing bank's customary fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.

**11.    Organizational Information**

**Parent:**

    **Exact Legal Name of Borrower:**  MILLER AUTO PARTS & SUPPLY COMPANY, INC.
    **State of Organization:**  Delaware
    **Type of Organization:**  corporation
    **Organizational Identification Number:**  3567884

**Industries:**

    **Exact Legal Name of Borrower:**  JOHNSON INDUSTRIES, INC.
    **State of Organization:**  Georgia
    **Type of Organization:**  corporation
    **Organizational Identification Number:**  K842715

**APPC:**

    **Exact Legal Name of Borrower:**  MILLER AUTO PARTS & PAINT COMPANY, INC.
    **State of Organization:**  Delaware
    **Type of Organization:**  corporation
    **Organizational Identification Number:**  4422076

**APT:**

    **Exact Legal Name of Borrower:**  AUTOPARTSTOMORROW.COM, LLC
    **State of Organization:**  Delaware
    **Type of Organization:**  limited liability company
    **Organizational Identification Number:**  4993139

**12.    Subsidiaries and Investments in Other Persons:**

| Company | Subsidiaries | Investments in Others |
|---|---|---|
| Miller Auto Parts & Supply Company, Inc. | Johnson Industries, Inc.<br><br>Miller Auto Parts & Paint | None |

| | Company, Inc.<br><br>AutoPartsTomorrow.com, LLC | |
|---|---|---|
| Johnson Industries, Inc. | None | None |
| Miller Auto Parts & Paint Company, Inc. | None | None |
| AutoPartsTomorrow.com, LLC | None | None |

### 13.    Pending Litigation:

**Parent:**

NONE

**Industries:**

NONE

**APT:**

NONE

**APPC:**

Lakisha N. Moffott v. Miller Auto Parts & Paint Company, Inc. – EEOC Charge No. 533-2012-01024. Moffott, who identifies herself as race black, alleges that she experienced racial slurs and unwelcome sexual advances during her brief employment tenure with Miller Auto Parts. Moffott also alleges that she was discharged because of her race and/or in retaliation for complaining to a manager about the alleged racial slurs and/or sexual advances. Miller Auto Parts has responded that Moffott never reported or mentioned any alleged racial slurs or sexual advances or comments to any Miller Auto Parts supervisor or manager during her employment and that it discharged Moffott during her new employee introductory period in July 2012, because she dumped a cup of hot coffee on a co-worker's head. The co-worker assaulted by Moffott also happens to be race black.

Miller Auto Parts & Paint Company, Inc./Thomas Walters – OSHA No. 3-6600-13-038. Walters alleges that Miller Auto Parts terminated his employment in February 2013 in retaliation for filing a complaint with OSHA. Miller Auto Parts has responded that it discharged Walters for theft and that it was unaware that Walters had filed a complaint with OSHA until he filed a claim for unemployment compensation benefits after his discharge.

KELLY AUTO PARTS, INC. v. MILLER AUTO PARTS & PAINT COMPANY, INC. – dispute over approximately $73,000 that Miller Auto Parts set-off against a note owed to Tom Kelly pursuant to the promissory note delivered to him as part of the Kelly Auto Parts acquisition in 2009. The location that Kelly was to lease to Miller pursuant to the transaction was never delivered, due to Kelly's inability to get an occupancy permit. As a result, Miller was forced to relocate, and incurred moving expenses, lost business, legal expenses, etc.

Russell H. Eck. V. Michael Kramer and Miller Auto Parts & Paint Company, Inc. – Mr. Eck filed a complaint against Mr. Kramer and APPC on or about October 8, 2012 in the Allegheny County, Pennsylvania Court of Common Pleas in which Mr. Eck alleges that he suffered various injuries on or about June 3, 2010 as a result of being struck by a vehicle operated by Mr. Kramer and owned by APPC.  APPC submitted a claim to its automobile insurance provider in connection with this matter and its insurance provider is presently managing the defense of the claim.

14.    **Existing Debt and Guarantees**:

The Subordinated Debt

See <u>Schedule 14</u> attached hereto and incorporated herein by this reference.

15.    **Prior Legal Names**:

See <u>Schedule 15</u> attached hereto and incorporated herein by this reference.

**Prior or Current Trade or Fictitious Names**:

See <u>Schedule 15</u> attached hereto and incorporated herein by this reference.

**Mergers and Acquisitions**:

See <u>Schedule 15</u> attached hereto and incorporated herein by this reference.

16.    **Locations of Offices and Collateral**

See <u>Schedule 16</u> attached hereto and incorporated herein by this reference.

**Current Chief Executive Office**:

See <u>Schedule 16</u> attached hereto and incorporated herein by this reference.

**Other Locations of Chief Executive Office in past five years**:

See <u>Schedule 16</u> attached hereto and incorporated herein by this reference.

**Other Current Collateral Locations**:

See <u>Schedule 16</u> attached hereto and incorporated herein by this reference.

17.    **Ownership Structure**:

| Company | Owned by |
|---|---|
| Miller Auto Parts & Supply Company, Inc. | 100% owned by Golden Eagle Asset Management Inc. |
| Miller Auto Parts & Paint Company, Inc. | 100% owned by Miller Auto Parts & Supply Company, Inc. |
| Johnson Industries, Inc. | 100% owned by Miller Auto Parts & Supply Company, Inc. |
| AutoPartsTomorrow.com, LLC | 100% owned by Miller Auto Parts & Supply Company, Inc. |

18.    **Owned Real Property**:

See Schedule 18 attached hereto and incorporated herein by this reference.

**Leased Real Property (including legal name of landlord and monthly rent)**:

See Schedule 18 attached hereto and incorporated herein by this reference.

**Warehousemen, processors, consignees or other bailees in possession or control of any Inventory (include name, address where Inventory is stored and description of the arrangement)**:

See Schedule 18 attached hereto and incorporated herein by this reference.

19.    **Bank Accounts**:

See Schedule 19 attached hereto and incorporated herein by this reference.

20.    **Commercial Tort Claims**:

None

21.    **Financial Covenants**:

(a)    Borrowers shall maintain, as of the last day of each Measurement Period set forth below, on a consolidated basis, a Fixed Charge Coverage Ratio (Excluding Restructuring Charges), as follows:

| Measurement Period | Required Ratio |
|---|---|
| Three months ending September 30, 2013 | 1.0 to 1.0 |

| | |
|---|---|
| Six months ending December 31, 2013 | 1.0 to 1.0 |
| Nine months ending March 31, 2014 | 1.0 to 1.0 |
| Twelve months ending June 30, 2014 | 1.0 to 1.0 |
| Each quarter thereafter for the twelve-month period then ended | 1.0 to 1.0 |

Fixed Charge Coverage Ratio (Excluding Restructuring Charges) equals the ratio of Borrowers' (i) net income (excluding extraordinary gains and/or restructuring charges), plus interest expense, plus taxes, plus depreciation and amortization, plus payments of principal and/or interest received on the HC/Hendrick Note, to (ii) interest expense, plus principal payments made or scheduled to be made with respect to indebtedness (other than scheduled but unpaid amounts on Subordinated Debt) plus payments on capitalized leases, plus taxes, plus dividends and distributions, plus unfinanced capital expenditures.

(b)        Borrowers shall maintain, on a consolidated basis, a Tangible Net Worth, plus the outstanding principal balance of Subordinated Debt, of at least $4,000,000 at all times, to be tested monthly, commencing with the calendar month ending July 31, 2013.  As used herein, "Tangible Net Worth" means, as of any date, the total assets of Borrowers minus the total liabilities of Borrowers calculated in conformity with GAAP, less all amounts due from Borrowers' Affiliates and the amount of all intangible items reflected therein, including all prepaid expenses, deposits, net leasehold improvements, unamortized debt discount and expense on Seller Subordination Debt, unamortized research and development expense, unamortized deferred charges, net operating losses, goodwill, intellectual property, unamortized excess cost of investments in subsidiaries over equity at dates of acquisition, and all similar items which should properly be treated as intangibles in accordance with GAAP, or as determined by Lender.

22.      **Permitted Purchase Money Debt:**   $500,000

23.      **Permitted Capital Expenditures:**    $500,000 during any fiscal year; provided that, of such amount, only $300,000 may be unfinanced capital expenditures

24.      **Maximum Annual Increase in Officers' Compensation:**    Borrowers represent and warrant to Lender that the aggregate compensation paid and to be paid to Borrowers' officers and directors for Borrowers' current fiscal year is an aggregate $517,250 base salary. There is a minimum discretionary aggregate bonus payable of $25,000 which is fixed payable upon confirmation of the Board of Directors of Parent. Such combined compensation of $542,250 shall not increase by more than five percent (5.0%) per fiscal year.

Additionally, there is a performance bonus payable to all management, under which officers participate.  The performance bonus is based on EBITDA goals of the Borrowers and is calculated as a percentage of base salary. No performance bonus is projected to be paid to officers in 2013, but the range of the potential performance bonus was 0$ to $250,000 for 2013.

There is no compensation paid to Directors of the Borrowers. The Parent does not have an independent Director as of the date of the Agreement. If the Parent determines it needs to have an

independent Director for governance purposes, compensation for the independent director is projected to be in the range of $25,000 to $50,000 per annum.

25. **Annual Financial Statements:**  To be audited and certified without qualification by an independent practicing certified public accountant acceptable to Lender.

26. **Borrowing Base Certificates:**  Borrowers' Agent shall deliver to Lender a Borrowing Base Certificate no less frequently than weekly by 11:00 a.m. on each Business Day, prepared as of the close of business on the immediately preceding Business Day.  Borrowers' Agent shall also deliver to Lender a Borrowing Base Certificate within ten (10) days of the end of each calendar month, determined as of the last day of the calendar month most recently ended.

27. **Field Examinations:**  Borrower agrees to pay to Lender Lender's customary fees and disbursements relating to field examinations of the Collateral, Borrower, Borrower's business and Borrower's books and records, which, as of the Agreement Date, are $1,000 per examiner per day plus all of the out-of-pocket examination costs and travel and other expenses incurred by such examiners.  Provided no Default exists, such fees and disbursements shall not exceed $30,000 per year.

28. **Cross Default Amount:**  $250,000

29. **Judgment Cross Default Amount:**

   (a) $50,000

   (b) $250,000

30. **Change of Management Default:**

   | Name | Office |
   | --- | --- |
   | Randolph J. Kulamer | Chief Executive Officer |
   | Charles D. Lightner | President |
   | George M. Hare | Chief Financial Officer |

31. **Notice Addresses:**

   If to Borrower:      Miller Auto Parts & Supply Company, Inc.
                        5944 Peachtree Corners East
                        Norcross, Georgia 30071
                        Attn.:  George Hare, CFO
                        Facsimile No.:  866.581.5132

   With a copy to:      McNees Wallace & Nurick LLC
                        100 Pine Street

P.O. Box 1166
Harrisburg, Pennsylvania 17108
Attn.: Timothy R. Deckert, Esq.
Facsimile No.: 717.260.1680

If to Lender :                FCC, LLC, d/b/a First Capital
                              3350 Riverwood Parkway, Suite 1750
                              Atlanta, Georgia  30339
                              Attn.: Portfolio Manager
                              Facsimile No.: 678-594-5901

With a copy to:               Ronald A. Weiner, Esq.
                              Arnall Golden Gregory LLP
                              171 17th Street, NW, Suite 2100
                              Atlanta, Georgia  30363
                              Facsimile No.: 404-873-8193

## EXHIBIT A

### Legal Description

ALL that certain lot or piece of ground situate, lying and being in the Borough of Bedford, County of Bedford and Commonwealth of Pennsylvania, bounded and described as follows:

BEGINNING at an iron pin at the intersection of the eastern line of North Juliana Street and the southern line of Mann Street; thence by Mann Street, North 90 degrees 00 minutes 00 seconds East, 240 feet to an iron pin on the western line of Huntingdon Avenue South 00 degrees 00 minutes 00 seconds East, 120 feet to an iron pin; thence along land now or formerly of Thomas F. Hagan, South 90 degrees 00 minutes 00 seconds West, 156 feet to a set iron pin; thence along land of which this was formerly a part of, North 00 degrees 00 minutes 00 seconds West, 60 feet to a set iron pin; thence South 90 degrees 00 minutes 00 seconds West, 84 feet to an iron pin along the eastern line of North Juliana Street North 00 degrees 00 minutes 00 seconds West, 60 feet to an iron pin the place of beginning.  BEING all of Lot No. 20 and part of Lot No. 21 in the Mann addition to Bedford Borough.

