IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| MILLER AUTO PARTS & SUPPLY | ) | PROPOSED |
| COMPANY, INC., et al., | ) | Jointly Administered Under |
| | ) | CASE NO. 14-68113-mgd |
| Debtors. | ) | |

DECLARATION OF RANDY KULAMER
IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS

I, Randy Kulamer, declare under penalty of perjury as follows:

1.

I am the Chief Executive Officer of Miller Auto Parts & Supply Company, Inc., a corporation duly organized under and existing pursuant to the laws of the State of Delaware and President of Johnson Industries, Inc., a corporation duly organized under and existing pursuant to the laws of the State of Georgia and with its principal place of business in the State of Georgia. In this capacity, I have obtained detailed knowledge of and experience with the business and financial affairs of Miller Auto Parts & Supply Company, Inc. ("**Miller Auto**"), Johnson Industries, Inc. ("**Johnson Industries**"), Miller Auto Parts & Paint Company, Inc. ("**Miller Paint**"), and AutoPartsTomorrow.com, LLC ("**APT**"), debtors and debtors-in-possession (collectively, the "**Debtors**").

2.

I am authorized to submit this declaration in support of the Debtors' First Day Motions (as hereinafter defined). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided by employees under my supervision or professionals retained by the Debtors, or my opinion based

upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. Opinions regarding compliance with applicable statutes or rules are based upon advice of counsel. If I were called upon to testify, I would testify competently to the facts set forth herein.

## Background

3.

On September 15, 2014 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.

The Debtors are distributors of automotive parts and service equipment, offering a unique product mix of both original equipment and aftermarket products. Johnson Industries, Miller Paint and APT each are a wholly owned subsidiary of Miller Auto. The Debtors operate from the Johnson Industries headquarters in Atlanta, Georgia and have distribution operations in the southeast, northeast and on-line. The Debtors' Southeastern distribution center is located in Norcross, Georgia and supports nine satellite centers across the state and supplies parts to key fleet customers across the country. From the Satellite locations, the Debtors distribute automotive parts and supplies to a network of dealers, repair shops and fleet customers. The Debtors have two Northeast distribution hubs, located in Bethel Park, Pennsylvania and Huntingdon, Pennsylvania, which support eleven satellite centers in the Northeast region. From these locations, the Debtors distribute automotive parts and supplies to a network of dealers, and

repair and service shops. Additionally, the Debtors maintain an on-line presence for retail and distribution focused on B-to-B and B-to-C e-commerce site serving customers nationally under the APT logo.

5.

The Debtors' major product lines includes: batteries; brake pads; brake drums and rotors; rotating electrical components such as starters and alternators; electrical engine sensors; various engine filters; air conditioning components; ride control assemblies such as shocks and struts; and, fuel components including fuel pumps, injectors and regulators. The Debtors source their parts from approximately 1,500 suppliers.

6.

The Debtors offer industry leading original equipment brands, such as Delco, Motorcraft and MOPAR, as the cornerstone of the Debtors' strategy to offer the original equipment parts whenever possible. The Debtors also offer parts from original equipment manufacturers that are Tier I suppliers to the automotive manufacturers, such as Bosch, Denso, Gates, Luk, NGK and Cummins. The Debtors source a portion of their non-OE product through its membership in the the Auto Parts Alliance headquartered in San Antonio, TX.

### History

7.

Founded as C.H. Miller Hardware Company, Inc. in 1921, Miller Auto flourished over five generations under the Miller family stewardship. In 2002, Golden Eagle Asset Management, acquired a controlling stake in the business and renamed it Miller Auto Parts &

Supply Company, Inc., which had eight locations in the Huntingdon area, with less than $4 million in annual revenue. Subsequently, Miller Auto acquired a number of other locations in Pennsylvania, either in its own name or through Miller Paint. In 2007, Miller Auto acquired Johnson Industries and gained a foothold in Georgia. The Debtors, through APT have been an e-commerce leader in the auto parts space.

8.

The Debtors' workforce is comprised of approximately 320 non-union employees. The management team is comprised of industry veterans with many years of relevant experience in all aspects of automotive parts sales and distribution.

9.

In recent months, the Debtors financial condition has deteriorated such that they will soon be unable to meet their current financial obligations as they come due in the ordinary course of business. Moreover, the Debtors' lack of liquidity has severely limited the Debtors' ability to continue the operation of their businesses. After evaluating alternatives, conducting an exhaustive sale process and consulting with their advisors and directors, the Debtors eventually concluded that it was in their best interest, and the interests of their creditors and employees, to seek protection under Chapter 11 of the Bankruptcy Code.

## The First Day Motions

10.

