IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| MILLER AUTO PARTS & SUPPLY | § | Jointly Administered Under |
| COMPANY, INC., et al., | § | CASE NO. 14-68113-mgd |
| | § | |
| Debtors. | § | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO
DEBTORS' MOTION FOR AN INTERIM ORDER (I) AUTHORIZING
(A) SECURED POSTPETITION FINANCING PURSUANT TO
11 U.S.C. §§ 105, 361, 362, AND 364(C) AND (D); (B) GRANTING SECURITY
INTERESTS, SUPERPRIORITY CLAIMS, AND ADEQUATE
PROTECTION AND (C) USE OF CASH COLLATERAL
AND (II) SCHEDULING A FINAL HEARING;
AND MEMORANDUM OF POINTS AND AUTHORITIES**

**[REFERS TO DOCKET NO. 10]**

**COMES NOW** the Official Committee of Unsecured Creditors (the "Committee") and files this *Objection to Debtors' Motion For An Interim Order (I) Authorizing (A) Secured Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, And 364(c) And (d); (B) Granting Security Interests, Superpriority Claims, And Adequate Protection And (C) Use Of Cash Collateral And (II) Scheduling A Final Hearing; And Memorandum Of Points And Authorities* (the "Objection"). In support of this Objection, the Committee respectfully shows the Court as follows:

**INTRODUCTION**

1. This Court must deny the relief sought in the Debtors' DIP Financing Motion[1] because both the protections and the control provisions offered to First Capital violate the Bankruptcy Code and are grossly overreaching and excessive.

---

[1] Capitalized terms used in this introductory section have the meanings ascribed to them below.

2. As detailed more fully below, through the guise of providing post-petition financing under Bankruptcy Code section 364, First Capital seeks to (a) insulate its pre-petition debt and security interests from any challenges from any party in interest, and (b) effectively control the Debtors' jointly administered bankruptcy cases. In exchange for the use of First Capital's alleged cash collateral, First Capital asks this Court to deem such use to constitute a post-petition loan worthy of a priming lien status under Bankruptcy Code section 364(d). Moreover, as such cash collateral is used and repaid, First Capital asks this Court to put First Capital beyond the reach of any party in interest, and this Court, by "bullet-proofing" First Capital's debt and liens via priming liens, cross-collateralization through a roll-up of First Capital's pre-petition debt, and the granting of superpriority claims to First Capital.

3. The proposed DIP financing protections offered by the Debtors to First Capital would constitute impermissible overreaching even in the event First Capital was advancing new, additional, funds. However, the numerous and onerous protections and control provisions are especially inappropriate in these bankruptcy cases because of one simple and inescapable fact: **<u>First Capital is not truly a DIP lender</u>**. As shown in the Budget, and as further discussed below, First Capital will advance no new funds during the period covered by the Budget.[2] Moreover, during this period the Debtors will generate a net positive cash flow of more than $1.8 million.

4. In exchange for the minor concession of allowing the Debtors to use cash collateral (while otherwise not increasing the total amount of First Capital's pre-petition debt), First Capital is extracting draconian measures from the Debtors in addition to the above-described protections. Perhaps the clearest example of First Capital's intention to highjack the

---

[2] The Budget is titled as a "16 Week Forecast" and the final column of the Budget states "13 Week Total." The Committee notes, however, that the Budget actually covers a total of 17 weeks.

Debtors' bankruptcy cases from all parties in interest is First Capital's demand to have its post-petition liens cover avoidance actions.[3]  Further examples include: (a) a Bankruptcy Code section 506(c) waiver; (b) the Debtors' inability to do much or to assert any right without First Capital's prior written consent, in First Capital's sole discretion; (c) complete protection from a subsequent finding of equitable subordination; (d) an expedited sale process almost guaranteed to sell the Debtors' business for less than it is worth;  and (e) a laundry list of events of default that will put First Capital fully in control of the bankruptcy cases.  Understandably, First Capital then asks the Court to expressly find that, despite all of the above, First Capital is not actually in control of the Debtors.[4]

5.      The protections and control provisions demanded by First Capital are egregious. Approval of such provisions by this Bankruptcy Court will have significant adverse consequences for the Debtors, the bankruptcy estates, and the Debtors' creditors.  Accordingly, the Bankruptcy Court should deny the relief sought in the DIP Financing Motion and should provide for such other and further relief as described below.