BEING the same premises title to which vested in Golden Bridge Properties, LLC, the Grantor herein, by deed of Interstate Emergency Services, Inc., a Pennsylvania Corporation, dated October 11, 2006, and recorded October 13, 2006, in the Office of the Recorder of Deeds for Bedford County in Record Book 1145, Page 142.

BEING the same premises which GOLDEN BRIDGE PROPERTIES, LLC by deed dated 3/21/2007 and intended to be recorded in the Recorders Office in and for BEDFORD COUNTY, PA granted and conveyed unto MILLER AUTO PARTS & SUPPLY COMPANY, INC.

# EXHIBIT B

**[Attach form of Borrowing Base Certificate]**

# FIRST CAPITAL - DAILY BORROWING BASE CERTIFICATE

BORROWERS:  Miller Auto Parts & Supply Company, Inc., as Borrower's Agent

REPORT #:                                   DATE:

| LINE # | COLLATERAL TYPES / LINE AMOUNTS | Accounts Receivables | Finished Goods "Active" Inventory | Finished Goods "Slow Moving" Inventory | TOTAL Inventory (Capped at 160% of A/R Loan Value) | Letters of Credit | REVOLVER TOTAL | LINE # |
|---|---|---|---|---|---|---|---|---|
| (1) | BEGINNING COLLATERAL (FROM PREVIOUS REPORT) | $18,000,000.00 | | | $11,074,523.07 | $3,000,000.00 | $18,000,000.00 | (1) |
| (2) | PLUS: SALES (A/R) or PURCHASES (INV.) | $0.00 | | | | | | (2) |
| (3) | LESS: CREDITS (A/R) or WITHDRAWALS (INV.) | $   - | $   - | $   - | | | | (3) |
| (4) | ENDING COLLATERAL | $   - | $   - | $   - | $   - | $0.00 | $0.00 | (4) |
| (5) | INELIGIBLE COLLATERAL | $   - | $   - | $   - | | | | (5) |
| (6) | TOTAL ELIGIBLE COLLATERAL | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | (6) |
| (7) | PERCENT OF ADVANCE ON ELIGIBLE COLLATERAL | 85.00% | 47.25% | 13.03% | 100.00% | | | (7) |
| (8) | LESSER OF COLLATERAL LOAN VALUE OR LINE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | (8) |
| (9) | RESERVES ESTABLISHED | | | | | | $   - | (9) |
| (10) | ACTUAL COMPUTED LOAN VALUE | | | | | | $   - | (10) |

### LOAN INFORMATION

|  |  |  |  |
|---|---|---|---|
| (11) | BEGINNING LOAN (FROM PREVIOUS REPORT) | | (11) |
| (12) | LESS: COLLECTIONS | $   - | (12) |
| (13) | | | (13) |
| (14) | + (-) ADJUSTMENTS | | (14) |
| (15) | NET LOAN OUTSTANDING BEFORE ADVANCES | $   - | (15) |
| (16) | AVAILABLE TO BORROW (LINE 8b MINUS LINE 13) | $0.00 | (16) |
| (17) | ADDITIONAL ADVANCE REQUESTED | $0.00 | (17) |
| (18) | NEW LOAN BALANCE (LINE 13 PLUS LINE 15) | $0.00 | (18) |
| (19) | NET AVAILABILITY (LINE 8b MINUS LINE 16) | $0.00 | (19) |

### SALES DETAIL

| | CREDIT DETAIL | |
|---|---|---|
| SALES from Sales Journal | CREDITS - LINE 10 | |
| CREDITS off Sales Journal | Discounts | $   - |
| Ret. & Allowances off Sales Journal | Other - Cash Not Remitted | $   - |
| OTHER - Adjustments | Other (Non A/R) | $   - |
| NET SALES - LINE 2    $0.00 | TOTAL CREDIT - LINE 3    $   - | |

### COLLECTIONS - LINE 10

| | | DEPOSIT LISTINGS | |
|---|---|---|---|
| | | 0.00 | 1 |
| | | | 2 |
| | | | 3 |
| | | | ... |
| | | | 8 |
| | TOTAL | $   - | |

Borrower hereby (a) as security for the repayment of Borrower's present and future indebtedness to FCC, LLC, dba First Capital (herein "FCC"), assigns, transfers and pledges to FCC, its successors and assigns, and gives and agrees that FCC has a security interest in, under and pursuant the Loan and Security Agreement and/or other financing instruments between Borrower and FCC, the Accounts specifically described in the invoice copies or schedules of accounts receivable attached hereto and identified herein, and the Inventory (i.e. Merchandise) generally identified herein or described in lien statements or security agreements attached hereto, and in all presently outstanding Accounts and all Inventory now owned by Borrower, and all Accounts and Inventory hereafter created, acquired or purchased by Borrower; (b) warrants and certifies to FCC that all Accounts created since the prior Report are evidenced by invoice copies or schedules of accounts receivable attached hereto, and that the total of all Accounts on the books and records of Borrower at said date is as shown and that amount; (c) warrants and certifies to CBC that all Inventory now made or acquired since the prior report is identified herein or is evidenced by suppliers' invoices, production reports, or other records attached hereto, and that the total of all Inventory of Borrower is as shown as of the date shown hereon for Inventory and that Borrower now has in its possession and control, or in the possession of a third party of its account which third party has been identified in writing by Borrower to FCC, Inventory in that amount; (d) warrants that the total of withdrawals since the prior report are as shown; and (e) warrants that all collections received or credits allowed on Accounts previously assigned to FCC have been duly and regularly entered to the credit of the respective debtors on the books and accounts of Borrower; that all such collections have been remitted and all such credits have been reported to FCC promptly, that none of the credit of the respective debtors on the books and accounts of Borrower; that all such collections have been has been made to FCC of returned or rejected goods covered by any Account previously assigned, with payment to FCC of the amount thereof.

---

This assignment and security agreement is accepted by FCC, LLC, dba First Capital, in Atlanta, Georgia, in reliance on the warranties, certifications and agreements of Borrower above, and those contained in said Loan and Security agreement.

Miller Auto Parts & Supply Company, Inc., as Borrower's Agent

BORROWER

By: _____

George Harc, CFO

FCC, LLC

By: _____

_____
TITLE

☒

1001900

## EXHIBIT C

## FORM OF COMPLIANCE CERTIFICATE

[TO BE PROVIDED ON BORROWER'S LETTERHEAD]

_____, 201__

FCC, LLC, d/b/a First Capital
3350 Riverwood Parkway, Suite 1750
Atlanta, Georgia  30339
Attn.:  Portfolio Manager

The undersigned, the _____ of MILLER AUTO PARTS & SUPPLY COMPANY, INC., a Delaware corporation ("Borrower's Agent"), gives this certificate to FCC, LLC, d/b/a First Capital, a Florida limited liability company ("Lender"), in accordance with the requirements of that certain Loan and Security Agreement dated as of August 13, 2013, between Borrowers' Agent, Lender and the other Borrowers party thereto (as amended from time to time, the "Loan Agreement").  Capitalized terms used in this Certificate, unless otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

No Default exists on the date hereof, other than:_____ [if none, so state].

As of the date hereof, Borrowers are current in payment of all accrued rent and other charges to Persons who own or lease any premises where any of the Collateral is located, and there are no pending disputes or claims regarding any Borrower's failure to pay or delay in payment of any such rent or other charges.

Set forth on Appendix 1 attached hereto is a true, accurate and complete calculation with respect to the financial covenants of Borrowers under the Loan Agreement.

Yours truly,

MILLER AUTO PARTS & SUPPLY COMPANY,
INC., a Delaware corporation


By:_____
Name:_____
Title:_____

5608856v9

## Appendix 1

A.  Minimum Tangible Net Worth Plus Subordinated Debt Requirement of $4,000,000.

Tangible Net Worth = Net Worth, plus Subordinated Debt less Intangibles

| | | |
|---|---|---|
| Net Worth | $_____ | , plus |
| Subordinated Debt | $_____ | , less |
| Intangible assets | $_____ | |
| Actual Tangible Net Worth | $_____ | ] |

B.  Minimum Fixed Charge Coverage Ratio Requirement    1.25 to 1

Fixed Charge Coverage Ratio = (a) net income (excluding extraordinary gains and/or[1] restructuring charges), plus interest expense, plus taxes, plus depreciation and amortization, divided by (b) interest expense, plus principal payments made or scheduled to be made with respect to indebtedness (other than scheduled but unpaid amounts on Subordinated Debt) plus payments on capitalized leases, plus taxes, plus dividends and distributions, plus unfinanced capital expenditures

| | | |
|---|---|---|
| Net Income | $_____ | , plus |
| Interest Expense | $_____ | , plus |
| Taxes | $_____ | , plus |
| Depreciation | $_____ | , plus |
| Amortization | $_____ | , plus |
| Note Receivable Payments (HC/Hendrick Note) | $_____ | equals |
| Numerator | $_____ | |
| Interest Expense | $_____ | , plus |
| Principal Payments made and scheduled to be made with respect to indebtedness | $_____ | , plus |
| Capitalized Lease Payments | $_____ | , plus |
| Taxes | $_____ | , plus |
| Dividends & Distributions | $_____ | , plus |
| Unfinanced capital expenditures | $_____ | equals |
| Denominator | $_____ | |
| Actual Fixed Charge    =   Coverage Ratio | _____ to 1 | |

---

[1] To be adjusted depending upon applicability (computation for Section 8(b) or Item 21(a) of the Schedule.

**EXHIBIT D**

**Seller Subordinated Debt**

| Seller Sub-Debt Holders | Original Instrument/Document Date | Original Principal Amount | Obligor |
|---|---|---|---|
| C&N Auto Parts, Inc. | March 29, 2010 | $135,000.00 | APPC, Parent, Industries |
| Perimeter Auto Parts, LLC | May 15, 2010 | $112,500.00 | JI |
| Ken Smith Auto Parts, Inc. | May 24, 2010 | $250,000.00 | JI |
| Robert Anthony Delmonico (ARI) | Aug. 1, 2008 | $8,250.00 | APPC |
| Robert Alfred Delmonico (ARI) | Aug. 1, 2008 | $272,250.00 | APPC |
| Danielle Delmonico (ARI) | Aug. 1, 2008 | $272,250.00 | APPC |
| Ralph S. Carratura (ARI) | Aug. 1, 2008 | $136,125.00 | APPC |
| Nicole M. Carratura (ARI) | Aug. 1, 2008 | $136,125.00 | APPC |
| Automotive Color Technology, LLC | Nov. 7, 2008 | $90,000.00 | APPC |
| Kelly Auto Parts, Inc. | August 13, 2013 | $126,995.22 | APPC |
| Joseph Horvath | Mar. 30, 2007 | $593,077.00 | Parent |
| Joseph and Shirley Horvath | Mar. 1, 2007 | $750,000.00 | Parent |
| Dorothy Stong | Feb. 6, 2009 | $150,000.00 | Parent |
| Benjamin G. Johnston | Aug. 2, 2010 | $53,349.54 | Parent |
| Bowsman Enterprises, LLC | Apr. 17, 2009 | $100,000.00 | Parent |
| Cook Brothers Automotive, Inc. | Aug. 31, 2006 | $122,208.11 | Parent |
| Richard Cook (Noncompete) | Aug. 31, 2006 | $344,736.00 | Parent |
| Gary Cook (Noncompete) | Aug. 31, 2006 | $344,736.00 | Parent |

**EXHIBIT E**

**Noteholder Subordinated Debt**

| Non Seller Sub-Debt Holders | Note Number | Original Date | Original Principal Amount | Obligor |
|---|---|---|---|---|
| Bahman and Yasmin Mossavar-Rahmani | 2010-07-01 | July 31, 2010 | $850,000.00 | APPC, Parent, Industries |
| Fribourg Limited | 2010-06-03 | July 27, 2010 | $1,000,000.00 | APPC, Parent, Industries |
| The Ghassem Ladjevardi Trust | 2010-05-004 | May 28, 2010 | $500,000.00 | APPC, Parent, Industries |
| C.H. Miller Hardware, Inc. | 2010-06-03 | June 15, 2010 | $325,000.00 | APPC, Parent, Industries |
| Dariush Owlia | 2010-05-003 | May 28, 2010 | $300,000.00 | APPC, Parent, Industries |
| Robert W. Kahan | 2010-05-01 | May 28, 2010 | $300,000.00 | APPC, Parent, Industries |
| United American Securities, Inc. | 2011-08-001 | August 15, 2011 | $150,000.00 | APPC, Parent, Industries |
| Thomas Miller | 2009-06-004 | August 15, 2009 | $175,000.00 | APPC, Parent, Industries |
| EFG Bank | 2010-06-01 | June 17, 2010 | $400,000.00 | APPC, Parent, Industries |
| Charles and Nancy Moore | 2010-05-002 | May 28, 2010 | $400,000.00 | APPC, Parent, Industries |
| George Sample | 2010-08-01 | Aug. 18, 2010 | $160,000.00 | APPC, Parent, Industries |
| Seyed H. Aleali | 2010-07-02 | August 9, 2010 | $50,000.00 | APPC, Parent, Industries |

560085669

| | | | | |
|---|---|---|---|---|
| David Goodman 2/Goodman Estate | 2009-06-005 | August 15, 2009 | $500,000.00 | APPC, Parent, Industries |
| David Goodman 3/Goodman Estate | 2010-06-02 | June 15, 2010 | $500,000.00 | APPC, Parent, Industries |
| David Goodman 1/Goodman Estate | 2009-06-001 | July 1, 2009 | $3,000,000.00 | APPC, Parent, Industries |

## Schedule 14

See Attached.