In conjunction with their bankruptcy petitions, the Debtors filed the motions and applications listed on Exhibit A (collectively, the "**First Day Motions**"). I submit this declaration in support of the First Day Motions. I have reviewed each of the First Day Motions

(including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

11.

As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtors' executives and discussions with outside advisors, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.

12.

As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the Chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as debtors-in-possession.

**Motion for Joint Administration**

13.

The Debtors are requesting that the Court jointly administer the four (4) related bankruptcy cases in order to promote judicial efficiency and to minimize the administrative

expense to each of the Debtor's estates. Miller Auto Parts & Supply Company, Inc., is the parent company of : (i) Johnson Industries, Inc., (ii) Miller Auto Parts & Paint Company, Inc., and (iii) AutoPartsTomorrow.com, LLC, which are all subsidiaries of Miller Auto Parts & Supply Company, Inc. and sister companies of each other. Joint administration and the maintenance of a single docket will streamline the bankruptcy process, minimize confusion among the creditor body from receipt of multiple pleadings for each Debtor and minimize the administrative expense to the Debtors' estates. Therefore, joint administration is in the best interest of the Debtors', their creditors and their estates.

### Motion for Establishment of Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals (the "Compensation Procedures Motion")

14.

The Debtors believe that the relief requested in this Motion will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in this case more effectively.

15.

Briefly stated, the requested procedures would permit each Professional to serve upon counsel for the Debtors, and the Office of the United States Trustee a statement of fees and expenses incurred by the Professional during the preceding month (a "**Monthly Statement**"). Subject to the terms and conditions of any order granting the DIP Financing Motion (defined below), the Debtors would be authorized to pay each Professional the fees and expenses requested in the Monthly Statement in the absence of an objection received within ten (10) days after service of the Monthly Statement. All fees and expenses of each Professional, whether or not paid or objected to in connection with a Monthly Statement, would remain subject to review

and approval by the Court in connection with interim and final fee applications under Sections 330 and 331 of the Bankruptcy Code.

16.

The Debtors propose that these procedures also apply to members of any official committee appointed in this case seeking reimbursement of expenses pursuant to Section 503(b)(3)(F) of the Bankruptcy Code. However, these procedures will not apply to professionals retained in the ordinary course of business pursuant to a separate motion, or those retained pursuant to 28 U.S.C. § 156 (in the case of the claims agent).

### Application for Authority to Retain Logan & Co., Inc. as Claims, Noticing, and Balloting Agent for the Debtors (the "Logan Retention Motion")

17.

The Debtors believe it is necessary and in the best interests of their creditors and estates to engage Logan & Co., Inc. ("**Logan**") to act as outside agent to the Clerk of the Bankruptcy Court to assume full responsibility for the distribution of notices and proof of claim forms and the maintenance, secondary processing, and docketing of all proofs of claim filed in the Debtors' bankruptcy cases. Logan provides comprehensive bankruptcy management services, including data processing, noticing, claims processing, and other administrative tasks in Chapter 11 cases. In addition, in connection with any plan of reorganization proposed by the Debtors, the Debtors have determined that they will require the services of Logan with respect to the mailing of the Debtors' disclosure statement, plan, and ballots and in maintaining and tallying the ballots in connection with the voting on such plan.

**Motion of the Debtors for Approval of
Notice Procedures (the "Notice Procedures Motion")**

18.

Hundreds of creditors and parties in interest may be technically entitled to receive notice in this case. To require the Debtors to provide notice of all pleadings and other papers filed in this case to these parties in interest would be extremely burdensome and costly to the Debtors' estates as a result of the photocopying, postage, and other expenses associated with such large mailings. Accordingly, the Debtors believe that the notice procedures requested in the Notice Procedures Motion are in the best interests of their estates and creditors, and will not prejudice the rights of any party in interest in these cases.

**Motion for Authority to (A) Maintain Existing Bank Accounts and Cash
Management System, and (B) Continue Use of Existing Business Forms
(the "Cash Management Motion")**

19.

Prior to the commencement of these Chapter 11 cases, the Debtors maintained approximately eight (8) bank accounts with various depository institutions, a schedule of which is attached to the Cash Management Motion as Exhibit A. It is critical for the Debtors to be able to continue their existing cash management system (as modified by any debtor-in-possession financing or cash collateral arrangement approved by this Court) during the pendency of these Chapter 11 cases. Any disruption to the Debtors' ordinary business affairs at this critical stage in the reorganization process could adversely impact their ability to successfully reorganize.

20.

The Debtors' pre-petition bank accounts and business forms are integrally related to the Debtors' cash management system. Thus, maintenance of the Debtors' current accounts and

forms is necessary to avoid delays, confusion, and disruption of the Debtors' business.