## JURISDICTION

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## FACTUAL BANKGROUND

**A.      Pre-Petition Financing and Sale Efforts**

---

[3] The Interim DIP Order "excludes" a lien on avoidance actions.  However, the Interim DIP Order specifically states that such exclusion is "pending Final Order."  Given all of the other protections demanded by First Capital (discussed below), the Committee assumes for the purposes of this Objection that First Capital will use this reservation language in the Interim DIP Order to seek a lien on avoidance actions at the final hearing.

[4] *See* Interim DIP Order at ¶ ("By consenting to entry of this Interim Order, making advances under the DIP Facility or administering the financing relationship with Debtor pursuant to the DIP Loan Documents, DIP Lender shall not be deemed to be in control of the Debtors or their operations or to be acting as a "responsible person," "managing agent" or "owner or operator.").

7. According to the Debtors, almost exactly one year ago, FCC, LLC d/b/a First Capital ("First Capital," and sometimes referred to as the "DIP Lender")[5] agreed to an asset-based loan to the Debtors of approximately $18 million.[6]

8. Thereafter, on September 15, 2014 (the "Petition Date"), the Debtors filed for bankruptcy protection. Notably, as of the Petition Date:

    a. The Debtors were not in default under the loan documents with First Capital and had not overdrawn on the applicable revolver;[7]

    b. According to the Debtors' budget (the "Budget"), a copy of which is attached hereto as **Exhibit 1**,[8] over the period covered by the Budget, the Debtors will actually generate net cash flow of over $1.8 million;

    c. The Budget provides for zero additional funding by First Capital over the Budget period;[9] and

    d. Despite months of an alleged pre-petition sale process, no sale stalking horse was identified.

**B.    The Bankruptcy Cases**

9. On the Petition Date, the Debtors filed their voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "Bankruptcy Court").

10. On the Petition Date, the Debtors filed various first day motions, including the *Motion For An Interim Order (I) Authorizing (A) Secured Postpetition Financing Pursuant to 11*

---

[5] The Debtors refer to First Capital by two different names ("First Capital" and the "DIP Lender"), seemingly to distinguish between First Capital's pre-petition and post-petition roles. As shown below, the distinction is a fiction because post-petition First Capital is the same lender dealing with the same debt.

[6] While the total made available under the loan was $18 million, the total outstanding as of the Petition Date is approximately $13 million.

[7] As separately acknowledged by both counsel for the Debtors and counsel for First Capital at the September 17, 2014 first day hearing.

[8] The Budget was also attached as an exhibit to the DIP Financing Motion.

[9] See Budget at "Unused Line" under the "Cash Receipts" section.

*U.S.C. §§ 105, 361, 362, And 364(c) And (d); (B) Granting Security Interests, Superpriority Claims, And Adequate Protection And (C) Use Of Cash Collateral And (II) Scheduling A Final Hearing; And Memorandum Of Points And Authorities* (the "DIP Financing Motion") [Doc. No. 10].

11. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. On September 18, 2014, the Bankruptcy Court entered an order providing for the joint administration of the Debtors' bankruptcy cases. [Doc. No. 26].

12. No trustee or examiner has been appointed in these cases.

13. On September 17, 2014, the Bankruptcy Court held a hearing on the Debtors' first day motions, including the DIP Financing Motion. Following the hearing, the Bankruptcy Court entered various orders on first day motions, including the *Interim Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364(c) and (d); (B) Granting Security Interests, Superpriority Claims, and Adequate Protection and (C) Use of Cash Collateral and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* (the "Interim DIP Order") [Doc. No. 29]. A final hearing on the DIP Financing Motion is currently scheduled for October 3, 2014.

14. On September 24, 2014, the Committee was appointed in these cases, compromised of Federal-Mogul Corporation, Global Parts Distributors LLC and Standard Motor Products, Inc.

15. Pursuant to the DIP Financing Motion, the Debtors are seeking final approval for the Debtors to, among other things, obtain post-petition financing ("DIP Financing") provided by

-5-

First Capital. The Debtors and First Capital are seeking various DIP financing protections as set forth in the Interim DIP Order.