*5608856v9*

**Schedule 14**
**Existing Debt and Guarantees**

**Sub Debt**

| Sub Debt Holder | 3/31/13 Balance Sheet Amount |
|---|---|
| Bahman Mossavar-Rahmani | 722,500 |
| Fribourg | 1,000,000 |
| The Ghassem Ladjevardi Trust | 500,000 |
| C H Miller Hardware Company In | 276,250 |
| Dr Dariush Owlia | 255,000 |
| Dr Robert W Kahan | 255,000 |
| United American Securities Inc | 150,000 |
| Thomas Miller | 148,750 |
| EFG Bank | 400,000 |
| Charles Moore | 340,000 |
| George Sample | 83,500 |
| Dr Seyed Aleali | 42,500 |
| Goodman 2 | 500,000 |
| Goodman 3 | 500,000 |
| Goodman 1 | 3,000,000 |
| **Total** | 8,173,500 |

**Sellers Notes**

| Sellers Note Holder | 4/1/13 Balance Sheet Amount |
|---|---|
| C & N Auto Parts | 65,248 |
| M Siegel | 2,278 |
| *last payment on 3/30* | |
| Perimeter Auto Parts | 10,115 |
| Ken Smith | 150,000 |
| ARI | 45,000 |
| ACT | 30,000 |
| Kelly Auto Parts | 53,693 |
| J Horvath | 179,866 |
| J Horvath | 306,250 |
| D Stong | 72,083 |
| *exception due to missing SA* | |
| C Bowsman | 40,000 |
| Foreign Car Parts (B Johnston) | 29,196 |
| Cook Brothers | 11,429 |
| Cook Brothers | 49,248 |
| Seller Notes and Other Notes Payable Total | 1,044,407 |

**Guarantees**

None

## Schedule 15

See Attached.

<u>Schedule 15</u>
<u>Legal / Trade Names and Mergers & Acquistions</u>

**Prior Legal Names**:

None

**Prior or Current Trade or Fictitious Names:**

Miller Auto Parts and Supply Co
     - Uses Trade name Miller Auto parts, uses acronym of MAPSCO in Logo
Miller Auto Parts and Paint Co
     - Uses Trade name Miller Auto parts, JI Parts Express brand Logo on web site; Dealer Parts Service
Johnson Industries
     - Uses Johnson Industrues; JI Parts Express as current trade name, brand logo and web site
AutoPartsTomorrow.com
     - Autopartstomorrow.com (current trade name); Autopartstomorrow on eBay (current trade name);
     JI Parts Express (brand logo on website but no longer in use)

<u>Mergers and Acquisitions:</u>

| Acquiring Company | Acquired Business Name | Type of Acquistion |
|---|---|---|
| Miller Auto Parts & Supply Company, Inc. | d/b/a Stong's Auto Parts (2/6/09) | (all asset acquisitions) |
| | Bowsman Enterprises, LLC (4/17/09) | (all asset acquisitions) |
| | d/b/a Foreign Car Parts Store (8/2/10) | (all asset acquisitions) |
| Miller Auto Parts & Paint Company, Inc. | Automotive Resources, Inc. (8/6/08) | (all asset acquisitions) |
| | Automotive Color Technology, LLC (11/7/08) | (all asset acquisitions) |
| | Kelly Auto Parts, Inc. (1/30/09) | (all asset acquisitions) |
| | Dyke Auto Parts, Inc. (7/7/10) | (all asset acquisitions) |
| c.    Johnson Industries, Inc. | Brake Specialty Company, Inc. (9/12/08) | (all asset acquisitions) |
| | Ken Smith Auto Parts, Inc. (5/24/10) | (all asset acquisitions) |
| | Speedway Auto Parts, Inc. (12/14/09) | (all asset acquisitions) |
| | C&N Auto Parts, Inc. (3/29/09) | (all asset acquisitions) |
| | G&W Autoparts, Inc. (1/22/09) | (all asset acquisitions) |
| | Perimeter Auto Parts, LLC (5/17/10)] | (all asset acquisitions) |

## Schedule 16

See Attached.

Schedule 16
Current Locations, Chief Executive Office and Prior Locations
This is a Nine Page Schedule

**Current Locations**

| Company | Description | Business Activity | Address | | | | Collateral Type |
|---|---|---|---|---|---|---|---|
| **Johnson Industries, Inc.** | | | | | | | |
| 101 | Atlanta | Headquarters & Hub Warehouse | 5944 Peachtree Corners East | Norcross | GA | 30071 | Hub Warehouse and Headquarters - Inventory & racking/ Computer & Office Equip,  accounting records |
| 10102 | Roswell | Satellite Warehouse | 200 Hembree Park Dr, Ste J | Roswell | GA | 30076 | Inventory and office equipment / racking |
| 10104 | Snellville | Satellite Warehouse | 2020 Westside Court,, Ste F-J | Snellville | GA | 30078 | Inventory and office equipment / racking |
| 10107 | Turner Field | Satellite Warehouse | 515 Ralph David Abernathy Blvd | Atlanta | GA | 30312 | Inventory and office equipment / racking |
| 10109 | Columbus | Satellite Warehouse | 1514 Box Road | Columbus | GA | 31907 | Inventory and office equipment / racking |
| 10110 | Albany | Satellite Warehouse | 816 West Broad Avenue | Albany | GA | 31701 | Inventory and office equipment / racking |
| 10111 | Valdosta | Satellite Warehouse | 408 N Patterson Street | Valdosta | GA | 31601 | Inventory and office equipment / racking |
| 10112 | Emory | Satellite Warehouse | 1210 Dalon Road | Atlanta | GA | 30306 | Inventory and office equipment / racking |
| 10114 | Woodstock | Satellite Warehouse | 110 Londonderry Ct, Suite 108 | Woodstock | GA | 30188 | Inventory and office equipment / racking |
| 10115 | Marietta | Satellite Warehouse | 1700 Enterprise Way-Suite 104 | Marietta | GA | 30067 | Inventory and office equipment / racking |
| **Miller Auto Parts & Paint Company, Inc.** | | | | | | | |
| 141 | Pittsburgh | Hub Warehouse | 3382 Industrial Blvd | Bethel Park | PA | 15102 | Hub Warehouse  - Inventory & racking/  Computer & Office Equip,  accounting records |
| 14101 | Washington | Satellite Warehouse | 19 West Maiden Street | Washington | PA | 15301 | Inventory and office equipment / racking |
| 14104 | New Kensington | Satellite Warehouse | 912-924 5th Avenue | New Kensington | PA | 15068 | Inventory and office equipment / racking |
| 14113 | Mt. Lebanon | Satellite Warehouse | 439 Washington Road | Mt. Lebanon | PA | 15228 | Inventory and office equipment / racking |
| **Miller Auto Parts & Supply Company Inc.** | | | | | | | |
| 201 | Huntingdon | Hub Warehouse | 10151 Fairgrounds Rd | Huntingdon | PA | 16652 | Hub Warehouse  - Inventory & racking/  Computer & Office Equip,  accounting records |
| 20102 | Clearfield | Satellite Warehouse | 110 South 3rd Street | Clearfield | PA | 16830 | Inventory and office equipment / racking |
| 20106 | New Bloomfield | Satellite Warehouse | 315 Keystone Way | New Bloomfield | PA | 17068 | Inventory and office equipment / racking |
| 20109 | Mifflintown | Satellite Warehouse | 4132 William Penn Hwy | Mifflintown | PA | 17059 | Inventory and office equipment / racking |
| 20110 | South Fork | Satellite Warehouse | 219 Mount Hope Road | South Fork | PA | 15956 | Inventory and office equipment / racking |
| 20112 | Tyrone | Satellite Warehouse | 120 West 10th Street | Tyrone | PA | 16686 | Inventory and office equipment / racking |
| 20118 | State College | Satellite Warehouse | 3450 West College Ave | State College | PA | 16801 | Inventory and office equipment / racking |
| 20119 | Cumberland    (Naves Cross) | Satellite Warehouse | 12600 Naves Cross Road NE | Cumberland | MD | 21502 | Inventory and office equipment / racking |
| 20122 | Bedford** | Satellite Warehouse | 254 North Juliana Street | Bedford | PA | 15522 | Inventory and office equipment / racking |

**     Bedford is an owned Building

**Current Chief Executive Office**

| Company | Address | | | | Comments |
|---|---|---|---|---|---|
| Parent Entity - Miller Auto Parts & Paint Company, Inc. | 10151 Fairgrounds Rd | Huntingdon | PA | 16652 | This location is formal address of the parent entity |
| Management Headquarters - Johnson Industries | 5944 Peachtree Corners East | Norcross | GA | 30071 | CEO, CFO, Central Purchasing is out of this office |

**Other Location in last five years of Executive Office**

No Change from Current Executive Office List

Schedule 16
Current Locations, Chief Executive Office and Prior Locations
This is a Nine Page Schedule