## Motion for Authority to Continue Pre-Petition Insurance Programs and to Pay Pre-Petition Premiums and Related Obligations (the "Insurance Motion")

21.

In connection with the operation of their business, the Debtors maintain various insurance policies and programs (collectively, the "**Insurance Programs**") through several different insurance carriers (the "**Insurance Carriers**"). Exhibit A to the Insurance Motion is a summary of the Debtors' various insurance policies, including a list of the Insurance Carriers, policy terms, and the aggregate annual premiums due thereunder.

22.

The Debtors' Insurance Programs include liability and property insurance policies, which provide the Debtors with insurance coverage relating to, among other things, general liability, workers' compensation, business automobile, and property.

23.

The Debtors are required to pay premiums based upon a fixed rate established by the Insurance Carriers. The premiums for these policies are determined annually and are either (1) directly billed to the Debtors in monthly installments or (2) financed by the Debtors pursuant to a premium finance agreement.

24.

As of the Petition Date, the Debtors believe that they are current on pre-petition premiums with respect to the Insurance Programs. To the extent there is an outstanding insurance policy premium for the pre-petition period, however, the Debtors seek authority to pay

the pre-petition premium in the ordinary course and as such payments are necessary to keep the Insurance Programs in force.

25.

It is essential to the continued operation of the Debtors' business and their efforts to reorganize that the Insurance Programs be maintained on an ongoing and uninterrupted basis. The failure to pay premiums when due may affect the Debtors' ability to renew the insurance policies. If the insurance policies are allowed to lapse, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ongoing business operations. Such a result would also place at risk the estates' assets that are necessary to satisfy secured and unsecured claims.

### Motion of the Debtors for Order Pursuant to 11 U.S.C. §§ 105(a) and 363, Authorizing the Debtors to Pay Pre-petition Sales and Use Taxes and Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief (the "Sales and Use Tax Motion")

26.

In connection with the normal operation of their businesses in the ordinary course, the Debtors collect sales and use taxes (collectively, the "**Sales and Use Taxes**") from their customers (and pays such taxes on behalf of certain vendors through direct pay certificates) on behalf of various state and local taxing authorities (the "**Taxing Authorities**") for payment to such Taxing Authorities.

27.

On a periodic basis, the Debtors pay to the Taxing Authorities all previously collected Sales and Use Taxes via funds drawn by checks or by means of electronic fund transfers.

28.

The Debtors estimate that Sales and Use Taxes collected but not paid to the Taxing Authorities as of the Petition Date is approximately $71,420.00, based on the average monthly sales tax liability. In addition, prior to the Petition Date, certain Taxing Authorities were sent checks (the "**Checks**") with respect to such obligations that may not have cleared the Debtors' banks or other financial institutions (together, the "**Banks**") as of the Petition Date.

29.

The Debtors seek authority to pay all pre-petition Sales and Use Tax obligations owed to the Taxing Authorities. Also, to the extent the checks have not cleared the Banks as of the Petition Date, the Debtors seek an order authorizing the Banks to honor the Checks, and to rely on the Debtors' representations as to which Checks may and may not be cleared, without any liability to any third party. In addition, to the extent the Taxing Authorities have otherwise not received payment for pre-petition Sales and Use Taxes due to them, the Debtors seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary to pay all outstanding Sales and Use Tax obligations due as of the Petition Date.

30.

The relief requested in the Sales and Use Tax Motion is necessary to ensure that the Debtors comply with applicable sales and use tax collection requirements and that the Debtors' officers and directors do not incur any civil or criminal liability for failure to follow the requirements set forth under state law for collecting and paying sales and use taxes.

**Motion for Authority to Pay Pre-Petition Wages, Payroll Taxes,
Certain Employee Benefits, and Related Expenses and
Other Compensation to Employees and Independent
Contractors (the "Wages and Benefits Motion")**

31.

As of the Petition Date, the Debtors employed approximately 304 employees and independent contractors.

32.

The Debtors have incurred certain pre-petition obligations that remain unpaid as of the Petition Date because they accrued, either in whole or in part, prior to the Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "**Obligations**") will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date. These obligations can generally be categorized as follows: (i) wages, salaries, and other compensation; (ii) payroll taxes; (iii) qualified 401(k) plan obligations; (iv) health and welfare benefits; and (v) other benefits.

33.

Pursuant to Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, a debtor's employees' claims for "wages, salaries, or commission, including vacation, severance, and sick leave pay" earned within one hundred eighty (180) days before the Petition Date, and claims against the Debtors for contributions to employee benefit plans arising from services rendered within one hundred and eighty (180) days before the Petition Date, are afforded unsecured priority status to the extent the claims do not exceed $12,475. 11 U.S.C. §§ 507(a)(4)–(5). As of the Petition Date, the Debtors believe that there are no employees for whom the Payroll Obligations would exceed $12,475.