## COMMITTEE'S OBJECTIONS

### A. First Capital is not a DIP Lender and Is Solely Entitled to Adequate Protection for the Debtors' Use of Cash Collateral

16. As noted above, First Capital is not advancing any new funds during the period covered by the Budget.[10] In fact, using the information plainly set forth in the Budget, the Debtors will generate gross cash receipts of $28,002,000, with a net cash flow of $1,829,380 during the Budget period. Notably, the net cash flow of over $1.8 million is after payment of $506,771 in projected post-petition payments to professionals.[11]

17. The Committee anticipates First Capital arguing that First Capital will be making frequent advances to the Debtors during the post-petition period under the terms of the pre-petition revolving loan. The Committee acknowledges that, during the post-petition period, the Debtors will continue to draw down on the pre-petition revolving loan just as the Debtors did during the pre-petition period. That does not mean, however, that First Capital is extending any new money to the Debtors. During the post-petition period, First Capital will continue to be collateralized by the fact that the Debtors are limited to drawing down amounts in excess of 85% of the Debtors' eligible accounts plus 90% of their eligible inventory (at liquidation value).[12] The entire point of Bankruptcy Code section 364 is to provide lenders with protections to

---

[10] *Id*. This is despite the allegations made by the Debtors and First Capital at the first day hearing and repeated at the Committee formation meeting, that the Debtors are in financial crisis and would have quickly run out of money if they had not sought bankruptcy protection.

[11] This figure includes $10,000 of U.S. Trustee fees. The Committee also notes that the $1,829,380 net cash flow amount includes amounts from a pre-petition week, which for some reason was included in the Budget. This begs the question of what happened during that pre-petition week to give rise to such a wide swing in cash flow.

[12] *See* the Loan and Security Agreement dated August 13, 2013, at Schedule 1, attached as Exhibit B to the DIP Financing Motion.

incentivize lenders to incur the risk associated with lending new money. A simple pre-petition asset based revolving loan that continues into the post-petition period does not qualify.

18. Rather than DIP financing protections, to the extent that post-petition proceeds generated by the Debtors are First Capital's cash collateral, First Capital is entitled to adequate protection, nothing more, nothing less. *In re Johnson*, 479 B.R. 159, 171 n.56 (Bankr. N.D. Ga. 2012); *see also M4 Enters., Inc.*, 183 B.R. 981, 985 (Bankr. N.D. Ga. 1995) (citing Bankruptcy Code sections 361(1) and 363 for the proposition that a secured party is entitled to adequate protection for its use of cash collateral); *In re Empire for Him, Inc.*, 1 F.3d 1156, 1160 (11th Cir. 1993). The "use of cash collateral generated from [a] debtor's business operations cannot and should not be equated with new monies provided by a post-petition lender, regardless of the language appearing in the agreed cash collateral order." *In re 360 Inns, Ltd.*, 76 B.R. 573, 578 (Bankr. N.D. Tex. 1987); *see also In re Trout*, 123 B.R. 333, 336 (Bankr. D. N.D. 1990) ("The concept of new money is fundamentally different from a wish to use cash collateral.").

19. Significantly, both the Debtors and First Capital both acknowledged at the first day hearing in these cases that First Capital is oversecured. Courts uniformly recognize that "[a]n equity cushion in property may provide a creditor with adequate protection of its interest." *In re May*, 169 B.R. 462, 472 (Bankr. S.D. Ga. 1994); *see also In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (Bankr. S.D.N.Y. 1998) (same). Therefore, by virtue of its equity cushion, First Capital already has the protection it is entitled to under the Bankruptcy Code.

20. Moreover, in addition to the equity cushion, First Capital is provided replacement liens (known in the Interim DIP Order as "Adequate Protection Liens"),[13] which the Committee does not object to so long as (a) the replacement liens are only to the extent, validity, and priority

---

[13] Interim DIP Order at ¶ 8.

of First Capital's liens as of the Petition Date, and (b) such replacement liens are granted only to the extent of the diminution in First Capital's interest in the Debtors' property.

**B.    Impermissible "DIP Lender" Protections**

21.    Therefore, because First Capital is not actually a DIP lender, First Capital is not entitled to any of the protections normally provided to DIP lenders to incentivize such post-petition lending including:

  a.  A priming lien under Bankruptcy Code section 364(d)(1);[14]

  b.  Cross-collateralization whereby pre-petition claims are secured with post-petition liens;[15]

  c.  A superpriority claim under Bankruptcy Code section 364(c)(1);[16]

  d.  A Bankruptcy Code section 506(c) waiver;[17]

  e.  A lien on avoidance actions;[18]

  f.  A Bankruptcy Court finding that First Capital's pre-petition liens and the post-petition liens granted under the Interim DIP Order shall not be subject to subordination under Bankruptcy Code section 510 or otherwise;[19]

  g.  A lien on all otherwise unencumbered assets under Bankruptcy Code section 364(c)(2);[20] or

  h.  A junior lien on all property otherwise subject to a lien under Bankruptcy Code section 364(c)(3).[21]

---

[14] *Id.* at ¶7(c).