**Other Collateral Locations - Consignment Inventory**

| Customer Name | | Street | City | State |
|---|---|---|---|---|
| **Geogia Operations** | | | | |
| ACE AUTO CENTER | Total | 6662 BUFORD HIGHWAY | DORAVILLE | GA |
| ALL SEASONS OF SNELLVILLE**COD** | Total | 1557 SCENIC HWY | SNELLVILLE | GA |
| ALL TUNE AND LUBE**COD** | Total | 850 SANDY PLAINS ROAD | MARIETTA | GA |
| ALLPRO TRANSMISSION & AUTO CARE**COD** | Total | 5465 BUFORD HWY | NORCROSS | GA |
| ALSCO INC**DORAVILLE** | Total | 4111 PLEASANTDALE RD | DORAVILLE | GA |
| ANGKOR-TECH AUTO**COD** | Total | 3225 CHAMBLEE DUNWOODY | CHAMBLEE | GA |
| AUTO CHECK AUTO SERVICE | Total | 816 PLEASANT HILL ROAD | LILBURN | GA |
| AUTO DOCTORS****COD**** | Total | 3527 BANKHEAD HIGHWAY | LITHIA SPRINGS | GA |
| AUTO KINGDOM | Total | 5005 MEMORIAL DRIVE | STONE MOUNTAIN | GA |
| AUTO PLANNED MAINTENANCE | Total | 1605 HWY 29 | LAWRENCEVILLE | GA |
| AUTO SERVICE UNLIMITED *ALPH* | Total | 9930 JONES BRIDGE RD | ALPHARETTA | GA |
| AUTO TECH USA LLC | Total | 1355 SCENIC HWY N | SNELLVILLE | GA |
| AUTO-SERV | Total | 3003 JOHNSON FERRY RD NE | MARIETTA | GA |
| AUTOMOTIVE TECH & REPAIR**COD** | Total | 4921 CANTON RD. #600 | MARIETTA | GA |
| AUTOWORLD SUPERSTORE | Total | 6154 MEMORIAL DRIVE | STONE MOUNTAIN | GA |
| BARRON GARAGE**ATLANTA** | Total | 1574 GARRAUX ST | ATLANTA | GA |
| BATTERY RECOVERY SERVICES**COD** | Total | 457 NORTH CLARENDON AVE | SCOTTSDALE | GA |
| BILL THOMPSON TIRE SERVICE | Total | 200 East Oglethorpe Blvd. | Albany | GA |
| BILL'S AUTO SERVICE CENTER**COD** | Total | 3507-4 LAWRENCEVILLE HWY | TUCKER | GA |
| BON AUTO SERVICE **CASH ONLY** | Total | 3568 CHAMBLEE TUCKER ROA | ATLANTA | GA |
| BRAKE MASTER | Total | 4303 LAVISTA RD | TUCKER | GA |
| BROWNS AUTO CLINIC | Total | 3830 GREEN INDUSTRIAL WAY | ATLANTA | GA |
| BUCKHEAD AUTO CENTER**COD** | Total | 3126 PIEDMONT ROAD | ATLANTA | GA |
| BUCKHEAD EXXON**WEEKLY PAY** | Total | 2965 PEACHTREE NE | ATLANTA | GA |
| BUDDY'S TIRE & SERVICE CENTER | Total | 9284 SOUTH MAIN STREET | JONESBORO | GA |
| BUFORD BRAKES & LUBE | Total | 4927 LITTLE MILL RD | BUFORD | GA |
| BURGESS AUTOMOTIVE**COD** | Total | 2869 HIGHWAY 19 | PELHAM | GA |
| BURNT HICKORY AUTO SERVICE | Total | 4100 BANKHEAD HIGHWAY | DOUGLASVILLE | GA |
| C S AUTO REPAIR**COD** | Total | 2558 CANTON ROAD | MARIETTA | GA |
| Camilla Auto Parts | Total | 100B W. Oakland Ave. | Camilla | GA |
| CAMP AUTOMOTIVE | Total | 1475 CARROLL DR | ATLANTA | GA |
| CANTON ROAD MUFFLER/AUTO**COD** | Total | 2093 CANTON ROAD | MARIETTA | GA |
| CATHERINES AUTO - PIEDMONT**COD** | Total | 1916 PEIDMONT CIRCLE NE | ATLANTA | GA |
| CATHERINES AUTO - SOUTHLAND**COD** | Total | 1341 SOUTHLAND CIRCLE | ATLANTA | GA |
| CENTERVILLE AUTO CENTER | Total | 3575 HWY 124 | SNELLVILLE | GA |
| CENTRAL EMS | Total | 205 HEMBREE PARK DRIVE SU | ROSWELL | GA |
| CITY MUFFLER | Total | 214 NORTH TENNESSEE STREE | CARTERSVILLE | GA |
| CITY OF PEACHTREE CITY | Total | 209 MCINTOSH TRAIL | PEACHTREE CITY | GA |
| COBB GALLERIA AUTOMOTIVE | Total | 2781 CUMBERLAND BLVD | SMYRNA | GA |
| CONSUMERS AUTOMOTIVE | Total | 1341 JOE FRANK HARRIS PARK | CARTERSVILLE | GA |
| COOL IT AUTO AIR | Total | 1480 VETERANS MEMORIAL H | MABLETON | GA |
| COOPER LAKE AUTOMOTIVE | Total | 4739 SOUTH COBB DRIVE | SMYRNA | GA |
| CREATIVE AUTOWORKS | Total | 12870 BELLS FERRY ROAD | CANTON | GA |
| CRYSTAL AUTO REPAIR**COD** | Total | STEVE DR #8 | DORAVILLE | GA |
| D & H AUTOMOTIVE | Total | 1492 HOWELL MILL RD | ATLANTA | GA |
| DAVES COMPLETE CAR CARE | Total | 9815 SOUTH MAIN STREET | WOODSTOCK | GA |
| DAY BROTHERS**COD** | Total | 1255 ROSWELL RD | MARIETTA | GA |
| DJ S REPAIR SERVICE | Total | 726 SOUTH WESTOVER BLVD | ALBANY | GA |
| DULUTH INTERNATIONAL AUTO SERVICE | Total | 2895 PEACHTREE IND BLVD #J | DULUTH | GA |
| DV AUTO REPAIR & BODY SHOP**COD** | Total | 4281 HUGH HOWELL ROAD | TUCKER | GA |
| EAGLE AUTO REPAIR LLC.**COD** | Total | 321 LAKES BLVD | LAKE PARK | GA |
| EDDIES AUTO SERVICE | Total | 5440 WEB PARKWAY | LILBURN | GA |
| ELITE TRUCK & AUTO REPAIR, INC. | Total | 2058 OLD COVINGTON HIGHW | CONYERS | GA |
| ELLENTON TIRE & AUTO | Total | Highway 37 East Ellenton Rd | Ellenton | GA |
| ELLER PERFORMANCE**COD** | Total | 745 BURNT HICKORY RD | CARTERSVILLE | GA |
| EMBRY HILLS CHEVRON | Total | 3530 CHAMBLEE TUCKER ROA | CHAMBLEE | GA |
| ENTERPRISE AUTO MAINTENANCE | Total | 1035 WYLIE RD | MARIETTA | GA |

Schedule 16
Current Locations, Chief Executive Office and Prior Locations
This is a Nine Page Schedule

**Other Collateral Locations - Consignment Inventory**

| Customer Name | | Street | City | State |
|---|---|---|---|---|
| **Geogia Operations** | | | | |
| EWING AUTOMOTIVE | Total | 3262 LENORA CHURCH RD | SNELLVILLE | GA |
| EXPRESS OIL CHANGE #1 -CLAIRMONT RD | Total | 2778 CLAIRMONT ROAD | ATLANTA | GA |
| EXPRESS OIL CHANGE #17-HOLCOMB BRIDGE RD Total | | 1577 HOLCOMB BRIDGE RD | ROSWELL | GA |
| EXPRESS OIL CHANGE #20-NORTH MAIN | Total | 830 NORTH MAIN STREET | ALPHARETTA | GA |
| EXPRESS OIL CHANGE #22 - HOWELL MILL | Total | 1760 HOWELL MILL RD | ATLANTA | GA |
| EXPRESS OIL CHANGE #23 - MORELAND | Total | 230 MORELAND AVENUE | ATLANTA | GA |
| EXPRESS OIL CHANGE #24-CHAMBLEE PID | Total | 5722 PEACHTREE INDUSTRIAL | CHAMBLEE | GA |
| EXPRESS OIL CHANGE #26**SANDY SPRINGS** Total | | 5811 ROSWELL RD | SANDY SPRINGS | GA |
| EXPRESS OIL CHANGE #37-CRABAPPLE RD | Total | 12470 CRABAPPLE RD | ALPHARETTA | GA |
| EXPRESS OIL CHANGE #38-MANSELL RD | Total | 895 MANSELL ROAD | ROSWELL | GA |
| EXPRESS OIL CHANGE #39-HAYNES BRIDGE R | Total | 11720 HAYNES BRIDGE ROAD | ALPHARETTA | GA |
| EXPRESS OIL CHANGE #7 - CANDLER RD | Total | 2555 CANDLER ROAD | DECATUR | GA |
| FRASER DANTE LIMITED | Total | 10997 ALPHARETTA HWY | ROSWELL | GA |
| G & L AUTOMOTIVE REPAIR**WEEKLY PAY** | Total | 6969-C GLADE ROAD | ACWORTH | GA |
| G & S AUTO & MUFFLER**COD** | Total | 1580 LOWER ROSWELL RD | MARIETTA | GA |
| GA AUTO CARE**WEEKLY PAY** | Total | 3747 LONGMIRE WAY | DORAVILLE | GA |
| GARRETT AUTOMOTIVE - KENNESAW | Total | 2400 N COBB PARKWAY | KENNESAW | GA |
| GIDDEONS AUTOMOTIVE | Total | 103 ELLIOT INDUSTRIAL DRIVE | WOODSTOCK | GA |
| Gieryics Automotive Repair | Total | 2401 Dawson Road | Albany | GA |
| GORDY TIRE**HOWELL MILL** | Total | 1590 HOWELL MILL ROAD | ATLANTA | GA |
| GRADY ELECTRIC MEMBERSHIP CORP | Total | 1499 HWY 84 W | CAIRO | GA |
| GRAND SHOP | Total | 6524 BUFORD HWY | DORAVILLE | GA |
| GRAYSON TIRE & AUTO CENTER**COD** | Total | 2122 HIGHWAY 20 | GRAYSON | GA |
| GREEN AUTO REPAIR | Total | 6968 BUFORD HIGHWAY | DORAVILLE | GA |
| INTERNATIONAL MOTOR WORKS | Total | 2201-G BROCKETT ROAD | TUCKER | GA |
| J & N AUTO SERVICE | Total | 2929 JONES MILL ROAD | DORAVILLE | GA |
| JDA MARINE INC**COD** | Total | 270 SHANNON WAY | LAWRENCEVILLE | GA |
| JERRYS BOAT REPAIR **COD** | Total | 1381 ABRAMS RD | SILVER CREEK | GA |
| JOHN'S AUTO REPAIR**COD** | Total | 415 WALKER STREET | DOUGLAS | GA |
| JUAN AUTO REPAIR | Total | 14 STEVE DR | DORAVILLE | GA |
| KEENER AUTO REPAIR | Total | 3066 N DECATUR RD | SCOTTSDALE | GA |
| KEITH RUSSELL AUTOMOTIVE | Total | 1450 JOE FRANK HARRIS PARK | CARTERSVILLE | GA |
| KELLY'S AUTO CARE | Total | 1395 HOWELL MILL ROAD | ATLANTA | GA |
| KELLY'S CAR CARE**COD** | Total | 102 RAY ALY | VALDOSTA | GA |
| KENNESAW TIRE | | 2850 SOUTH MAIN ST | KENNESAW | GA |
| KILLIAN HILL SERVICE CENTER | Total | 24 KILLIAN HILL ROAD | LILBURN | GA |
| KILLIAN SERVICE CENTER ** WKLY ** | Total | 1255 UNIVETER ROAD | CANTON | GA |
| LAKEWOOD EMISSIONS**COD** | Total | 2108 METROPOLITAN PARKW | ATLANTA | GA |
| LARRY BAIT | Total | 1305 1ST ST NE | MOULTRIE | GA |
| LILBURN CHEVRON | Total | 4784 LAWRENCEVILLE  HWY | LILBURN | GA |
| LOGANVILLE AUTO CENTER | Total | 3480 HWY 78 | LOGANVILLE | GA |
| LOWER ROSWELL COASTAL ***COD*** | Total | 2011 LOWER ROSWELL RD | MARIETTA | GA |
| MAHDAVI MOTOR SPORT | Total | 5395 HIGHWAY 29 | LILBURN | GA |
| MARIETTA ALIGNMENT | Total | 701 WASHINGTON AVE | MARIETTA | GA |
| Martin Motors | Total | 709 S. Davis Street | Nashville | GA |
| Master Tech Auto Service **COD - CHK OK* Total | | 803 N. St. Augustine Road | Valdosta | GA |
| MATTHEW'S GARAGE | Total | 18 PINSON DR | CARTERSVILLE | GA |
| MEINEKE CAR CARE CENTER-NOR/PIB **TLC ** Total | | 5250 PEACHTREE INDUSTRIAL | NORCROSS | GA |
| MEND A DENT COLLISION**COD - CHK OK** | Total | 310 SOUTH DAVIS STREET | NASHVILLE | GA |
| MIDAS MUFFLER -SANDY SPRINGS**COD** | Total | 6560B ROSWELL RD | SANDY SPRINGS | GA |
| MIDTOWN BP**COD** | Total | 2200 MONROE DR NE | ATLANTA | GA |
| MIDTOWN COLLISION & SERVICE | Total | 2050 LIDDELL DRIVE | ATLANTA | GA |
| MIKE FRASER'S AUTO REPAIR | Total | 209 EAST NINTH STREET | CORDELE | GA |
| MITCHELL AUTO SERVICE | Total | 113 N. Cleveland Street | Albany | GA |
| MITCHELL COUNTY CHRYSLER | | 4535 Mt Olive Road | Pelham | GA |
| MMC AUTOMOTIVE**WEEKLY PAY** | Total | 5419 MEMORIAL DRIVE | STONE MOUNTAIN | GA |
| MODERN AUTO | Total | 9203 ROSE AVE | DOUGLASVILLE | GA |

Schedule 16
Current Locations, Chief Executive Office and Prior Locations
This is a Nine Page Schedule