34.

Any delay in paying the Obligations will adversely impact the Debtors' relationship with their Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely in order for their businesses to be successful. The Debtors must have the support of their employees in order for the Debtors to maximize the going concern value of their assets. At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in employees' morale attributable to the Debtors' failure to pay previously earned wages, salaries, benefits, and other similar items.

35.

Moreover, absent an order granting the relief requested in this Motion, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations. The stability of the Debtors will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives.

**Motion for Interim Order (I) Authorizing (A) Secured Post-Petition
Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364(c) and
(B) Granting Security Interests, Superpriority Claims, and
Adequate Protection and (C) Use of Cash Collateral and (II) Scheduling
<u>a Final Hearing (the "DIP Financing Motion")</u>**

36.

The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without DIP Financing (as defined in the DIP Financing Motion). The ability of the Debtors to finance their operations, and the availability of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed

money, is essential to the Debtors' ability to operate their businesses. In the absence of such financing, the operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur.

37.

Prior to the Chapter 11 filing, financial advisors for the Debtors contacted potential lenders, seeking alternative financing sources. The DIP Financing proposed by the DIP Lender represents the best alternative available to the Debtors.

38.

The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Financing. The terms of the DIP Financing are fair and reasonable, are in the best interests of the Debtors' estates and have been negotiated in good faith and at arm's length. Without the liquidity provided by the DIP Financing, the Debtors will be unable to pay vendors, employees and other constituencies that are essential to the orderly operation of their businesses. The Debtors' management exercised their best business judgment in negotiating the DIP Financing that is presently before the Court.

39.

For these reasons, access to credit under the DIP Financing is critical. The Debtors cannot wait for the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of the Motion. The Debtors' need for access to the DIP Financing therefore is immediate.

40.

A proposed Interim Order is attached as an exhibit to the DIP Financing Motion and is incorporated herein by reference. Pending the Final Hearing (as defined in the DIP Financing Motion), the Debtors require immediate financing under the terms and conditions set forth in said Interim Order for, among other things, financing their operations and other working capital needs. It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post-petition operating expenses, as well as the pre-petition expenses approved in the first day orders, to minimize the damage occasioned by their cash flow problems.

41.

Absent immediate financing, the Debtors will be unable to pay ongoing operational expenses. Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors and other parties in interest.

## Motion for Order Shortening Notice and Expediting Hearing on First-Day Motions (the "Expedited Hearing Motion")

42.

The relief requested in the Expedited Hearing Motion is necessary to ensure that there is no interruption in the services being provided by the Debtors or damage to the Debtors' businesses or the value of their assets. To require the Debtors to comply with otherwise applicable notice requirements would cause immeasurable harm to the Debtors' ability to efficiently and effectively manage their operations, would create disruptions in the timely payment of obligations, and would threaten the Debtors' existence in light of their current

condition. Accordingly, the Debtors believe that the relief requested in the Expedited Hearing Motion is warranted.

## Conclusion

Accordingly, for the reasons stated herein, and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such further relief as the Court deems just and proper.

Executed this 15th day of September, 2014.

_____
Randy Kulamer
Chief Executive Officer of Miller Auto Parts &
Supply Company, Inc. and
President of Johnson Industries, Inc.

*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§152 and 3571.

## EXHIBIT A
## INDEX OF FIRST DAY MOTIONS

| 1.  | Motion for Joint Administration |
|-----|---------------------------------|
| 2.  | Motion for Establishment of Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals |
| 3.  | Motion for Authority to Retain Logan & Co., Inc. as Claims, Noticing, and Balloting Agent for the Debtors |
| 4.  | Motion of the Debtors for Approval of Notice Procedures |
| 5.  | Motion for Authority to (A) Maintain Existing Bank Accounts and Cash Management System, (B) Continue Use of Existing Business Forms, and (C) Continue Use of Existing Investment Guidelines |
| 6.  | Motion for Authority to Continue Pre-Petition Insurance Programs and to Pay Pre-Petition Premiums and Related Obligations |
| 7.  | Motion of the Debtors for Order, Pursuant to U.S.C. §§ 105(a) and 363, Authorizing the Debtors to Pay Pre-petition Sales and Use Taxes and Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief |
| 8.  | Motion for Order Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, Related Expenses, and Other Compensation to Employees and Independent Contractors |
| 9.  | Emergency Motion for Authority to Incur Post-Petition Secured and Super-Priority Indebtedness ("DIP Motion") |
| 10. | Motion for Order Shortening Notice and Scheduling Expedited Hearing on First-Day Motions |
| 11. | Declaration of Randy Kulamer in Support of First Day Applications and Motions |