[15] *Id.* at ¶ 4(a).

[16] *Id.* at ¶ 10.

[17] *Id.*; *see also* DIP Financing Motion at p. 6.

[18] See infra at footnote 3.

[19] *Id.* at ¶ 7(d).

[20] *Id.* at ¶ 7(a).

[21] *Id.* at ¶ 7(b).

**(1)     Priming Lien**

22.     As to the priming lien sought by First Capital, such a lien is appropriate only where new credit is actually provided post-petition. *In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1495 (11th Cir. 1992) ("Section 364(d) speaks only of the granting of liens as security for *new credit* authorized by the Court." (emphasis in original)); *Bland v. Farmworker Creditors*, 308 B.R. 109, 114-15 (S.D. Ga. 2003) (same).    Rather than a priming lien, First Capital's secured party interests are protected by a Bankruptcy Code section 507(b), which is provided in paragraph 9 of the Interim DIP Order.

**(2)     Cross-Collateralization**

23.     The Interim DIP Order improperly provides for a pay-down of First Capital's pre-petition debt with post-petition proceeds.[22]   This has the effect of rolling over, or cross-collateralizing, the pre-petition indebtedness because, over time, such indebtedness will be paid down (*i.e.*, converted to a post-petition claim) and thus will be beyond any meaningful challenge by the Committee. The Eleventh Circuit has prohibited cross-collateralization in DIP financing orders as "beyond the scope of the bankruptcy court's inherent equitable power because it is directly contrary to the fundamental priority scheme of the Bankruptcy Code." *In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1495 (11th Cir. 1992).[23]   Thus, even if First Capital were a true DIP

---

[22] *Id.* at ¶ 4.

[23] The specific type of cross-collateralization prohibited in the *Saybrook* case is the "*Texlon*-type" cross-collateralization whereby pre-petition debt is secured as part of a post-petition financing arrangement. *In re Saybrook*, 963 F.2d at 1491 (citing *In re Texlon Corp.*, 596 F.2d 1092, 1094 (2d Cir. 1979)). While some courts have made distinctions between "roll-ups" and *Texlon*-type cross-collateralization, there is no meaningful distinction in this case. The *Saybrook* case prohibits cross-collateralization because it upends the Bankruptcy Code priority scheme by improperly affording post-petition protection to a pre-petition claim. The roll-up in the Interim DIP Order substantively has that exact effect.

lender (which they are not), such cross-collateralization would not be appropriate. As such, it should not be permitted in these bankruptcy cases.

### (3) Superpriority Claims

24. Likewise, the superpriority claims sought by First Capital are not appropriate because such claims are also limited to post-petition borrowing. *See In re FCX, Inc.*, 54 B.R. 833, 841 (Bankr N.D. 1985) ("Section 364(c)(1) authorizes a super priority for postpetition loans; it does not authorize giving a super priority for prepetition loans."). Moreover, First Capital's demand for a superpriority claim is especially inappropriate in these cases because the superpriority claim would cover "all DIP Indebtedness."[24] In other words, the entire prepetition indebtedness, which becomes "DIP Indebtedness," is elevated to superpriority status. As discussed above, the cross-collateralization provisions of the Interim DIP Order mean that First Capital's pre-petition debt will be converted to fully protected post-petition DIP Indebtedness. The practical effect would be that First Capital's pre-petition indebtedness would be placed beyond the challenge of any party in interest. In other words, it would act as a release of First Capital. Such a release is wholly improper. *See, e.g., In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr. D. N.H. 1993) (holding that a post-petition financing stipulation immunizing the FDIC was held unenforceable as the court was "not authorized to and never would insulate any party from the consequences of their conduct no matter how egregious.").

25. Tying the superpriority claim to the DIP Indebtedness would also render the estates' avoidance actions a meaningless nullity. The Interim DIP Order makes a point of stating that the "DIP Facility Liens" do not extend to avoidance actions (at least not until a final order is

---

[24] *See* Interim DIP Order at ¶ 2.

entered).[25] However, the proceeds of such actions would likely be subject to First Capital's superpriority claim. In essence, First Capital appears to give with the left hand – no liens on avoidance actions in the Interim DIP Order – but takes away with the right hand – no corresponding carve out of the superpriority claim.