**Other Collateral Locations - Consignment Inventory**

| Customer Name | | Street | City | State |
|---|---|---|---|---|
| **Geogia Operations** | | | | |
| MOORE AUTO & MARINE | Total | 5620 WHITE ROAD | BUFORD | GA |
| NATIONWIDE DISCOUNT MUFFLER | Total | 1694 SCOTT BLVD | DECATUR | GA |
| NE-RO BRAKE AND TIRE SERVICE | Total | 2311 SOUTH PATTERSON STRI | VALDOSTA | GA |
| NORCROSS AUTO & TRUCK REPAIR | Total | 5875 BUFORD HIGHWAY | NORCROSS | GA |
| NORTH PEACHTREE 66 | Total | 4291 NORTH PEACHTREE RD | CHAMBLEE | GA |
| NORTH ROSWELL AUTO | Total | 10999 CRABAPPLE ROAD | ROSWELL | GA |
| NORTHRIDGE AUTOCARE | Total | 8290-B ROSWELL RD | DUNWOODY | GA |
| PACES FERRY EXXON**WEEKLY PAY** | Total | 1400 WEST PACES FERRY ROA | ATLANTA | GA |
| PAYLESS AUTO REPAIR**COD** | Total | 1594 AUSTELL RD | MARIETTA | GA |
| POINT TO POINT AUTOMOTIVE | Total | 595 MACON STREET | MCDONOUGH | GA |
| PONCE DE LEON EXXON**DNS** | Total | 1161 PONCE DE LEON AVE | ATLANTA | GA |
| PRECISION TECH AUTOMOTIVE | Total | 1329-B JOE FRANK HARRIS PA | CARTERSVILLE | GA |
| PRECISION TUNE | Total | 416 PLEASANT HILL ROAD | LILBURN | GA |
| PREMIER AUTOWORKS | Total | 2917 NORTH SLAPPEY BLVD | ALBANY | GA |
| PRO AUTO CARE**COD** | Total | 1895 AIRPORT INDUSTRIAL PA | MARIETTA | GA |
| RAPID ROTATION**COD** | Total | 1580 LOWER ROSWELL RD | MARIETTA | GA |
| REGGIE FENNELLS GARAGE | Total | 1860 BRASWELL ROAD | ROCKMART | GA |
| ROLLINS AUTOMOTIVE**COD** | Total | 2288 HENRY CLOWER BLVD | SNELLVILLE | GA |
| ROSWELL AUTO TECH**COD** | Total | 846 ATLANTA STREET | ROSWELL | GA |
| RUSSEL'S AUTOMOTIVE | Total | 88 WOOLSEY RD | HAMPTON | GA |
| S & T AUTO | Total | 106 REDDING DRIVE | BREMEN | GA |
| SIGNATURE AUTOMOTIVE SPECIALISTS | Total | 2346 LAWRENCEVILLE HIGHW | DECATUR | GA |
| SNELLVILLE AUTO CENTER, LLC | Total | 3354 HWY 78 | SNELLVILLE | GA |
| SOUTHERN MOTOR WORKS | Total | 3446 BUFORD HIGHWAY | DULUTH | GA |
| SPEED OIL CHANGE | Total | 11345 ALPHARETTA HIGHWA | ROSWELL | GA |
| STAFFORD'S GARAGE | Total | 3914 BEUNA VISTA ROAD | COLUMBUS | GA |
| Stanford And Son | Total | 1301 Southerfield Road | Americus | GA |
| STANFORD AUTOMOTIVE & REPAIR | Total | 66 YOUNG'S MILL ROAD | LAGRANGE | GA |
| STEWART'S AUTOMOTIVE**COD** | Total | 115 SW BUNKER STREET | MADISON | FL |
| STRIPLING AUTO AIR ELECTRIC | Total | 1012 WEST BROAD AVENUE | ALBANY | GA |
| SUPERIOR TIRE AND AUTO**COD** | Total | 2000 VETERANS PARKWAY | COLUMBUS | GA |
| T & S MOTORSPORTS, LLC. | Total | 605 HIGHWAY 84 EAST | CAIRO | GA |
| TERRELL BROS AUTO REPAIR | Total | 387 OLD BREMEN RD | CARROLLTON | GA |
| THE OIL PIT | Total | 4908 MEMORIAL DRIVE | STONE MOUNTAIN | GA |
| TINGLEF AUTOMOTIVE**CASH** | Total | 5587 SHADBURN FERRY ROAD | BUFORD | GA |
| TJ AUTOMATICS & SERVICES, LLC. | Total | 655 LIVELY AVENUE SUITE 301 | NORCROSS | GA |
| TODDS AUTO CLINIC**COD** | Total | 4739 14TH AVENUE | COLUMBUS | GA |
| TONY'S AUTO REPAIR**COD** | Total | 2644 STEVE DRIVE | DORAVILLE | GA |
| TRANSMOTOR PRO**COD** | Total | 3568 BUFORD HIGHWAY SUIT | DULUTH | GA |
| TUCKER TIRE | Total | 4147 LAWRENCEVILLE HIGHW | TUCKER | GA |
| U.S. AUTO SALES***ATHENS*** | Total | 2705 ATLANTA HWY | ATHENS | GA |
| U.S. AUTO SALES***COVINGTON*** | Total | 3192 EMORY STREET NW | COVINGTON | GA |
| U.S. AUTO SALES***FOREST PARK*** | Total | 330 B FOREST PARKWAY | FOREST PARK | GA |
| U.S. AUTO SALES***LITHIA SPRINGS*** | Total | 3042 BANKHEAD HWY | LITHIA SPRINGS | GA |
| U.S. AUTO SALES**BUFORD DR** | Total | 202 BUFORD DRIVE | LAWRENCEVILLE | GA |
| U.S. AUTO SALES**GAINESVILLE** | Total | 1590 MONROE DRIVE | GAINESVILLE | GA |
| U.S. AUTO SALES**MARIETTA** | Total | 1925 COBB PARKWAY | MARIETTA | GA |
| U.S. AUTO SALES**SNELLVILLE** | Total | 3485 HWY 124 | SNELLVILLE | GA |
| U.S. AUTO SALES**STONE MTN** | Total | 6252 MEMORIAL DRIVE | STONE MOUNTAIN | GA |
| U.S. AUTO SALES**UNION CITY** | Total | 4100 JONESBORO ROAD | UNION CITY | GA |
| VALDOSTA TOYOTA | Total | 2980 JAMES ROAD | VALDOSTA | GA |
| WEST WALTON AUTOMOTIVE | Total | 3880-A HIGHWAY 81 SOUTH | LOGANVILLE | GA |
| WRIGHT'S CAR CARE**WEEKLY PAY** | Total | 4993 PEACHTREE ROAD | CHAMBLEE | GA |
| WT STANDARD**ATLANTA** | Total | 454 MARIETTA STREET | ATLANTA | GA |
| YOUR FAVORITE MECHANIC | Total | 2277 HENRY CLOWER BLVD | SNELLVILLE | GA |

Schedule 16
Current Locations, Chief Executive Office and Prior Locations
This is a Nine Page Schedule

**Other Collateral Locations - Consignment Inventory**

| Customer Name | | Street | City | State |
|---|---|---|---|---|
| **Pittsburgh Operations** | | | | |
| *HI TECH II AUTO CARE (1306-1313) COD*   Total | | 5516 BABCOCK BLVD | PITTSBURGH | PA |
| 908 AUTO SERVICE | Total | 3433 SAXONBURG ROAD | NATRONA HEIGHTS | PA |
| A.S.A.P. Auto Care | Total | 16th & Jacob Street | Wheeling | WV |
| A-1 AUTOMOTIVE | Total | 535 FREEPORT RD. | CREIGHTON | PA |
| ALLISON PARK AUTO SERVICE | Total | 1017 Excutive Dr | Gibsonia | PA |
| ALTERNATIVE TRANSMISSION & AUTO REPAI   Total | | 221 E MAIDEN ST | WASHINGTON | PA |
| ARROWHEAD SERVICE | Total | 405 WEST PIKE STREET | HOUSTON | PA |
| AUTO REPAIR UNLIMITED | Total | 1000 COCHRANS MILL RD | PITTSBURGH | PA |
| AUTO SERVICE MALL (1306-1313) | Total | 2522 BRANDT SCHOOL | WEXFORD | PA |
| B & T AUTO REPAIR (3307-3407) | Total | 203 KITTANNING ST | BUTLER | PA |
| BARKER AUTO REPAIR | Total | 126 RIDGE ROAD | EIGHTY FOUR | PA |
| BEARD'S AUTO CENTER | Total | 1464 PARK AVE. | WASHINGTON | PA |
| BILL BELL INC. (3207) | Total | 1820 HANCOCK AVENUE | VANDERGRIFT | PA |
| BOB MATTHEW'S IMP/DOM | Total | 2702 SAW MILL RUN BLVD | PITTSBURGH | PA |
| Bob's Auto Service | Total | 42 Battle Run Road | Triadelphia | WV |
| Bowser Automotive | Total | 301 Meridian Road | Butler | PA |
| BRAKE STOPP | Total | 2615 STEFFIN HILL ROAD | BEAVER FALLS | PA |
| Budget Charter, INC Total | | 173 EAST RIVERSIDE ROAD | ADAH | PA |
| C&W AUTOMOTIVE & MACHINE SHOP | Total | 8507 PERRY HWY REAR | PITTSBURGH | PA |
| CHUCK'S COMPLETE AUTO SVC | Total | 75 MCCURRAY RD | PITTSBURGH | PA |
| DARRYLS AUTO | Total | 10 CHARLES ST | PITTSBURGH | PA |
| DaVendra's Auto Care & Tire Center | Total | 601 34th Street | Bellaire | OH |
| DIXON AUTOMOTIVE | Total | 335 MT LEBANON BLVD | PITTSBURGH | PA |
| EAST END AUTO  COD | Total | 714 FIRST STREET | CANONSBURG | PA |
| ECONOMY AUTOMOTIVE SERVICES | Total | 4200 CLAIRTON BLVD | PITTSBURGH | PA |
| FLEMING TIRE | Total | 649 rt 228 | MARS | PA |
| FRAN SABAN AUTOMOTIVE (1106-1113) | Total | 3949 ROUTE 8 | ALLISON PARK | PA |
| Franklin Auto Repai(1313) | Total | 133 McAleer Road | Sewickley | PA |
| GALORES AUTO SERVICE | Total | 971 LITTLE DEER CREEK VALLEYRD | RUSSELLTON | PA |
| Gary's Service Center Total | | 940 MAIN STREET | BENTLEYVILLE | PA |
| GHELARDUCCI & SONS | Total | 702 MILL ST. | BRIDGEVILLE | PA |
| Goddard's Exxon | Total | 901 Lafayette Avenue | Moundsville | WV |
| GOOD TIRE SERVICE (3207-6025) | Total | 401 S. WATER STREET | KITTANNING | PA |
| GORMLEY AUTOMOTIVE | Total | 5030 CURRY RD | PITTSBURGH | PA |
| GREENSPRINGS AUTO CENTER(1106) | Total | 5224 WOODLAND DRIVE | WEST MIFFLIN | PA |
| Hazlett's Service | Total | 918 Russelton Road | Cheswick | PA |
| HERKY MILLER INC (1306-1313) | Total | 3300 BABCOCK BLVD | PITTSBURGH | PA |
| HUBER AUTOMOTIVE | Total | 568 WOODLAND RD | COAL CENTER | PA |
| IGLOO AUTO | Total | P.O. BOX 115 | ADAMSBURG | PA |
| J & T TIRE CO. | Total | 3304 RT. 8 | ALLISON PARK | PA |
| JAKS MUFFLER & BRAKE | Total | 894 HENDERSON AVE. | WASHINGTON | PA |
| JAS Automotive | Total | 5005 Lindermer Dr. | Bethel Park | PA |
| JEFF'S  AUTO CARE | Total | 3860 WM PENNY HWY | MURRYSVILLE | PA |
| Ken's Auto Sevice Total | | 3779 MILLERS RUN ROAD | MCDONALD | PA |
| KOTCHEY AUTO REPAIR INC. | Total | 1860 MIDDLE STREET | PITTSBURGH | PA |
| KUDLA'S AUTO CENTER | Total | 2733 SOUTH PARK RD. | BETHEL PARK | PA |
| LATKOWSKI'S AUTO SERVICE | Total | PO BOX 434 | SOUTH PARK | PA |
| LAUR'S AUTO SERVICE | Total | 3019 INDUSTRIAL BLVD | BETHEL PARK | PA |
| Layman Auto Repair | Total | 201 Grant Avenue | Moundsville | WV |
| LITWIN AUTOMOTIVE | Total | 3103 CHURCHVIEW AVE | PITTSBURGH | PA |
| LOMBARDI'S AMOCO | Total | 99 EAST MAIDEN STREET | WASHINGTON | PA |
| LUCAS TRUCK REPAIR | Total | 409 Saxonburg Blvd | SAXONBURG | PA |
| M & M AUTO SERVICE | Total | 44 KITTANNING PIKE | PITTSBURGH | PA |
| McAdoos Towing and Crane Svc | Total | 467 Old National Pike | West Aleixander | PA |
| MIKE'S AUTO REPAIR SERVICE COD | Total | 1621 SAW MILL RUN BLVD REAR | PITTSBURGH | PA |
| MURRYSVILLE MEDIC ONE | Total | 3237 SARDIS RD | MURRYSVILLE | PA |
| NACIS AUTO REPAIR, INC | Total | 1060 PITTSBURGH STREET | CHESWICK | PA |