### (4) Section 506(c) Waiver

26. In addition, a waiver of Bankruptcy Code section 506(c) is against public policy and should not be blindly made in advance of the circumstances that may require its implementation in the future. As noted by the Supreme Court in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000), only a debtor-in-possession or a trustee may, in the first instance, invoke this right under section 506(c) to charge expenses for preservation of a secured creditor's collateral against a secured creditor. The Bankruptcy Court should not authorize a blind, future waiver of section 506(c) by the Debtors. If it does so, it should be made clear that the Committee is not precluded by such a waiver and may assert a section 506(c) surcharge.

### C. First Capital's Attempt to Take Control of These Bankruptcy Cases for its Sole Benefit

27. In addition to demanding impermissible protection of its interests, First Capital is also arguing that it is entitled to an impermissible level of control over the Debtors, their bankruptcy cases, all creditors, and even this Bankruptcy Court. Examples include:

> a. "Waiver. The Debtors hereby irrevocably waive, and are barred from asserting *any* right (a) without First Capital's or DIP Lender's prior written consent (which may be withheld in their *sole discretion* . . . ."[26] Pursuant to this onerous and overbearing provision, the Debtors would be barred from:

---

[25] *Id.* at ¶ 7.
[26] Interim DIP Order at ¶ 12 (emphasis added).

-11-

      i. Borrowing money from any other source;
     ii. Seeking to modify the final DIP order in any way;
    iii. Proposing a plan;
    iv. Seeking an extension of exclusivity; or
     v. Seeking to sell any assets outside the ordinary course of business[27]

b. The Debtors cannot use funds from their estates to:

      i. Commence any claims against First Capital;
     ii. Prevent First Capital from exercising any rights; or
    iii. Challenging the liens or indebtedness of First Capital[28]

c. First Capital controls the sale process and requires deadlines that are sure to chill a robust and competitive sale process. These deadlines are:

      i. <u>October 9, 2014</u>: the Debtors must enter into an APA approved by First Capital;
     ii. <u>October 17, 2014</u>: the Bankruptcy Court must enter an order establishing sale proceeds; and
    iii. <u>November 21, 2014</u>: the Bankruptcy Court must enter a sale order approved by First Capital[29]

d. First Capital asserts that proxies entitle it to vote the Debtors' stock in the event of a default;[30]

e. First Capital is seeking a Bankruptcy Court finding that it is not in control of the Debtors or their operations, specifically:

> "By consenting to the entry of this Interim Order, making advances under the DIP Facility or administering the financing relationship with the Debtor pursuant to the DIP Loan Documents, DIP Lender shall not be deemed to be in control of the Debtors or their operations or to be acting as a 'responsible person,' 'managing agent' or 'owner or operator' . . . with respect to the operation or management of the Debtors.";[31]

---

[27] *Id.* at ¶¶ 12-13.

[28] *Id.* at ¶ 12.

[29] *Id.* at ¶ 6.

[30] *Id.* at ¶¶ D and 14.

[31] *Id.* at ¶ 23.

-12-

      f.      First Capital's fees are paid without an opportunity to object;[32] and

      g.      The defaults and termination under the Interim DIP Order are too broad and not in the estate's interest. They also demonstrate that putting First Capital in control is the actual purpose of the Interim DIP Order. For example, the following would be considered events of default:

        i.      *Any* violation of the voluminous Interim DIP Order would be an event of default;
        ii.     Relief of the automatic stay over $50,000 worth of property;
        iii.    Any order modifying or limiting First Capital's security interests, debts or related rights;
        iv.    Ordering a Bankruptcy Code section 506(c) discharge; or
        v.     Cumulative 10% sales, cash receipts, and disbursement Budget variances.[33]

28.     Each of the control provisions above is inappropriate. Taken together, however, the provisions sought by First Capital demonstrate that First Capital is using these bankruptcy cases solely for its own benefit to both improve its position and to fully control a proposed liquidation process while limiting the rights of the Debtors, creditors and even this Bankruptcy Court. Courts have steadfastly refused to allow the bankruptcy process to be used in such a manner. As summarized by the court in *Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990):

> [T]he "Financing Arrangement" would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt.