Schedule 16
Current Locations, Chief Executive Office and Prior Locations
This is a Nine Page Schedule

**Other Collateral Locations - Consignment Inventory**

| Customer Name | | Street | City | State |
|---|---|---|---|---|
| **Pittsburgh Operations** | | | | |
| NORM WEISS AUTOMOTIVE | Total | 1803 WEST LIBERTY AVE | PITTSBURGH | PA |
| P&W AUTO INC | Total | 536 Valley Brook Road | Venetia | PA |
| PARKWAY SERVICE CENTER | Total | 910 WEST SAW MILL RUN BLVD | PITTSBURGH | PA |
| PAUL SCHEMPP AUTOMOTIVE | Total | 2605 LEECHBURG RD | PITTSBURGH | PA |
| Paul's Auto Sales and Service | Total | 836 Monongahela Avenue | Glassport | PA |
| PERFORMANCE AUTO SVC (PX6) 545196 | Total | 1701 FREEPORT ROAD | ARNOLD | PA |
| PETERS TWP SCHOOL DIST | Total | 631 E MCMURRAY RD | MCMURRAY | PA |
| PORT AUTHORITY OF ALLEGHENY COUNTY | Total | 611 W. WARRINGTON AVE, BLDG 1 | PITTSBURGH | PA |
| R & J AUTOMOTIVE SPECIALISTS | Total | 460 PITTSBURGH RD. | BUTLER | PA |
| RANDY'S REPAIR, INC | Total | 1101 FREEPORT ROAD | CREIGHTON | PA |
| RED'S GARAGE | Total | 1110 MAIN STREET | BENTLEYVILLE | PA |
| RICK HALL AUTO SERVICE | Total | 551 BROWN AVE | TURTLE CREEK | PA |
| ROTH AUTOMOTIVE | Total | 747 SECOND AVE | VERONA | PA |
| S & V Exxon LLC | Total | 111 Marshall Street | Benwood | WV |
| SACCO AUTOMOTIVE | Total | 1051 N. CANAL ST. | PITTSBURGH | PA |
| SARVER AUTOMOTIVE& PERFORMANCE | Total | 315 SARVER ROAD | SARVER | PA |
| SCHINDLER AUTOMOTIVE, LLC | Total | 1004 GLENN AVENUE | GLENSHAW | PA |
| Schmidt Brothers Tire/Service | Total | 2811 Eoff Street | Wheeling | WV |
| SEYBERT AUTO SERVICE | Total | 822 Rt 68 | EAST BRADY | PA |
| Sharpe Automotive LLC | Total | 2704 Leechburg Road | Lower Burrell | PA |
| Smitty's Auto Service | Total | 164 Browns Road | Jefferson | PA |
| SNYDER BROTHERS AUTOMOTIVE | Total | 4695 CAMPBELLS RUN RD | PITTSBURGH | PA |
| Speney Sales and Service(1013) | Total | 115 WEST MAIN ST | WEST NEWTON | PA |
| STEEL CITY COLLISION | Total | 951 KILLARNEY | PITTSBURGH | PA |
| STUSH'S AUTO REPAIR | Total | 64 THIRD ST | LAWRENCE | PA |
| SWISSVALE  AUTO PARTS (1213) | Total | 1904 MONONGAHELA AVE | SWISSVALE | PA |
| TOM COFFIELD AUTOMOTIVE | Total | 2217 CRAFT CREEK RD. | PROSPERITY | PA |
| TONY TYKE INC | Total | 4020 WM PENN HWY | MONROEVILLE | PA |
| TONY'S AUTO SERV. | Total | 582 BUTLER STREET | PITTSBURGH | PA |
| TRIO TRUCKING, INC | Total | 318 SCOTT AVENUE | GLENSHAW | PA |
| TRUDEAU'S AUTOMOTIVE | Total | 3409 BABCOCK BLVD | PITTSBURGH | PA |
| VALLEY TIRE CO., INC. Washington | Total | 87 West Chestnut Street | Washington | PA |
| WEST TIRE | Total | 425 EAST MAIDEN ST. | WASHINGTON | PA |
| WESTLAND OFF ROAD | Total | 1105 1/2 FAYETTE ST | WASHINGTON | PA |
| WHITEHALL TIRES 4 LESS | Total | 2759 SAW MILL RUN BLVD | PITTSBURGH | PA |

Schedule 16
Current Locations, Chief Executive Office and Prior Locations
This is a Nine Page Schedule

**Other Collateral Locations - Consignment Inventory**

| Customer | Street | Street | City | State | Zip Code |
|---|---|---|---|---|---|
| **Pittsburgh Operations** | | | | | |
| ALLENSVILLE PLANING MILL Total | 108 EAST MAIN STREET | - | ALLENSVILLE | PA | 17002 |
| COHENOURS AUTO SERVICES     1 Total | 10978 VALLEY STREET | - | SHIRLEYSBURG | PA | 17260 |
| CURT*S CAR CARE     1 Total | 1573 ROUTE 522 | - | MC VEYTOWN | PA | 17051 |
| DOUG SHEEDER'S AUTO WORKS     1 Total | 17008 BEAVERTOWN RD | - | TODD | PA | 16685 |
| HILDEBRAND MOTOR COMPANY, LLC  1 Tota | PO BOX 123 | - | ALLENSVILLE | PA | 17002 |
| HUSTON FORD     1 Total | 10719 WILLIAM PENN HWY | - | HUNTINGDON | PA | 16652 |
| J. ZINOBILE LUMBER INC.     1 Total | 22545 DECORUM ROAD | - | NEELYTON | PA | 17239 |
| JJ'S AUTOBODY     1 Total | 701 HIGHWAY US 22 | - | LEWISTOWN | PA | 17044 |
| KEYS AUTOMOTIVE SERVICE INC.  1 Total | 113 MOUNT VERNOR AVENUE | - | HUNTINGDON | PA | 16652 |
| MECK'S AUTO BODY     1 Total | 3503 COLD SPRINGS ROAD | - | HUNTINGDON | PA | 16652 |
| MOUNT UNION AUTO SERVICE     1 Total | 205 NORTH DIVISION STREET | - | MOUNT UNION | PA | 17066 |
| PJ'S TRUCKING     4 Total | PO BOX 434 | - | ORBISONIA | PA | 17243 |
| PYLES BODY SHOP     4 Total | ROUTE 641  PO BOX 32 | - | NEELYTON | PA | 17239 |
| ROUTE 26 AUTOMOTIVE Total | 8413 ANDERSON LANE | - | HUNTINGDON | PA | 16652 |
| RICK SINGLETON RENTALS     1 Total | 9129 WILLIAM PENN HIGHWAY | - | HUNTINGDON | PA | 16652 |
| RODGER'S AUTO REPAIR Total | 15 NORTH DIVISION STREET | - | MOUNT UNION | PA | 17066 |
| SHAFFERS SERVICE STATION INC. 1 Total | 11295 RAYSTOWN ROAD | - | HUNTINGDON | PA | 16652 |
| SHEFFIELD'S AUTO SALES     1 Total | 4112 FOX LANE | - | HESSTON | PA | 16647 |
| STEWART'S PRECISION AUTO     1 Total | 825 LARKE ROAD | - | WILLIAMSBURG | PA | 16693 |
| BOB BOOB'S GARAGE     2 Total | 512 BANKS STREET | - | CLEARFIELD | PA | 16830 |
| AUMILLER AUTO REPAIR     9 Total | 4475US HWY 522N. | - | MC CLURE | PA | 17841 |
| BROWNS AUTOMOTIVE SERVICE, LLC.9 Tota | 18080 ROUTE 35 SOUTH | - | MIFFLIN | PA | 17058 |
| CENTRE GARAGE     9 Total | 9787 WILLIAM PENN HIGHWAY | - | THOMPSONTOWN | PA | 17094 |
| DUNNS GENERAL REPAIR Total | RD 1   BOX 54 | - | EAST WATERFORD | PA | 17021 |
| GARY'S GARAGE     9 Total | 8 MAYKUT LANE | - | MIFFLINTOWN | PA | 17059 |
| HOUSERS AUTO BODY     9 Total | 8726 BACK MOUNTAIN ROAD | - | MILROY | PA | 17063 |
| JUNIATA ALIGNMENT     9 Total | 615 MUDDT RUN ROAD | - | MIFFLINTOWN | PA | 17059 |
| MCS TRANSPORTATION     9 Total | 8191 US HIGHWAY 522 SOUTH | - | LEWISTOWN | PA | 17044 |
| MCCONNELLS GARAGE     9 Total | 332 PLANNING MILL ROAD | - | RICHFIELD | PA | 17086 |
| JOHN H. SHEAFFER, INC.     9 Total | 6430 WILLIAM PENN HIGHWAY | - | MIFFLINTOWN | PA | 17059 |
| WATERLOO GARAGE     9 Total | 959 BRICK CHURCH ROAD | - | EAST WATERFORD | PA | 17021 |
| WHITE TOP AUTOMOTIVE     9 Total | 2337 WHITETOP RD | - | MIDDLEBURG | PA | 17842 |
| WILSON'S SERVICE CENTER     9 Total | PO BOX 1206 | 164 WEST 4TH STREET | LEWISTOWN | PA | 17044 |
| ALL STAR AUTO II     10 Total | 512 WEST HIGH STREET | - | EBENSBURG | PA | 15931 |
| BASSET AUTO REPAIR     10 Total | 2680 FIELDSTONE AVE | - | SUMMERHILL | PA | 15958 |
| BENDERS AUTO REPAIR & SRV     10 Total | 309 11TH STREET | - | WINDBER | PA | 15963 |
| BILL'S SERVICE STATION     10 Total | 680 GOUCHER STREET | - | JOHNSTOWN | PA | 15906 |
| COCHRAN AUTO BODY     10 Total | 200 TOLLGATE RD | - | JOHNSTOWN | PA | 15906 |
| CONEMAUGH AUTO SERV.     10 Total | 485 CHESTNUT STREET | - | CONEMAUGH | PA | 15909 |
| CONRAD'S AUTO SERVICE     10 Total | 398 BLACKBURN ROAD | - | MINERAL POINT | PA | 15942 |
| CRUMS REPAIR     10 Total | PO BOX 103 | - | WILMORE | PA | 15962 |
| DICKS AUTO WINDBER     10 Total | 313 SOMERSET AVENUE | - | WINDBER | PA | 15963 |
| GARY'S REPAIR     10 Total | 196 EVERGREEN RD | - | WILMORE | PA | 15962 |
| GEORGE GLEASON'S GARAGE     10 Total | P.O. BOX 57 | - | MINERAL POINT | PA | 15942 |
| JET LUBE OF JOHNSTOWN, LLC     10 Total | 3124 ELTON ROAD | - | JOHNSTOWN | PA | 15904 |
| JOHNS TRANSMISSION & AUTO     10 Total | 105 SPRUCE STREET | - | WINDBER | PA | 15963 |
| KLS AUTO REPAIR     10 Total | 1161 WM PENN AVENUE | - | JOHNSTOWN | PA | 15906 |
| MAC'S SERVICE & TIRE     10 Total | 2469 BEDFORD STREET | - | JOHNSTOWN | PA | 15904 |
| MCCLOSKEY TIRE & MUFFLER SHOP 10 Total | 222 LIBERTY AVENUE | - | CRESSON | PA | 16630 |
| MERT'S     10 Total | 119 PINE STREET | - | NANTY GLO | PA | 15943 |
| OHLER'S SERVICE     10 Total | 2000 GRAHAM AVENUE | - | WINDBER | PA | 15963 |
| PRINCIPLE AUTOMOTIVE     10 Total | 746 FULMER ROAD | - | JOHNSTOWN | PA | 15904 |
| RICK'S AUTO SERVICE     10 Total | OLD RT 53 BOX 196 | - | SUMMERHILL | PA | 15958 |
| SALIX SERVICE CENTER INC.     10 Total | 1567 FOREST HILLS DRIVE | - | SALIX | PA | 15952 |
| SELL'S AUTO SERVICE     10 Total | 360 NAPOLEON STREET | - | JOHNSTOWN | PA | 15901 |
| STEVE'S AUTO     10 Total | 214 MAIN STREET | - | CONEMAUGH | PA | 15909 |
| T.J. LACKO'S     10 Total | BOX  247 | - | BEAVERDALE | PA | 15921 |
| THOMAS' AMOCO     10 Total | 504 12TH STREET | - | WINDBER | PA | 15963 |
| VARNER'S AUTO GARAGE     10 Total | SOUTH MAIN STREET | - | DAVIDSVILLE | PA | 15928 |
| WINGARD'S AUTO RANCH     10 Total | BOX 8 | - | ELTON | PA | 15934 |
| WM PENN AUTO INC     10 Total | 837 WM PENN AVENUE | - | JOHNSTOWN | PA | 15906 |
| WYANDT'S ONE STOP     10 Total | 312 N. MAIN ST | - | DAVIDSVILLE | PA | 15928 |
| BRUBAKER'S AUTO SERVICE Total | 3290 EAST PLEASANT VALLEY BLVD | - | ALTOONA | PA | 16601 |
| BUD ELLENBERGER GARAGE Total | 1036 WARRIORS MARK PATH | - | WARRIORS MARK | PA | 16877 |
| BURLEY'S AUTO     12 Total | 1049 MAIN STREET | - | PATTON | PA | 16668 |
| DILLON TRUCKING     12 Total | RD 3 BOX 104 | - | TYRONE | PA | 16686 |
| ELITE AUTO & TRUCK LLC     12 Total | 1301 EAST WALTON AVENUE | - | ALTOONA | PA | 16602 |