*See also In re General Growth Properties, Inc.*, 423 B.R. 716, 725 (Bankr. S.D.N.Y. 2010) (stating that "proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Berry Good, LLC*, 400 B.R. 741 747 (Bankr. D. Ariz. 2008) ("[B]ankruptcy courts do not allow terms in financing arrangements

---

[32] *Id.* at ¶ 14(a). Given this fact, it is apparent that both the Debtors and First Capital admit that First Capital is oversecured. Otherwise, this provision would violate Bankruptcy Code section 506(b).

[33] *Id.* at ¶¶ 6 and 17.

which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender."); *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992) (same).

29.     Each of the control provisions described above should be stricken from any final DIP order.

### D.     The Committee Rights and Clarifications Required in Any Final DIP Order

30.     First Capital has also sought to squeeze all parties out of asserting their rights in these cases. As to the holders of subordinated debt, they are subject to intercreditor agreements that appear to completely tie the hands of the subordinated debt holders, including prohibiting an objection to any action taken by First Capital in the bankruptcy cases. As to the Committee, the Budget allocates a paltry $30,000 carve-out, thus ensuring that the only remaining constituency not under First Capital's thumb has its hands tied from the beginning. As an example of the imbalanced nature of the proposed Committee care-out, the Budget allocates a $250,000 carve-out for the Debtors' professionals and seemingly no limit to First Capital's legal fees.[34]

31.     The Committee should be permitted to actually fulfil its statutory and fiduciary duties in these cases, rather than being merely another party under the complete control of First Capital. To this end, any DIP order should specify as follows:

> a. The Committee carve-out should be increased to an amount that is realistically reflective of the amount of work the Committee will undertake in these cases. Moreover, in order for the Committee to properly serve its function in these cases, there cannot be any limitation on the ability of the Committee to use carve-out funds to bring causes of action against First Capital;

---

[34] At this point, it is unclear whether the $250,000 professional carve out amount is inclusive or exclusive of any retainers that the Debtors' professionals may be holding. See Interim DIP Order at ¶ 15(b) (suggesting that there was as per-petition "retainer funded by First Capital").

    b.    First Capital's liens or claims shall not extend to avoidance actions <u>or</u> to the proceeds of avoidance actions, specifically including any superpriority claims;

    c.    The 30 day period for the Committee to challenge First Capital's liens should be extended to 90 days, with an opportunity for the Committee to seek additional extensions from the Bankruptcy Court. In addition, the DIP order should explicitly provide that the Committee is not bound by any of the waivers or stipulations applicable to the Debtors including, without limitation, a section 506(c) waiver, any waiver or stipulation with respect to subordination, or any of the broadly-worded waivers set forth in Interim DIP Order ¶ 12;

    d.    The DIP order should make clear that the Committee is provided with standing to challenge the liens of First Capital and any of the sub-debt holders without further order of the Bankruptcy Court. This includes bringing a cause of action on behalf of the Committee or on behalf of the Debtors, notwithstanding any waiver or stipulation agreed to as between the Debtors and First Capital;

    e.    Any termination of the automatic stay upon an event of default should be increased from 5 to 10 days; and

    f.    All financial reporting provided by the Debtors to First Capital should be simultaneously provided to the Committee.

## **CONCLUSION**

WHEREFORE, the Committee requests that the Bankruptcy Court enter an order: (i) denying the DIP Financing Motion for the foregoing reasons; (ii) finding that the Debtors may use cash collateral pursuant to the Budget; (iii) finding that First Capital is adequately protected by its equity cushion and by replacement liens to the extent, validity, and priority of its pre-petition liens; (iv) other modifications as set forth above; and (v) providing for such other and further relief as may be just and proper.

|  |  |
|---|---|
| Dated: September 30, 2014. | Respectfully submitted, |

**KANE RUSSELL COLEMAN & LOGAN PC**

By: */s/ Joseph M. Coleman*
    Joseph M. Coleman
    *Pro hac vice* application pending
    Jason B. Binford
    *Pro hac vice* application pending

3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Telephone – (214) 777-4200
Fax – (214) 777-4299
Email: jcoleman@krcl.com; jbinford@krcl.com; ecf@krcl.com

—and—

**MCKENNA LONG & ALDRIDGE LLP**

Gary W. Marsh
Henry F. Sewell, Jr.