**Schedule 16**
**Current Locations, Chief Executive Office and Prior Locations**
**This is a Nine Page Schedule**

Other Collateral Locations - Consignment Inventory

| Customer | Street | Street | City | State | Zip Code |
|---|---|---|---|---|---|
| **Pittsburgh Operations** | | | | | |
| HAMER'S GARAGE          12 Total | LOGAN AVENUE & ATENTH STREET | - | TYRONE | PA | 16686 |
| GEORGE A KELLER GARAGE & FARM 12 Tota | 1303 SICKLES CORNER BACK | - | TYRONE | PA | 16686 |
| L&L SERVICE & SUPPLY Total | 1236 ST. LAWRENCE ROAD | - | PATTON | PA | 16668 |
| MESSNER GARAGE          12 Total | 1320 N TUCKAHOE STREET | - | BELLWOOD | PA | 16617 |
| PAUL'S AMOCO Total | 1251 PENNSYLVANIA AVENUE | - | TYRONE | PA | 16686 |
| MILLER BROS. AUTO SALES, INC. 5 Total | PO BOX 203 | - | MILL HALL | PA | 17751 |
| BILL'S HAPPY CAMPER          18 Total | PO BOX 15 | NORTH WATER STREET | MILL HALL | PA | 17751 |
| S & R REPAIR          18 Total | PO BOX 824 | - | MILESBURG | PA | 16853 |
| STOCKERS CHEVROLET          5 Total | 701 BENNER PIKE | - | STATE COLLEGE | PA | 16801 |
| TIRE TOWN INC.          5 Total | 2045 NORTH ATHERTON STREET | - | STATE COLLEGE | PA | 16803 |
| ULMER'S MECHANICAL REPARATIONS18 Tot | 713 PLEASANT VIEW BLVD. | - | BELLEFONTE | PA | 16823 |
| A.L.L. CONSTRUCTION, INC. Total | P.O. BOX 232 | - | MOUNT STORM | WV | 26739 |
| AUTO CLINIC          19 Total | 11800 MCMULLEN HIGHWAY | - | CUMBERLAND | MD | 21502 |
| BOGGS SUPPLY CO, INC.          19 Total | BOX 3050 RR3 | - | KEYSER | WV | 26726 |
| BUMPER TO BUMPER AUTO Total | 170 HORSESHOE DRIVE #200 | - | WARFORDSBURG | PA | 17267 |
| ROMNEY AUTO REPAIR LLC          19 Total | PO BOX 855 | - | ROMNEY | WV | 26757 |
| CORLEYS          19 Total | 172 FAITH CHURCH ROAD | - | HYNDMAN | PA | 15545 |
| CUMBERLAND CONCRETE CORP.          19 Total | P.O. BOX 3369 | - | CUMBERLAND | MD | 21504 |
| D.K. TIRES & ALIGNMENT INC.          19 Total | 638 GREENE STREET | - | CUMBERLAND | MD | 21502 |
| PRECISION AUTO CARE          11 Total | 903 HATCHERY ROAD | - | INWOOD | WV | 25428 |
| DONALD B RICE TIRE CO INC.          19 Total | 909 NORTH EAST STREET | - | CUMBERLAND | MD | 21502 |
| HENDERSHOR'S AUTO REPAIR          19 Total | 192 THORTON DRIVE | - | MC CONNELLSBURG | PA | 17233 |
| HIGH Q INC. AUTOMOTIVE TESTING19 Total | PO BOX 626 | - | FORT ASHBY | WV | 26719 |
| HINKLE TRUCKING          19 Total | P.O. BOX 65 | - | CIRCLEVILLE | WV | 26804 |
| EMERGENCY VEHICLE SPECIALIST 19 Total | 16121 BUSINESS PARKWAY NORTH | - | HAGERSTOWN | MD | 21740 |
| JIM SACCO AUTO WRECKERS Total | BOX 10B | COOKS MILL ROAD | HYNDMAN | PA | 15545 |
| MINERAL FABRICATION/MACHINE 19 Total | P.O. BOX 21 | INDUSTRIAL PARK | KEYSER | WV | 26726 |
| OAKDALE REPAIR          19 Total | HC 72  BOX 7185 | - | SCHERR | WV | 26726 |
| RT 42 SERVICE CENTER Total | P.O. BOX 715 | - | DORCAS | WV | 26847 |
| SK AUTO          19 Total | HC86  BOX 58A | - | GREEN SPRING | WV | 26722 |
| TIMBROOKS CHEVY          19 Total | RR 3  BOX 3224 | - | KEYSER | WV | 26726 |
| TIMBROOK FORD          19 Total | RT 3 BOX 3280 | - | KEYSER | WV | 26726 |
| TIMBROOK NISSAN          19 Total | PO BOX 1682 | - | CUMBERLAND | MD | 21502 |
| TIMBROOK PONTIAC-CADILLAC INC. Total | P.O. BOX 1682 | - | CUMBERLAND | MD | 21502 |
| UHL ENTERPRISES          19 Total | P.O. BOX 1682 | - | CUMBERLAND | MD | 21502 |
| WITT MACHINE Total | 212 MARKET STREET | - | CUMBERLAND | MD | 21502 |
| ZIM'S TIRE SHOP          19 Total | BOX 77  ROUTE 1 | - | RIDGELEY | WV | 26753 |
| AL'S HILLTOP AUTO          22 Total | 149 EMERICK ROAD | - | SCHELLSBURG | PA | 15559 |
| BAKERS BODY CENTER          22 Total | 5741 BUSINESS 220 | - | BEDFORD | PA | 15522 |
| BEDFORD FORD(C-UP USED CARS)22 Total | PO BOX 158 | - | BEDFORD | PA | 15522 |
| BEDFORD VALLEY PETROLEUM CORP. Total | 10228 LINCOLN HIGHWAY | - | EVERETT | PA | 15537 |
| BOB YINGLING AUTO SERVICE          22 Total | 2076 POTTER CREEK ROAD | - | NEW ENTERPRISE | PA | 16664 |
| BRUMBAUGH TRANSMISSION SERVICE TotalRD 2    BOX 62 | | ROYER MTN. ROAD | WILLIAMSBURG | PA | 16644 |
| CHAMBERLAINS SERVICE STATION  22 Total | 134 SIX MILE RUN ROAD | - | RIDDLESBURG | PA | 16672 |
| DON KLINE'S GARAGE          22 Total | P.O. BOX 41 | 939 NEW STREET | HOPEWELL | PA | 16650 |
| DULL'S AUTO WRECKERS          22 Total | 115 MAIN STREET | - | ALUM BANK | PA | 15521 |
| FISCHER'S GARAGE, INC.          22 Total | 153 CAMP MEETING ROAD | - | CRYSTAL SPRING | PA | 15536 |
| GEORGE S. HANN & SON, INC.      4 Total | 28329 GREAT COVE ROAD | - | FORT LITTLETON | PA | 17223 |
| H. EUGENE KOONTZ TRUCKING INC.22 Total | 3102 CENTENNIAL ROAD | - | BEDFORD | PA | 15522 |
| HOMETOWN GARAGE          4 Total | PO BOX 477 | - | HUSTONTOWN | PA | 17229 |
| HUFFMANS GARAGE          12 Total | PO BOX 74 | 5TH AVENUE | HYNDMAN | PA | 15545 |
| INTERSTATE EMERGENCY SERVICE 22 Total | 16287 LINCOLN HIGHWAY | - | BREEZEWOOD | PA | 15533 |
| INTERSTATE EMERGENCY SERVICES Total | 174 TRANSPORT STREET | SUITE 201 | BEDFORD | PA | 15522 |
| KEE-TA QUAY CONSTRUCTION          4 Total | P.O. BOX 388 | - | HUSTONTOWN | PA | 17229 |
| LYNN'S PERFORMANCE          22 Total | 6150 RAYSTOWN ROAD | - | HOPEWELL | PA | 16650 |
| MANNS CHOICE AUTOMOTIVE          22 Total | 6411 ALLEGHENY ROAD | - | MANNS CHOICE | PA | 15550 |
| MIKE'S PLACE          22 Total | 8301 CLEAR RIDGE ROAD | - | ARTEMAS | PA | 17211 |
| OSMAN TRANSMISSION SERVICE   22 Total | 5789 QUAKER VALLEY ROAD | - | ALUM BANK | PA | 15521 |
| PEFFER'S GARAGE          22 Total | PO BOX 21 | - | WATERFALL | PA | 16689 |
| RESSLER, INC.          22 Total | 3793 BUSINESS 220 | - | BEDFORD | PA | 15522 |
| SHAWN'S AUTOMOTIVE REPAIR Total | 3821 QUAKER VALLEY ROAD | - | ALUM BANK | PA | 15521 |
| STUFFS GARAGE Total | 116 NIXON LANE | - | NEW PARIS | PA | 15554 |
| T.J.'S TRANSMISSION SERVICE Total | 7722 LINCOLN HIGHWAY/STE. | - | BEDFORD | PA | 15522 |
| TONY ROY AUTO SALES Total | 10241 LINCOLN HIGHWAY | - | EVERETT | PA | 15537 |
| TWIGGS AUTOMOTIVE SERVICE          22 Total | 14201 BALTIMORE PIKE NE | - | CUMBERLAND | MD | 21502 |
| WAGNER'S GARAGE Total | 113 BEDFORD STREET | - | NEWRY | PA | 16665 |
| WAYNE'S TRUCK & AUTO SERVICE Total | 1937 BEAVERDAM ROAD | - | IMLER | PA | 16655 |

### Schedule 16
### Current Locations, Chief Executive Office and Prior Locations
### This is a Nine Page Schedule

**Prior Locations - closed between 2009 and 2013**

| Code | Description | Business Activity | Date Closed | Address | City | State | Zip |
|------|-------------|-------------------|-------------|---------|------|-------|-----|
| 10103 | Howell Mill | Closed | 6/30/2011 | 774 Forrest Street, Ste 100 | Atlanta | GA | 30318 |
| 10105 | Conyers | Closed | 9/30/2009 | 371 Gees Mill Business Pkwy Ste 200 | Conyers | GA | 30094 |
| 10106 | Riverdale | Closed | 10/9/2009 | 283 HWY 138, Ste B | Riverdale | GA | 30274 |
| 10108 | Speedway | Closed | 12/31/2012 | 90 Woolsey Road | Hampton | GA | 30228 |
| 10113 | Tucker | Closed | 4/30/2013 | 2040 I Steel Dr | Tucker | GA | 30084 |
| 10116 | Douglasville | Closed | 5/31/2011 | 8284 Mozley Rd | Douglasville | GA | 30134 |
| 14103 | Pit North - Wolb | Closed | 11/30/2010 | 3861 East Street | Pittsburgh | PA | 15214 |
| 14105 | Greensburg | Closed | 6/30/2009 | 60 Rear S. Hamilton Ave | Greensburg | PA | 15601 |
| 14106 | Carnegie | Closed | 9/30/2009 | 950 Vista Park Dr | Pittsburgh | PA | 15205 |
| 14107 | Beaver Falls | Closed | 5/31/2013 | 6816 Big Beaver Blvd | Beaver Falls | PA | 15010 |
| 14108 | Wexford | Closed | 2/28/2009 | 11975 Perry Hwy | Wexford | PA | 15090 |
| 14109 | Butler | Closed | 3/31/2009 | 405C Hansen Ave | Butler | PA | 16001 |
| **14114** | West End | Closed | 6/30/2013 | 1720 Noblestown Road | Pittsburgh | PA | 15205 |
| 14115 | Carnegie | Closed | 10/31/2011 | 249 East Main Street | Carnegie | PA | 15106 |
| 171 | Nashville | Closed | 7/31/2010 | 111A Oldham Street | Nashville | TN | 37213 |
| 17102 | Madison | Closed | 8/31/2009 | 1249 Northgate Business Pky | Madison | TN | 37115 |
| **20103** | Everett | Closed | 8/31/2010 | 314 West Main Street | Everett | PA | 15537 |
| 20105 | Bellefonte | Closed | 12/31/2010 | 2961 Benner Pike | Bellefonte | PA | 16823 |
| **20108** | Altoona | Closed | 4/30/2011 | 216 Frankstown Road | Altoona | PA | 16602 |
| **20115** | Hyndman | Closed | 8/31/2010 | 3833 Center Street | Hyndman | PA | 15545 |
| 20120 | Oakland | Closed | 12/31/2011 | 13149 Garrett Hwy | Oakland | MD | 21550 |

## Schedule 18

See Attached.