303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone – (404) 527-4000
Fax – (404) 527-4198
Email: gmarsh@mckennalong.com;
hsewell@mckennalong.com

PROPOSED COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

## **CERTIFICATE OF SERVICE**

This is to certify that on the 30th day of September, 2014, I caused a copy of the foregoing Objection to be served on the Master Service List as filed by Debtor and attached hereto as Exhibit "A" by depositing said pleading in the United States Mail with sufficient postage affixed thereto.

This 30th day of September, 2014.

*/s/ Henry F. Sewell*
Henry F. Sewell
Georgia Bar No. 636265

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia  30308
(404) 527-4000
(404) 527-4198 (facsimile)

**EXHIBIT "A"**
**MASTER SERVICE LIST**

| | | |
|---|---|---|
| AC-DELCO<br>806 Tyvola Road FCNP<br>Suite 108<br>Charlotte, NC 28217 | Berkley Mid Atlantic Group LLC<br>P.O. Box 580458<br>Charlotte, NC 28258-0458 | Ford Motor Company (38048)<br>LOCKBOX 14147<br>5505 N. Cumberland Suite 307<br>Chicago, IL 60656-4147 |
| Ford Motor Company (30029)<br>LOCKBOX 14147<br>5505 N. Cumberland Suite 307<br>Chicago, IL 60656-4147 | Ford Motor Company (32199)<br>LOCKBOX 14147<br>5505 N. Cumberland Suite 307<br>Chicago, IL 60656-4147 | GM Service Parts Operations<br>P.O. Box 905053<br>Charlotte, NC 28290-5053 |
| Federal - Mogul Corp<br>PO BOX 636438<br>Cincinnati, OH 45263-6438 | Denso Sales California, Inc.<br>P.O. Box 601009<br>Pasadena, CA 91189-1009 | Global Parts Distributors LLC<br>P 0 Box 538461<br>Atlanta, GA 30353-8461 |
| Cummins Filtration Inc.<br>91864 Collections Centers Drive<br>Chicago, IL 60693-1864 | Honeywell<br>File #53005<br>Los Angeles, CA 90074-3005 | Carlisle Brake and Friction<br>25529 Network Place<br>Chicago, IL 60673 |
| WIX Filtration Corp<br>PO Box 73071<br>Chicago, IL 60673-7071 | Dorman Products<br>PO Box 1827<br>Albany, GA 31702-1827 | Standard Motor Products, Inc.<br>93307 Network Place Chicago,<br>IL 60673-1933 |
| Monroe Auto Equipment Company<br>1 International Dr.<br>Monroe, MI 48161 | Valvoline<br>PO BOX 371002<br>Pittsburgh, PA 15250-7002 | Middle Atlantic Warehouse<br>P.O. Box 414579<br>Boston, MA 02241-4579 |
| ISN-Integrated Supply Network<br>1374 Bebevrager Drive<br>Stone Mountain, GA 30083 | Ashland Inc.<br>P. 0. Box 16735<br>Atlanta, GA 30368 | Robert Bosch LLC<br>P 0 Box 95092<br>Chicago, IL 60694-5092 |
| Tenneco Automotive 500<br>North Field Drive Lake<br>Forest, IL 60045 | Troncalli Chrysler 818<br>Atlanta Highway<br>Cumming, GA 30040 | Bendix Commercial Vehicles Systems<br>Attn: Nicholas R. Bell<br>901 Cleveland Street<br>Elyria, OH 44035 |
| IAP Inc<br>26 Englehard Ave<br>Avenel, NJ 07001 | Motorcar Parts of America 783<br>Old Hickory Blvd. Suite 251W<br>Brentwood, TN 37027 | Gates Rubber Company<br>6500 Marbut Road<br>Lithonia, GA 30058 |
| Alliance Parts Warehouse LLC<br>600 Fiber Optic Drive<br>North Little Rock, AR 72117 | Performance Friction Corp. 830<br>Carbon Metallic Hwy. Clover,<br>SC 29710 | The Timken Corporation<br>1835 Dueber Avenue, SW<br>Canton, OH 44706 |