**Schedule 18**
**Owned and Leased Locations**

**Owned Location**

| Owned by | Location |
|---|---|
| Miller Auto Parts and Supply Co. | 254 North Juliana Street, Bedford PA, 15522 |

**Leased Locations**

| Code | Description | April 2013 Rent Amount | Address | | | | Lease Term | Landlord | Landlord Address |
|---|---|---|---|---|---|---|---|---|---|
| **Johnson Industries, Inc.** | | | | | | | | | |
| 101 | Atlanta | 31,250 | 5944 Peachtree Corners East | Norcross | GA | 30071 | 1/4/09-1/3/14 | Buddy Johnson | 1655 Huntington Trail, Dunwoody GA 30350 |
| | | 3,308 | | | | | | FirstCal Industrial 2 Acquisitions LLC / | |
| 10102 | Roswell | | 200 Hembree Park Dr, Ste J | Roswell | GA | 30076 | 2/1/10-3/31/13 | Sealy & Company, Inc. | 3400 Peachtree Rd - Suite 1700, Atlanta GA 30326 |
| 10104 | Snellville | 4,500 | 2030 Westside Court, Ste F-J | Snellville | GA | 30078 | 6/1/12-5/31/17 | 2030 Westside LLC | 4958 Lavista Road, Tucker, GA 30084 |
| | | 3,537 | | | | | | Shanglen Inc. (Landlord) | |
| 10107 | Turner Field | | 515 Ralph David Abernathy Blvd | Atlanta | GA | 30312 | 10/25/12-10/24/17 | Brake Specialty Co (Sub Landlord)** | **515 Ralph David Abernathy Blvd , Atlanta, GA 30312 |
| 10109 | Columbus | 4,000 | 1514 Box Road | Columbus | GA | 31907 | 1/1/11-12/31/11 | Tim & Laura Reagan | 2120 Parkvieisle Lane, Hixson TN 37343 |
| 10110 | Albany | 3,300 | 816 West Broad Avenue | Albany | GA | 31701 | 4/1/13-3/31/16 | Fuller Brothers, LLC & SEGAW LLC | 629 Fussell Road, Leesburg, GA 31763 |
| 10113 | Valdosta | 3,750 | 408 N Patterson Street | Valdosta | GA | 31601 | 10/1/2013-9/30/16 | Langdale Ford | 216 W Magnolia Street, Valdosta GA 31501 |
| 10112 | Emory | 8,682 | 1316 Dolon Road | Atlanta | GA | 30306 | 3/29/10 3/29/15 | Minmarka LLC | 1591 Knob Hill Road, Atlanta GA 30329 |
| 10114 | Woodstock | 1,139 | 110 Londonderry Ct, Suite 109 | Woodstock | GA | 30188 | 10/1/12-9/30/17 | Maybrook Realty Inc | c/o Saunders Management Co., Inc. 760 Brooks Ave., Rochester NY 14619 |
| 10115 | Marietta | 5,408 | 3700 Enterprise Way-Suite 104 | Marietta | GA | 30067 | 6/1/11-5/31/16 | Meritex Marietta, LLC | Attn: Asset Manager 5238 Royal Woods Pkwy-Suite 150, Tucker GA 30084 |
| **Miller Auto Parts & Paint Company, Inc.** | | | | | | | | | |
| 141 | Pittsburgh | 20,833 | 3382 Industrial Blvd | Bethel Park | PA | 15102 | 1/1/08-1/1/16 | Donald or Kathleen DiPietro | 370 11th Ave South, Naples FL 34102 |
| 14501 | Washington | | 19 West Maiden Street | Washington | PA | 15301 | 4/1/10-3/31/13 | Auld Hotel Properties | 947 Allison Ave, Washington PA 15301 |
| 14304 | New Kensington | 2,500 | 912-924 5th Avenue | New Kensington | PA | 15068 | 12/1/12-11/30/15 | Marvin H Williams | 453 Chopeldale Drive , Apollo, PA 15613 |
| 14113 | Mt. Lebanon | 3,000 | 439 Washington Road | Mt. Lebanon | PA | 15228 | 7/1/10-6/30/15 | Letitia Dyke | 100 Adams Ave Apt34, Pittsborgh PA 15243 |
| **Miller Auto Parts & Supply Company, Inc.** | | | | | | | | | |
| 301 | Huntingdon | 5,000 | 10151 Fairgrounds Rd | Huntingdon | PA | 16652 | 5/3/13-4/30/18 | Miller Family Trust | 10153 Tanglewood Drive, Huntingdon, PA 16652 |
| 30102 | Clearfield | 2,200 | 110 South 3rd Street | Clearfield | PA | 16830 | 12/1/06-12/1/2014 | Michael & Dawn Tibbens | 7630 Cfd-Curw Hwy, Clearfield PA 16830 |
| 20106 | New Bloomfield | | 335 Keystone Way | New Bloomfield | PA | 17068 | Month-to-Month | George & Carrie Lyter | 335 S. Fifth Street, Newport, PA 17044 |
| 20109 | Mifflintown | 3,000 | 4132 William Penn Hwy | Mifflintown | PA | 17059 | 8/1/13-7/31/18 | Robert & Michelle Kint | RR #4 Box 132, Mifflintown, PA 17054 |
| 20110 | South Fork | 2,400 | 219 Mount Hope Road | South Fork | PA | 15956 | 1/1/09-12/31/13 | William Morley | 901 Kerr Drive, Johnstown, PA 15904 |
| 20113 | Tyrone | 2,000 | 320 West 10th Street | Tyrone | PA | 16686 | 9/1/09-8/31/14 | M&T of Blair County, LLC | 174 Hollow Run Trail, Duncansville, PA 16635 |
| 20118 | State College | | 2450 West College Ave | State College | PA | 16801 | Month-to-Month | Benjamin & Christa Johnston | 396 DeBlair Road, Furnace PA 16865 |
| 20119 | Cumberland (Naves Cross) | 3,000 | 12600 Naves Cross Road NE | Cumberland | MD | 21502 | 10/1/06-9/30/2013 | Cook Bros. | 12600 Naves Cross Road , Cumberland, MD 21502 |
| 20172 | Bedford** | n/a | 254 North Juliana Street | Bedford | PA | 15522 | OWNED BY MAPS | MAPS | 10151 Fairgrounds Road, P O Box 507, Huntingdon PA 16652 |
| | | 113,697 | | | | | | | |

\*\* Bedford Location is Owned

**Other Collateral Locations - Consignment Inventory**

See list included in Schedule 16 - Collateral Locations

## Schedule 19

See Attached.

Schedule 19
Bank Accounts

| Bank Description | | Name of Account | Purpose of Bank account | Bank Address |
|---|---|---|---|---|
| PNC Master Loan Account - Bank Controlled | | | | |
| **Georgia - Johnson Industries Inc.** | | | | |
| PNC Acct# 80-2655-8551 | | Johnson Industries | Lockbox /deposit acct for all Georgia Customers paying to a lock box | PO Box 340777 Pittsburgh PA 15230 |
| PNC - 80-2655-8543 | | Johnson Industries | Main Johnson Industries Disbursement Account | PO Box 340777 Pittsburgh PA 15230 |
| Regions Bank - Acct#0144898290 Rossman - 404-253-5274 | Scott | Johnson Industries | All Georgia branches manually deposit to this account - this has a deposit account control agreement attached | 1593 Mulkey Rd Austell GA 30106 |
| **Georgia - autopartstomorrow.com LLC** | | | | |
| PNC Acct# 80-2656-3393 | | AutopartsTomorrow.com/Ebay Collection-autopartstomorrow | AutoPartsTomorrow.com Website Deposit Acct | PO Box 340777 Pittsburgh PA 15230 |
| | | PayPal Acct named "Scott_Gardner@teamjl.com" | eBay Store deposit account - autopartstomorrow | |
| PNC Acct# 80-2656-8821 | | Autoparts Tomorrow2/EBay Collection | eBay store Deposit Account | PO Box 340777 Pittsburgh PA 15230 |
| | | PayPal Acct named "Billing@autopartstomorrow.com" | eBay deposit acct - autopartstomorrow2 | |
| **Pennsylvania - Pittsburgh - Miller Auto Parts & Paint Co. Inc.** | | | | |
| PNC Acct# 80-2655-8578 | | Miller Auto Parts & Paint | Pitt Lockbox /deposit acct | PO Box 340777 Pittsburgh PA 15230 |
| PNC Acct#80-2655-9191 - zba to main deposit account | | Miller Auto Parts & Paint | Pitt branch PNC ZBA ACCT | PO Box 340777 Pittsburgh PA 15230 |
| PNC 10-2503-6851 | | Miller Auto Parts & Paint | Pitt local Disbursement acct | PO Box 609  Pittsburgh PA 15230 |
| **Pennsylvania - Huntingdon - Miller Auto Parts & Supply Inc.** | | | | |
| PNC Acct# 80-2655-8535 | | Miller Auto Parts & Supply | Hunt deposit acct | PO Box 340777 Pittsburgh PA 15230 |
| PNC - 80-2655-8527 | | Miller Auto Parts & Supply | Hunt Disbursement acct | PO Box 340777 Pittsburgh PA 15230 |
| Kish Acct # 128651 Berger - 814-641-5474 | Larry | Miller Auto Parts & Supply | Huntingdon local bank disbursement | PO Box 917 Belleville PA 17004 Route 22  Huntingdon PA 16652 |
| Standard Bank - Acct 0050074256 | | Miller Auto Parts & Supply | Huntington local bank acct | Lavale MD 21502 |
| Clearfield Bank and Trust - xxxxx9795 Michelle Fannin - 814-765-1645 | | Miller Auto Parts | Clearfield local bank acct | PO Box 171 Clearfield PA 16830 204 Bridge Street Clearfield PA 16830 |
| Fist National Bank of Mifflintown- xxxxxx7782 Pine - 717-436-2144 | Sandra | Miller Auto Parts & Supply | Mifflintown local bank acct | PO Box 96 Mifflintown PA 17059 2 Main Street Mifflintown PA 17059 |
| First Commonwealth - 7110092239 Bishop - 814-472-4680 | Diane | Miller Auto Parts & Supply | South Fork local bank acct | Indiana PA 15701 7089 West High Street Ebensburg PA 15931 |
| M&T Bank - 9830473964 Phone # 814-684-1010 | | Miller Auto Parts & Supply | Tyrone local bank acct | 1002 7th St Harrisburg PA 17102 1 West 10th Street Tyrone PA 16686 |
| Susquehanna - 12008363 Williams - 814-623-2750 | Pam | Miller Auto Parts | Bedford local bank acct | Camden NJ 08103 601 E Pitt St Bedford PA 15522 |
| **Accounts to be closed in new banking structure** | | | | |
| Standard Bank - Acct 0050074256 | | Miller Auto Parts & Supply | Huntingdon local bank acct | Lavale MD 21502 |
| PNC Acct#80-2655-9191 - zba to main deposit account | | Miller Auto Parts & Paint | Pitt branch PNC ZBA ACCT | PO Box 340777 Pittsburgh PA 15230 |
| PNC Acct#80-2655-9183 - zba to main deposit account | | Miller Auto Parts & Supply | Hunt Branch PNC ZBA ACCT | PO Box 340777 Pittsburgh PA 15230 |