| | | |
|---|---|---|
| 3M<br>Attn: Sherri M. Hall<br>3M Center<br>St. Paul, MN 55144-1000 | Cardone Industries, Inc. 5501 Whitaker Avenue Philadelphia, PA 19124-1799 | SOMS Technologies LLC<br>4 Broadway Suite Suite 11<br>Valhalla, NY 10595 |
| Extang Corporation<br>5400 S. State Road<br>Ann Arbor, MI 48108-9754 | AMREP, Inc.<br>425 Franklin Road<br>Suite 530<br>Marietta, GA 30067-7736 | TRI Star Dodge Jeep Chrysler of Uniontown (2510)<br>2 Superior Way<br>Uniontown, PA 15401 |
| Bahman and Yasin Mossavar-Rahmani<br>40 Summit Road<br>Riverside, CT 06878 | Fribourg Limited<br>Aquitaine Trustees Limited P.O. Box 270<br>West Suite, 2nd Floor 1 Le Trochot<br>St Peter Port, Guernsey GY1 4LW | The Ghassem Ladjevardi Trust<br>7242 East Desert Loop Tucson, AZ 85750 |
| C.H. Miller Hardware, Inc.<br>1051 Fairgrounds Road<br>Huntingdon, PA 16652 | Dr. Dariush Owlia 1<br>Whitfield Heights<br>Avon, CT 06001-3955 | Dr. Robert W. Kahan<br>17 Virginia Lane<br>Unionville, CT 06085 |
| United American Securities, Inc.<br>441 Lexington Avenue Suite 1220<br>New York, NY 10017 | Thomas Miller<br>10133 Tanglewood Drive Huntingdon, PA 16652 | EFG Bank Quai du Seujet 24 1211<br>Geneve 2<br>Switzerland |
| Charles and Nancy Moore<br>610 Thornwood Lane<br>Northfield, IL 60093 | George Sample<br>6400 South Atlantic Avenue New Smyrna Beach, FL 32169 | Seyed H. Aleali<br>5 Wintergreen Drive<br>Easton, CT 06612 |
| David Goodman<br>c/o Gregory A. Jackson, Esq.<br>504 Penn Street<br>Huntingdon, PA 16652 | Robert Anthony Delmonico P.O. Box 38125<br>Pittsburgh, PA 15238-8125 | Danielle Delmonico<br>10555 Forest Hill Drive<br>Wexford, PA 15090 |
| Ralph S. Carratura 59<br>Cedar Ridge Ext. West<br>Deer, PA 15101 | Nicole M. Carratura 59<br>Cedar Ridge Ext. West<br>Deer, PA 15101 | Joseph Horvath 231<br>Mallard Lane<br>Duncansville, PA 16635 |
| Joseph and Shirley Horvath<br>227 Woodside Lane<br>Duncansville, PA 16635 | Cook Brothers Automotive, Inc.<br>425 Fairmont Lane<br>Cumberland, MD 21502 | Richard T. Cook, Jr. 425 Fairmont Lane<br>Cumberland, MD 21502 |
| Gary W. Cook 24<br>Locust Street<br>Cumberland, MD 21502 | Office of the United States Trustee<br>75 Spring Street, SW<br>Room 362<br>Atlanta, GA 30303 | Miller Auto Parts & Supply Company, Inc.<br>Attn: Mr. George Hare, CFO<br>5944 Peachtree Corners East<br>Norcross, GA 30071-1336 |

| | | |
|---|---|---|
| J. Robert Williamson<br>Ashley R. Ray<br>Scroggins & Williamson, P.C.<br>1500 Candler Building<br>127 Peachtree Street, NE<br>Atlanta, GA 30303 | Darryl Laddin<br>Arnall Golden Gregory LLP<br>171 17th Street, NW<br>Suite 2100<br>Atlanta, GA 30363 | Internal Revenue Service<br>Centralized Insolvency Operation<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 |
| Thomas M. Byrne, Esq.<br>Stacey McGavin Mohr, Esq.<br>Sutherland Asbill & Brennan LLP<br>999 Peachtree Street, NE<br>Atlanta, GA 30309-3996 | Vivieon E. Kelley<br>Office of the United States Trustee<br>362 Richard Russell Building<br>75 Spring Street, SW<br>Atlanta, GA 30303 | Martha A. Miller, Esq.<br>Schulten, Ward & Turner<br>Suite 2700<br>260 Peachtree Street, NW<br>Atlanta, GA 30303-1240 |
| Donald H. Cram, III<br>Duane M. Geck<br>Severson & Werson, P.C.<br>Suite 2600<br>One Embarcadero Center<br>San Francisco, CA 94111 | E. Todd Sable<br>Chauncey C. Mayfield II<br>Honigman Miller Schwartz and Cohn LLP<br>660 Woodward Avenue<br>2290 First National Bldg.<br>Detroit, MI  48226 | |

-3-